**E-FILED**
Tuesday, 30 November, 2004  10:32:12 AM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| GREG BURRUS | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CASE NO. 03-3225 |
| | ) | |
| GREAT WESTERN PRODUCTS CO. | ) | |
| | ) | |
| Defendant. | ) | |

## GREAT WESTERN PRODUCTS COMPANY, INC.'S
## MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Local Rule 7.1 and

the Court's December 18, 2003 Scheduling Order, Defendant Great Western Products Company,

Inc. ("Great Western" or "Company") respectfully moves the Court to enter summary judgment

in its favor on all claims in this action. In support of this Motion, Great Western states as

follows:

### I.    Introduction

By his own admission, Plaintiff, Greg Burrus ("Burrus"), has had longstanding

difficulties coping with workplace stress. Burrus' stress level increased as Great Western

implemented operational and procedural changes at its Assumption plant in order to address the

location's operational deficiencies -- deficiencies Burrus admits existed. Burrus' stress level

continued to rise as Great Western management reported to him complaints that had been made

against him by his subordinate employees and about customer complaints directed to the

Assumption Shipping Department. Because of his stress, Burrus, by his own testimony, left his

job on at least two occasions -- and on both occasions Burrus admits that Great Western

management asked him to return. Nevertheless, on February 13, 2003, Burrus finally made the decision to resign his employment because he was no longer capable of managing the stress associated with the Assumption Shipping Manager position.

In this action, Burrus contends that he was retaliatorily constructively discharged by Great Western. However, it is well-settled that Illinois courts do not recognize any such cause of action. To the extent that Burrus is contending that he was constructively discharged, his deposition testimony reveals that his resignation was occasioned by his own determination that he could no longer adequately perform his job as the Assumption facility's Shipping Manager and that he could no longer manage the stress associated with that position -- facts that fall woefully short of a constructive discharge claim under Illinois law. Finally, putting aside the fact that he was not discharged, and thus his retaliation claim must fail, Burrus cannot proffer any facts to support his retaliation allegations. In fact, Burrus admits that Great Western agreed with many of his workplace concerns. Accordingly, as there is no genuine issue of material fact, Burrus' Complaint fails as a matter of law and Great Western's Motion for Summary Judgment should be granted.

## II.     Statement Of Material Facts Claimed To Be Undisputed

### A.     The Company And Its Assumption, Illinois Operations

1.     Great Western is an Alabama Corporation that manufactures snack food equipment, supplies and accessories. (Complaint/Answer ¶¶ 2-3)[1]

---

[1] References to Burrus' Complaint and Great Western's Answer will be cited as "Complaint/ Answer" followed by the paragraph number the cited reference can be found. References to Burrus' Deposition, cited portions of which are attached as Exhibit A, will be cited at "Burrus Dep." followed by the page number the cited reference can be found. References to Burrus' Deposition Exhibits, which are attached as Exhibit B, will be cited as "Dep. Ex." followed by the Exhibit number. Bob Roese's Affidavit will be cited as "Roese Aff." followed by the paragraph number the cited reference can be found.

2.    Great Western presently operates a facility in Assumption, Illinois. (Complaint/Answer ¶ 2)

3.    As early as 1985, the Assumption facility presently operated by Great Western was owned by Max Hutchins ("Hutchins"), a company that manufactured and processed popcorn. (Burrus Dep. 9, 10)

4.    In approximately 1995, Blevins Concession Supplies ("Blevins") purchased the Assumption facility.  (Burrus Dep. 10)

5.    Great Western purchased the Assumption plant from Blevins in approximately 1999. (Burrus Dep. 11, 12)

6.    Great Western warehouses and ships movie theater concessions at its Assumption location.  (Burrus Dep. 15, 16)

7.    The Assumption plant also contains Great Western's only fumigation processing apparatus for its products.  (Burrus Dep. 43, 56)

8.    The Assumption facility is organized by a management hierarchy with the Plant Manager being the ultimate authority at the site.  (Burrus Dep. 22, 23)

9.    The Shipping Manager reports to the Plant Manager.  (Burrus Dep. 22, 23)

10.    At the time Great Western purchased the Assumption plant, Reese Harris ("Harris") was Great Western's Production Manager.  (Burrus Dep. 14)

11.    Harris worked out of Great Western's Hollywood, Alabama headquarters. (Burrus Dep. 13)

12.    At the time Great Western purchased the Assumption facility, Scott Martin ("Scott Martin") was Great Western's President.  (Burrus Dep. 13)

INIMAN2 886716v1

13.    Martin worked out of the Company's Hollywood, Alabama offices.
(Burrus Dep. 13)

14.    Phil Uphoff ("Uphoff") was Great Western's first Plant Manager at the
Assumption facility and continued in that position until approximately January of 2002 at which
point he was replaced by Bob Roese.  (Burrus Dep. 14, 18, 22)

**B.    Burrus' Employment At The Assumption Facility**

15.    Burrus began working at the Assumption facility in 1985 when the facility was
operated by Hutchins.  (Burrus Dep. 9, 10)

16.    While working for Hutchins, Burrus bagged popcorn and helped to unload
delivery trucks.  (Burrus Dep. 9, 10, 11)

17.    Hutchins eventually made Burrus the facility's Shipping Manager.  (Burrus Dep.
9, 10, 11)

18.    After Blevins purchased the Assumption Plant, Burrus continued as the facility's
Shipping Manager.  (Burrus Dep. 11)

19.    When Great Western purchased the Assumption plant, Burrus commenced
employment with Great Western as Shipping Manager.  (Burrus Dep. 12)

20.    As the Assumption facility's Shipping Manager, Burrus initially reported to Harris
and Martin.  (Burrus Dep. 12)

21.    In approximately 2000, Burrus began reporting to Jerry Hulleback ("Hulleback"),
Great Western's Operations Manager.  (Burrus Dep. 13)

22.    Hulleback worked out of the Company's Hollywood, Alabama offices.  (Burrus
Dep. 13)

INIMAN2 886716v1

23.     Burrus had a good working relationship with Hulleback and Burrus had not had any workplace issues with Hulleback during the time Hulleback supervised him. (Burrus Dep. 16, 17)

24.     Burrus reported to Hulleback until approximately August or September of 2002 at which point Reg Bryant ("Bryant") became the Company's Operations Manager. (Burrus Dep. 14, 16, 23, 24)

25.     The Assumption Shipping Department was responsible for sending Assumption-based products to customers. (Burrus Dep. 32)

26.     As the Shipping Manager, Burrus was responsible for completing shipping documents, was responsible for the accuracy of the products shipped from the Assumption plant, and was responsible for handling any problems associated with the products shipped from the Assumption location. (Burrus Dep. 14, 28, 29, 39)

27.     Burrus supervised approximately four other employees in the Assumption facility's Shipping Department. (Burrus Dep. 14)

### C.     **Burrus' Difficulties With Workplace Stress**

28.     As early as September of 1998, Burrus had complained to his physician about stress. (Burrus Dep. 174, 175; Burrus Dep. Ex. 8)

29.     In order to assist Burrus with his stress, his doctor prescribed Xanax. (Burrus Dep. 174, 175)

30.     Burrus has continued taking Xanax since 1998. (Burrus Dep. 40, 175)

31.     The stress made Burrus "crazy." (Burrus Dep. 39)

32.     Burrus' stress was a result of "trying to do [his] job right and not being able to." (Burrus Dep. 27)

INIMAN2 886716v1

33.    Burrus found it stressful that he had to give the employees under his supervision "different job tactics," and that he had to make telephone calls to Great Western's purchasing and customer service departments.  (Burrus Dep. 28)

34.    Burrus also found it stressful that customers would call him complaining about orders that came from the Assumption facility.  (Burrus Dep. 28)

35.    Burrus experienced stress in being responsible for checking the lids of shipping containers to make certain that they were securely affixed.  (Burrus Dep. 74)

36.    Burrus found it stressful that Great Western management made him and his department accountable for shipping errors at the Assumption facility.  (Burrus Dep. 34)

### D.    Bryant's Supervision Of Burrus

37.    In the summer of 2002, Bryant replaced Hulleback as Great Western's Operations Manager.  (Burrus Dep. 14, 16, 23, 24)

38.    Prior to Bryant's ascension to the Operations Manager position, the Assumption facility was overstocked with products and thus it was "impossible" to rotate the products in the warehouse because of space limitations.  (Burrus Dep. 25)

39.    Upon becoming Great Western's Operations Manager, Bryant "tightened up" the operations of Great Western generally, including at the Assumption location.  (Burrus Dep. 24)

40.    Bryant wanted Burrus to "straighten up" the Assumption warehouse.  (Burrus Dep. 25, 26)

41.    Bryant required Burrus to communicate with him regarding the status of the Assumption warehouse and required Burrus to follow additional shipping procedures.  (Burrus Dep. 23, 34)

INIMAN2 886716v1

42.    Bryant implemented the procedures in an attempt to improve Great Western's shipping system. (Burrus Dep. 38)

43.    Bryant also required Burrus to have a more visible presence in the Assumption warehouse, required Burrus to have a cleaner desk, and required Burrus to complete paperwork regarding shipments in an effort to make certain that shipments were complete. (Burrus Dep. 35, 36, 37, 38)

44.    Prior to Bryant, Burrus had never followed the aforementioned procedures. (Burrus Dep. 36)

45.    Bryant also required Burrus to alert the Company's Purchase Order Department if a customer was not going to receive a complete shipment and required Burrus to respond to customer complaints about shipments sent from the Assumption plant. (Burrus Dep. 36, 37)

46.    Bryant further required the Assumption facility to rotate its products more often. (Burrus Dep. 24)

47.    Burrus found Bryant to be a more demanding supervisor than Hulleback. (Burrus Dep. 26)

48.    Burrus' stress level increased after Bryant became Great Western's Operations Manager as a result of Bryant's changes in operational procedures. (Burrus Dep. 34, 38, 39)

### E.    Burrus' July Of 2002 Job Abandonment

49.    Burrus first left his employment with Great Western in July of 2002. (Burrus Dep. 17, 41)

50.    Burrus left his employment in July of 2002 because Roese, the Assumption Plant Manager, was in the warehouse rearranging product racks. (Burrus Dep. 17, 41)

7

51.    Prior to July of 2002, Burrus had never had any workplace problems or issues with Roese. (Burrus Dep. 22)

52.    Burrus left his employment in July of 2002 because he was embarrassed that Roese was directing the employees that Burrus customarily supervised. (Burrus Dep. 18, 41)

53.    Burrus felt that Roese's actions meant that Burrus was not performing his job properly. (Burrus Dep. 18, 41)

54.    Burrus had been experiencing stress for several months prior to leaving the Assumption facility in July of 2002. (Burrus Dep. 27)

55.    Because of his embarrassment and stress, Burrus left the facility without speaking to anyone. (Burrus Dep. 18, 26, 27)

56.    After leaving the facility, Hulleback contacted Burrus and told him to take the remainder of the work week off and to return to work on Monday. (Burrus Dep. 19)

57.    Burrus did not inform Hulleback in this conversation that he had quit his employment with Great Western. (Burrus Dep. 19)

58.    Rather, Burrus informed Hulleback that he was upset and had left the Assumption facility because he was upset. (Burrus Dep. 19)

59.    Burrus told Hulleback that he would return to work on Monday. (Burrus Dep. 20)

60.    Burrus also spoke to Roese about the incident. (Burrus Dep. 20)

61.    Roese told Burrus to "just hang in there." (Burrus Dep. 21)

62.    Burrus returned to work at the Assumption plant the following Monday. (Burrus Dep. 20)

63.    Great Western disciplined Burrus because of his job abandonment. (Burrus Dep. 20)

INIMAN2 886716v1

**F.    Burrus' 2002 Performance Evaluation And Subsequent Job Performance Deficiencies**

64.    On or about December 15, 2002, Bryant faxed to Burrus his 2002 Performance Review and performance goals for 2003.  (Burrus Dep. 98, 99; Burrus Dep. Ex. 1)

65.    Among the issues identified in the Review were:

- that since August of 2002 Great Western had received many customer complaints concerning shipments from the Assumption facility;

- the poor handling of customer return paperwork by the Assumption warehouse;

- the failure of the Assumption warehouse to forward paperwork to Great Western's corporate purchasing department and that the paperwork that was sent was improperly completed;

- that Burrus failed to work through the appropriate management chain of command when he had questions about Company policy or procedures;

- that the Assumption warehouse was not well organized and clean;

- that the cycle inventory process was not monitored properly;

- that international shipments from the Assumption warehouse had been sent without proper documentation;

- that the Assumption warehouse was not properly rotating product so that code dated items or products were not being shipped expeditiously; and

- that the Assumption warehouse refused delivery of pre-ordered shipments from third party vendors.

(Burrus Dep. Ex. 1)

66.    As for Burrus' 2003 goals, the Review provided the following:

- Burrus was to submit weekly activity reports to Bryant that included associate time records, weekly orders shipped, and information related to returns and receipts;

- Great Western would conduct unannounced inspections of the Assumption warehouse;

- customer service complaints were to be faxed to Burrus' attention and Burrus would be required to submit in writing to Bryant corrective action to prevent repeat complaints;

- the Assumption warehouse was to track cycle inventories and such inventories were to be reviewed on a weekly basis and

- the Assumption warehouse was to maintain a stock rotation sheet.

(Burrus Dep. Ex. 1)

67.     Bryant discussed with Burrus everything that was stated in the written Review.

(Burrus Dep. 100)

68.     Burrus informed Bryant that he would do his best to comply with Bryant's

recommendations.  (Burrus Dep. 100)

69.     On or about December 23, 2002, Bryant advised Burrus that Great Western's

management expected cycle inventory counts to be conducted as regularly scheduled.[2]  (Burrus

Dep. Ex. 2)

70.     In the letter, Bryant informed Burrus that the failure of the Assumption warehouse

to perform cycle counts had been an ongoing problem. (Burrus Dep. Ex. 2)

71.     The letter also stated that "the cycle count process is a require [sic] activity and

failure to perform cycle counts as requested will be grounds for termination.  (Burrus Dep.

Ex. 2)

72.     Burrus understood the purpose of the correspondence was to inform him that he

was to conduct cycle counts in a timely manner.  (Burrus Dep. 111, 112)

---

[2]  A "cycle count" is an inventory procedure used by Great Western whereby the Company would manually confirm its inventory against the inventory data in its computer inventory records.  (Burrus Dep. 105, 106)

73.    As of December of 2002, Burrus understood that Bryant was not pleased with Burrus' job performance.  (Burrus Dep. 112)

### G.    Roese Becomes Burrus' Supervisor

74.    In January of 2003, Bryant ceased being Burrus' supervisor and Burrus reported directly to Roese.  (Burrus Dep. 104)

75.    Roese assumed some of Burrus' job responsibilities such as completing performance evaluations of Shipping Department employees.  (Burrus Dep. 119, 120, 121, 122)

76.     Roese assigned the scheduling of incoming product, a job formerly performed by Burrus, to the facility's secretary.  (Burrus Dep. 122)

77.    Roese also made suggestions to Burrus as to how to store products in the warehouse.  (Burrus Dep. 119, 120, 121, 122)

78.    Roese changed some of Burrus' operating procedures within the Assumption Shipping Department.  (Burrus Dep. 123, 124)

79.    Burrus found the changes in the Shipping Department's operational procedures, and the changes in his job duties, to be stressful.  (Burrus Dep. 123, 124)

80.    Burrus did not like Roese's management style.  (Burrus Dep. 125)

81.    Burrus did not take issue with Roese's implementation of the new shipping and receiving procedures.  (Burrus Dep. 137)

82.    Burrus thought that Roese's instructions to him as to how to store products in the warehouse were appropriate in light of the fact that Roese was his supervisor.  (Burrus Dep. 122)

INIMAN2 886716v1

83.     On January 2, 2003, Bryant provided Burrus with correspondence that informed him that customers had complained about the performance of the Assumption warehouse. (Burrus Dep. 115, Burrus Dep. Ex. 3)

84.     Burrus discussed the correspondence with Bryant over the telephone and Burrus informed Bryant that he would attempt to address the customer concerns raised in the letter. (Burrus Dep. 116)

### H.    **Burrus' January And February Resignations**

85.     In January of 2003, Burrus asked to take some time off from work because he was "stressed out." (Burrus Dep. 126, 127)

86.     Burrus was feeling stress at that time because he was going through a bankruptcy. (Burrus Dep. 129)

87.     Roese asked Burrus not to quit and informed him to take the remainder of the day off. (Burrus Dep. 126, 127)

88.     On February 11, 2003, Roese spoke to Burrus about the effectiveness of the Shipping Department's operations. (Burrus Dep. 138)

89.     Roese expressed concern that Burrus had missed three days of work during a ten day period. (Burrus Dep. 138)

90.     Roese informed Burrus that his attendance difficulties were resulting in a lack of leadership in the Shipping Department. (Burrus Dep. 139)

91.     Roese also informed Burrus that the employees in his department viewed Burrus as having a poor attitude and that Burrus' subordinate employees had lodged complaints against him. (Burrus Dep. 140, 142)

12

92.    Roese further commented upon Burrus' lack of ideas for storage and product rotation in the Shipping Department.  (Burrus Dep. 140, 141)

93.    Roese asked Burrus what ideas he had to improve the Assumption Shipping Department's performance.  (Burrus Dep. 141)

94.    Roese instructed Burrus to think of ways to improve employee morale in the Shipping Department.  (Burrus Dep. 144)

95.    Burrus was incapable of improving employees' morale.  (Burrus Dep. 144)

96.    On February 12, 2003, Burrus contacted Great Western and informed the Company that he was "stressed out" and "wouldn't be coming to work."  (Burrus Dep. 145)

97.    Burrus informed the Company that he was  resigning because he was "stressed out."  (Burrus Dep. 146, 148, 149)

98.    The next day, February 13, 2003, Burrus went to the Assumption facility and signed resignation paperwork.  (Burrus Dep. 146, 150, 151; Burrus Dep. Ex. 7)

99.    On the resignation document Burrus noted that he resigned for personal reasons.  (Burrus Dep. 151; Burrus Dep. Ex. 7)

100.    Burrus resigned because his subordinate employees had lost their respect for him and because employee morale at the Assumption facility was poor.  (Burrus Dep. 152, 153, 154)

101.    Burrus resigned from Great Western in February of 2003 because he was going "nuts."  (Burrus Dep. 125)

102.    Burrus also believed that he was eventually going to be discharged if he didn't resign.  (Burrus Dep. 152, 153)

103.    On February 14, 2003, Burrus contacted the facility and informed Roese that he (Burrus) had "screwed up" and that he would like to resume working for the Company. (Burrus Dep. 130, 146, 147, 161)

104.    Burrus asked if there was a less stressful position that he could perform. (Burrus Dep. 161)

105.    Roese informed Burrus that in light of the fact that he had quit on three prior occasions, he would not be rehired by Great Western. (Burrus Dep. 130, 161, 162)

106.    Burrus believes that Roese "retaliated" against him because he did not like the way Burrus managed the warehouse and because Burrus was providing customers with incorrect orders. (Burrus Dep. 164, 165)

107.    Burrus believes that Roese would not let Burrus return to work at Great Western because he believes that Roese wanted to find someone who could do a better job at the Assumption warehouse. (Burrus Dep. 214)

108.    Burrus does not have any information as to what Roese's motives would be to have him separated from the Company. (Burrus Dep. 167, 168, 169, 213)

109.    Great Western accepted Burrus' February of 2003, because, in light of his two previous resignation attempts, it was apparent that Burrus was struggling with his job and did not desire to remain with the Company. (Roese Aff., ¶ 4)

110.    Great Western's acceptance of Burrus' February of 2003 resignation had absolutely nothing to do with (a) any workplace concerns that Burrus may have raised during his employment, including any issues about fumigated popcorn, loose product container lids, or mis-marked cheese, or (b) the Assumption facility's July 2002 OSHA investigation. (Roese Aff., ¶ 5)

INIMAN2 886716v1

I.      **Facts Related To Burrus' Retaliation Allegations**

1.      **Great Western's Fumigation Of A Popcorn Shipments**

111.    In 2001, a Great Western quality inspector arrived at the Assumption facility to inspect the facility's product.  (Burrus Dep. 64, 65)

112.    The quality inspector detected some popcorn that was "infested" and asked Burrus to fumigate and reprocess the popcorn.  (Burrus Dep. 65)

113.    Burrus took the infested popcorn to the reprocessing area of the facility.  (Burrus Dep. 65)

114.    Burrus did not ship the "infested" popcorn to customers.  (Burrus Dep. 65)

115.    In September of 2002, Burrus received a report from the Shipping Manager at Great Western's Hollywood, Alabama facility that a pallet of 35 pound popcorn bags that was originally shipped from Assumption to Hollywood was being returned to the Assumption plant to be fumigated.  (Burrus Dep. 42, 43, 46)

116.    When the shipment arrived, there were small worms on the outside of the popcorn's plastic shrink wrap cover.  (Burrus Dep. 44, 45)

117.    After being informed of the shipment, Uphoff, who was then the Assumption facility's Corn Manager, informed Burrus to remove the old plastic shrink wrap, re-wrap it with new shrink wrap, and ship it back to Great Western's Hollywood, Alabama facility.  (Burrus Dep. 45)

118.    Eventually, Great Western's Hollywood, Alabama facility sent the re-wrapped popcorn back to the Assumption facility a second time at which point Burrus put it in the production room to be fumigated.  (Burrus Dep. 45, 47)

119.    Once in the production room, the popcorn was to be treated, fumigated, and re-bagged. (Burrus Dep. 49)

120.    Burrus does not know what happened to the popcorn after he put it in the production room. (Burrus Dep. 47, 49, 50)

121.    After putting the popcorn in the production room, Burrus spoke with Bryant about the incident. (Burrus Dep. 48)

122.    Bryant agreed with Burrus that the popcorn should be fumigated. (Burrus Dep. 49, 61, 63, 64, 204)

123.    This conversation was the only conversation between Burrus and Bryant about the popcorn. (Burrus Dep. 61)

124.    Burrus also spoke with Roese about the incident. (Burrus Dep. 70, 71, 72, 204, 212)

125.    Roese also agreed that the popcorn needed to be fumigated. (Burrus Dep. 70, 71, 72, 204, 212)

126.    The popcorn was not sent to customers. (Burrus Dep. 46, 49, 52)

127.    On another occasion, a dispatcher from Great Western's Hollywood, Alabama facility contacted Burrus with regard to a shipment of popcorn that was infested with worms. (Burrus Dep. 51, 53)

128.    The dispatcher informed Burrus to segregate the infested popcorn from the facility's other products, to treat the infested shipment with fox toxin, to put the popcorn in a tank and to expose the popcorn to bromine. (Burrus Dep. 53)

129.    These procedures were to cleanse the popcorn. (Burrus Dep. 53, 54)

INIMAN2 886716v1

130.    No one at Great Western instructed Burrus to send this shipment of popcorn to customers and Burrus did not ship this popcorn to customers. (Burrus Dep. 60)

131.    Great Western does not ship to customers "infested" popcorn. (Burrus Dep. 68)

132.    Burrus does not have any information that Roese wanted to retaliate against Burrus because of his reaction to the infested popcorn. (Burrus Dep. 211)

133.    During his employment, to his knowledge, Burrus never sent "infested" popcorn to customers and is unaware of any instance where Great Western sent "infested" popcorn to customers. (Burrus Dep. 52, 55)

2.    **Great Western's Remediation Of Loose Product Container Lids Shipped To It From Third Party Vendors**

134.    As a part of its operations, Great Western purchased jalapeño peppers from a third party vendor called Louisiana Foods. (Burrus Dep. 71)

135.    After receiving the peppers from Louisiana Foods, Great Western would store them at the Assumption facility. (Burrus Dep. 72)

136.    As a result of Louisiana Foods' inadequately affixing the container lids, if it became hot in the storage facility, the lids of some of the containers that held the peppers would come off. (Burrus Dep. 72)

137.    Burrus was concerned about the improperly affixed lids because he was afraid that the peppers inside the containers would fall on someone. (Burrus Dep. 72)

138.    Others at Great Western shared Burrus' concern about the potential for falling peppers. (Burrus Dep. 73)

INIMAN2 886716v1

139.    Burrus was unhappy that the shipments of peppers from Louisiana Foods continued to arrive with loose lids because it made more work for him and his staff. (Burrus Dep. 75, 76, 204)

140.    Burrus spoke with Great Western's Purchasing Officer about the issue and the Purchasing Officer informed Burrus that he would speak with Louisiana Foods to correct the problem. (Burrus Dep. 73)

141.    It would not be good for Great Western's business if its customers received pepper containers with loose lids. (Burrus Dep. 205)

142.    Great Western management informed Burrus that if he observed a bad shipment of peppers, such a shipment was not to be forwarded to customers. (Burrus Dep. 74)

143.    Great Western management, including Roese, instructed Burrus and the shipping staff to check the pepper container lids to make sure they were securely fastened. (Burrus Dep. 74, 75, 77)

144.    Roese instructed Burrus that he was to re-tape the lids of containers whose lids were loose. (Burrus Dep. 77)

145.    Burrus has no information that Roese wanted to discharge Burrus because of his reaction to the loose pepper container lids. (Burrus Dep. 213)

146.    Burrus did not have any conversations with Bryant about the issues related to the loose pepper container lids. (Burrus Dep. 78)

### 3.    Great Western's Refusal To Re-label The Expiration Dates Of Mis-marked Cheese

147.    During Burrus' employment with Great Western, a Great Western Purchasing Officer informed him that he was going to provide Burrus with new cheese expiration labels because a shipment of cheese at the Assumption facility had been mislabeled. (Burrus Dep. 81)

18

148.    The purchasing Officer was not Burrus' supervisor.  (Burrus Dep. 87, 88)

149.    Specifically, the third party distributor of the cheese had contacted Great Western and informed the Company that it had put the wrong expiration date on the shipping box of the cheese in question but that the cheese had not expired.  (Burrus Dep. 81)

150.    Burrus never discussed the cheese re-labeling issue with Bryant.  (Burrus Dep. 84, 85)

151.    When Burrus spoke to Roese about the cheese re-labeling issue, Roese directed Burrus to speak with Great Western's Purchasing Officer.  (Burrus Dep. 86)

152.    Burrus has no information that Roese wanted to discharge Burrus because of his reaction to the mis-marked cheese.  (Burrus Dep. 213)

153.    Burrus also spoke to two Great Western Customer Service Representatives about the re-labeling of the cheese but neither had any knowledge about the issue.  (Burrus Dep. 86, 87)

154.    Burrus has no knowledge whether it would be inappropriate to re-label cheese if its expiration date had been mis-marked.  (Burrus Dep. 202, 203)

155.    Great Western refused to re-label the cheese shipment.  (Burrus Dep. 81)

156.    No one at Great Western provided Burrus with replacement labels for the cheese and Burrus never relabeled the cheese.  (Burrus Dep. 81, 82, 83, 84)

### 4.    The Assumption Facility's July Of 2002 OSHA Inspection

157.    In July of 2002, the Occupational Safety and Health Administration ("OSHA") conducted an inspection at the Assumption facility.  (Burrus Dep. 88, 89)

158.    Burrus did not file a complaint with the OSHA against Great Western.  (Burrus Dep. 88)

19

159.    No one from Great Western ever accused Burrus of filing the OSHA complaint. (Burrus Dep. 97, 98)

160.    As a result of the inspection, Great Western posted an OSHA notice at the Assumption plant.  (Burrus Dep. 89)

161.    After the inspection, Bryant informed Burrus what actions were needed so as to address OSHA's concerns.  (Burrus Dep. 90, 91)

162.    For example, Bryant informed Burrus to have someone weld the product racks in the warehouse.  (Burrus Dep. 92)

163.    Roese assisted Burrus in hiring an individual to fix the welds.  (Burrus Dep. 92)

164.    Burrus also informed Great Western's Purchasing Officer that less product should be forwarded to the Assumption facility in order to correct product overcrowding at that location.  (Burrus Dep. 92, 93)

165.    Great Western's Purchasing Officer agreed to this request.  (Burrus Dep. 92)

166.    Burrus and Great Western corrected the issues identified by OSHA.  (Burrus Dep. 93, 94)

## III.    Applicable Law

1.    The "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).

2.    "[S]ummary judgment is appropriate -- in fact, is mandated-- where there are no disputed issues of material fact and the movant must prevail as a matter of law." Dempsey v.

Atchison, Topeka and Santa Fe Ry. Co., 16 F.3d 832, 836 (7th Cir. 1994), *cert. denied*, 513 U.S.

821 (1994); Powers v. Runyon, 974 F. Supp. 693, 696 (S.D. Ind. 1997).

3.    A primary purpose of the summary judgment rule is to isolate and dispose of

unsupportable claims, and the rule is to be interpreted in a way that allows it to accomplish that

purpose. Celotex, 477 U.S. at 323-24; Beard v. Whitley Co. REMC, 840 F.2d 405, 411

(7th Cir. 1988).

4.    When determining whether an issue of material fact is present, the court considers

the governing substantive law and the applicable burdens of proof. Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 248 (1986).

5.    If the non-moving party does not establish the existence of an element essential to

his case, then summary judgment must be granted to the moving party. Oritz v. John O. Butler

Co., 94 F.3d 1121, 1124 (7th Cir. 1996), *cert. denied*, 519 U.S. 1115 (1997).

6.    "Conclusory allegations by the nonmoving party cannot defeat the motion -- the

nonmoving party must provide evidence of a dispute of material fact." Hedberg v. Indiana Bell

Telephone Co., Inc., 47 F.3d 928, 931 (7th Cir. 1995).

7.    Illinois does not recognize constructive discharge as the basis for retaliatory

discharge claims. Propst v. Bitzer, 39 F.3d 148, (7th Cir. 1994).

8.    There is no cause of action in Illinois for retaliatory constructive discharge.

Colgren v. County Line Cartage, Inc., 2000 WL 1154072, *5 (N.D. Ill. 2000); Taylor v. Gilbert

& Bennett, 1996 WL 501576, *6 (N.D. Ill. 1996); Hartlein v. Illinois Power Co., 601 N.E.2d

720, 730 (Ill. 1992); Welsh v. Commonwealth Edison Co., 713 N.E.2d 679, 682, 683 (Ill. App.

Ct. 1999); Grey v. First National Bank of Chicago, 523 N.E.2d 1138, 1443 (Ill. App. Ct. 1988).

9.    To establish a constructive discharge under Illinois law, a plaintiff must show that "the employer deliberately or intentionally made the employee's working conditions so intolerable that a reasonable person would have felt compelled to resign to escape the intolerable conditions." Propst v. Bitzer, 39 F.3d 148, 154 n. 5 (7th Cir. 1994); Dudycz v. City of Chicago, 563 N.E.2d 1122, 1126 (Ill. App. Ct. 1990).

10.    Retaliatory discharge "is a limited exception to the general rule that an at-will employee is terminable at any time for any reasons." Chicago Commons Ass'n v. Hancock, 804 N.E.2d 703, 705 (Ill. Ct. App. 2004).

11.    "To establish a cause of action for retaliatory discharge, a claimant must show: (1) he was discharged in retaliation for his activities; and (2) the discharge violated a clearly mandated public policy." Chicago Commons Ass'n v. Hancock, 804 N.E.2d 703, 705 (Ill. Ct. App. 2004).

12.    "In order to constitute a clearly mandated public policy excepting justifying application of the tort of retaliatory discharge, the matter 'must strike at the heart of a citizen's social rights, duties, and responsibilities." Geary v. Telular Corp., 793 N.E.2d 128, 134 (Ill. Ct. App. 2003).

## IV.    Argument

### A.    Burrus Fails To State A Claim Upon Which Relief Can Be Granted For Retaliatory Constructive Discharge

The sole cause of action asserted in Burrus' Complaint is for retaliatory constructive discharge. (Complaint, ¶¶ 27, 28, 29). However, Illinois courts (including the Illinois Supreme Court), and federal courts applying Illinois law, have long held that no such cause of action exists under Illinois law. "Illinois courts have repeatedly expressed their reluctance to expand the tort [of retaliatory discharge] beyond its original confines, particularly

with respect to the first element of discharge." Propst v. Bitzer, 39 F.3d 148, 154 (7th Cir. 1994). As noted by the Seventh Circuit, "Illinois courts have therefore consistently refused to recognize constructive discharge as the basis for retaliatory discharge claims." Id. Thus, under Illinois law, "'constructive discharge is not an actionable concept' in regard to retaliatory discharge." Grey v. First National Bank of Chicago, 523 N.E.2d 1138, 1443 (Ill. App. Ct. 1988).[3]

Here, it is undisputed that on February 12, 2003, Burrus contacted Great Western and informed the Company that he was resigning because he was "stressed out." (Burrus Dep. 145, 146, 148, 149)  The next day, February 13, 2003, Burrus went to the Assumption facility and signed resignation paperwork. (Burrus Dep. 146, 150, 151; Burrus Dep. Ex. 7)  On the resignation document, Burrus noted that he resigned for personal reasons; specifically because his subordinate employees had lost their respect for him and because employee morale at the Assumption facility was poor. (Burrus Dep. 151, 152, 153, 154; Burrus Dep. Ex. 7)  At no point prior to Burrus' February 13, 2003 resignation did Roese, Burrus' supervisor, threaten to discharge Burrus. (Burrus Dep. 162)

Accordingly, there is no dispute that Burrus was not discharged -- he resigned. As a result, under long settled Illinois law, Burrus cannot maintain a claim for retaliatory constructive discharge.  As there is no genuine issue of material fact, and Burrus' cause of action

---

[3]  See also  Colgren v. County Line Cartage, Inc., (N.D. Ill. 2000) (dismissing plaintiffs' retaliation allegations premised upon alleged violations of the Illinois Wage Payment and Collection Act where plaintiffs were not discharged -- "[t]he Illinois Supreme Court 'has thus far declined to recognize a cause of action for retaliatory constructive discharge. . . ."); Taylor v. Gilbert & Bennett, 1996 WL 501576, *6 (N.D. Ill. 1996) (granting employer's motion for summary judgment on plaintiff's retaliatory discharge claim where employee was permanently laid off -- Illinois does not recognize a cause of action for retaliatory constructive discharge); Hartlein v. Illinois Power Co., 601 N.E.2d 720, 730 (Ill. 1992) ("We further decline to expand the tort of retaliatory discharge, on these facts, to encompass the concept of 'constructive discharge.'"); Grey v. First National Bank of Chicago, 523 N.E.2d 1138, (Ill. App. Ct. 1988) (Dismissing plaintiff's claim for retaliatory constructive discharge where employee resigned).

INIMAN2 886716v1

for retaliatory constructive discharge fails as a matter of law, Great Western's Motion for

Summary Judgment should be granted.

**B.      Even If Illinois Recognized A Claim For Retaliatory Constructive Discharge
(Which It Does Not), Burrus' Claim Would Nonetheless Fail Because He Was
Not Constructively Discharged As A Matter Of Law**

**1.      General Legal Principles**

Even if Burrus could state a retaliatory discharge claim by using a constructive

discharge theory, his claim would still fail as a matter of law because he cannot state a

cognizable claim for constructive discharge.[4]  In order to establish constructive discharge, a

plaintiff must show that "the employer deliberately or intentionally made the employee's working

conditions so intolerable that a reasonable person would have felt compelled to resign to escape

the intolerable conditions." Propst v. Bitzer, 39 F.3d 148, 154 n. 5 (7th Cir. 1994); Dudycz v.

City of Chicago, 563 N.E.2d 1122, 1126 (Ill. App. Ct. 1990).  However, "[i]n the course of most,

if not all, people's employment, a wide variety of disappointments, and possible some injustices,

occur.  Most of these are normal incidents of employment that would not lead a reasonable

person to quit." Motley v. Illinois Human Rights Commission, 636 N.E.2d 100, 104 (Ill. App.

Ct. 1994).  As discussed by the court in Motley:

> reasonable people endure disappointments such as stares, criticism
> of performance, and now and then an unfortunate statement . . ..
> None of these disappointments, either separately or combined,
> create working conditions so intolerable as to force a reasonable

---

[4]   As an initial matter, it is not clear that Illinois law even recognizes a constructive discharge
theory in the non-employment discrimination context. See Zimmerman v. Bucheit of Sparta,
Inc., 645 N.E.2d 877, 882 (Ill. 1995) ("Illinois courts have refused to accept a 'constructive
discharge' concept"); Scheller v. Health Serv. Corp., 485 N.E.2d 26, 39 (Ill. App. Ct. 1985)
("Constructive discharge is not an actionable concept."); Welsh v. Commonwealth Edison
Co., 713 N.E.2d 679, 683 (Ill. App. Ct. 1999) (indicating that constructive discharge is not a
cognizable cause of action under Illinois law).  In any event, even if Illinois does recognize
such a claim, Burrus cannot demonstrate that his working conditions were so intolerable that a
reasonable person would have felt compelled to resign.

24

> person to quit . . .. [E]ven if a supervisor were considered a heavy-
> handed manager who dealt poorly with subordinates, that kind of
> manager is, unfortunately, not a rare breed, and simple
> mismanagement does not constitute constructive discharge.

Id. (*discussing* Phaup v. Pepsi Cola Gen. Bottlers, Inc., 761 F.Supp. 555 (N.D. Ill. 1991)).

Consequently, "[a]n employee may not be unreasonably sensitive to his or her working

environment." Id. Thus, "[c]onditions that are merely unpleasant will not allow an employee to

quit and then claim that, in essence, the employer forced that action." Shelvy v. Potter, 2002 WL

1888442, * 2 (N.D. Ill. 2002).

The requisite amount of severity necessary to establish a cognizable constructive

discharge claim has been found in such circumstances as:

- when an employee was subjected to escalating sexual remarks culminating in a physical assault and a death threat. Brooms v. Regal Tube Co., 881 F.2d 412, 423024 (7th Cir. 1989);

- where a manager held a gun to the employee's temple, took a picture and then circulated the picture at a company meeting, stating that "this is what a nigger looks like with a gun to his head;" Taylor v. Western & Southern Life Ins. Co., 966 F.2d 1188, 1191, 1199 (7th Cir. 1992) and

- where an employee's disputed sexual relationship with her supervisor resulted in a suicide attempt, Snider v. Consolidated Coal Co., 973 F.2d 555, 557, 561 (7th Cir. 1992).

By contrast, courts have refused to find an actionable constructive discharge claim where:

- the plaintiff made a "reasoned decision" to relinquish his position after "weighing all options." Dudycz v. City of Chicago, 563 N.E.2d 1122, 1127 (Ill. App. Ct. 1990);

- a supervisor made an inappropriate comment to the plaintiff and gave the plaintiff an unfavorable evaluation. Motley v. Illinois Human Rights Commission, 636 N.E.2d 100, 105 (Ill. App. Ct. 1994);

25

- the plaintiff was unhappy with her job duties. <u>Shelvy v. Potter</u>, 2002 WL 1888442, *1-2 (N.D. Ill. 2002);

- the plaintiff was excluded from office activities, was reprimanded for no reason, was given undesirable sales territories, and did not receive adequate workplace support. <u>Harriston v. Chicago Tribune Co.</u>, 992 F.2d 697, 705 (7th Cir. 1993);

- the plaintiff was suspended for violating company policies and received an unsatisfactory performance review. <u>Collins v. Argonne Nat'l Lab.</u>, 757 F.Supp. 934, 937-38 (N.D. Ill. 1991) and

- the plaintiff's workplace concerns were ignored, his breakfast shifts were reduced, and his supervisor was "hard on him." <u>Cuevas v. Monroe Street City Club, Inc.</u>, 752 F.Supp. 1405, 1413 (N.D. Ill. 1990).

**2.**     <u>**Burrus' Difficulty In Handling His Workplace Stress Does Not Create A Claim For Constructive Discharge**</u>

Here, Burrus falls woefully short of offering any evidence sufficient to create an actionable constructive discharge claim. Rather, Burrus' deposition testimony reveals that his resignation was voluntary and occasioned by his longstanding difficulties with workplace stress.

Specifically, in the summer of 2002, Bryant replaced Hulleback as Great Western's Operations Manager. (Burrus Dep. 14, 16, 23, 24) Burrus testified that prior to Bryant's ascension to the Operations Manager position, the Assumption facility was overstocked with products and thus it was "impossible" to rotate the products in the warehouse because of space limitations. (Burrus Dep. 25) However, upon becoming Great Western's Operations Manager, Bryant "tightened up" the operations of Great Western generally, including at the Assumption location. (Burrus Dep. 24, 25, 26)

Specifically, Burrus testified that Bryant:

- required Burrus to communicate with him regarding the status of the Assumption warehouse and required Burrus to

INIMAN2 886716v1

follow additional shipping procedures;  (Burrus Dep. 23,
34)

- required Burrus to have a more visible presence in the
Assumption warehouse, required Burrus to have a cleaner
desk, and required Burrus to complete paperwork regarding
shipments in an effort to make certain that shipments were
complete;  (Burrus Dep. 35, 36, 37, 38)

- required Burrus to alert the Company's Purchase Order
Department if a customer was not going to receive a
complete shipment and required Burrus to respond to
customer complaints about shipments sent from the
Assumption plant  (Burrus Dep. 36, 37) and

- required the Assumption facility to rotate its products more
often.  (Burrus Dep. 24)

Prior to Bryant, Burrus had never followed the aforementioned procedures.  (Burrus Dep. 36)

Based upon Bryant's operational changes, Burrus found Bryant to be a more demanding

supervisor than Hulleback.  (Burrus Dep. 26)

Burrus' stress level increased after Bryant became Great Western's Operations

Manager as a result of Bryant's changes in operational procedures.  (Burrus Dep. 34, 38, 39)

Burrus' stress was a result of:

- "trying to do [his] job right and not being able to;"  (Burrus
Dep. 27)

- having to give the employees under his supervision
"different job tactics;"  (Burrus Dep. 28)

- having to make telephone calls to Great Western's
purchasing and customer service departments;  (Burrus
Dep. 28)

- customers would calling him complaining about orders that
came from the Assumption facility;  (Burrus Dep. 28)

- being responsible for checking the lids of shipping
containers to make certain that they were securely affixed
and  (Burrus Dep. 74)

INIMAN2 886716v1

- being accountable for shipping errors at the Assumption facility. (Burrus Dep. 34)

Burrus' inability to deal with workplace stress resulted in him leaving his employment with Great Western in July of 2002. (Burrus Dep. 17, 18, 41)  In an effort to assist Burrus, Great Western management contacted him and told him to take the remainder of the work week off and to return to work on Monday. (Burrus Dep. 19, 20, 21)

In January of 2003, Burrus began reporting directly to Roese. (Burrus Dep. 104) Roese assumed some of Burrus' job responsibilities and made recommendations to Burrus as to how to operate the Assumption warehouse. (Burrus Dep. 119, 120, 121, 122) Roese also changed some of Burrus' operating procedures within the Assumption Shipping Department. (Burrus Dep. 123, 124) Burrus found the changes in the Shipping Department's operational procedures, and the changes in his job duties, to be stressful. (Burrus Dep. 123, 124) However, Burrus admits that he did not take issue with Roese's implementation of the new shipping and receiving procedures. (Burrus Dep. 137) Moreover, Burrus testified that he believes that Roese's instructions to him as to how to store products in the warehouse were appropriate in light of the fact that Roese was his supervisor. (Burrus Dep. 122)

On January 2, 2003, Bryant provided Burrus with correspondence that informed him that customers had complained about the performance of the Assumption warehouse. (Burrus Dep. 115, Burrus Dep. Ex. 3) Burrus informed Bryant that he would attempt to address the customer concerns raised in the letter. (Burrus Dep. 116) Shortly thereafter, in January of 2003, Burrus asked to take some time off from work because he was "stressed out." (Burrus Dep. 126, 127)  Roese asked Burrus not to quit and informed him to take the remainder of the day off. (Burrus Dep. 126, 127)

28

However, Burrus' workplace difficulties continued. Specifically, on February 11, 2003, Roese spoke to Burrus about the effectiveness of the Shipping Department's operations. (Burrus Dep. 138) Roese expressed concern that Burrus had missed three days of work during a ten day period. (Burrus Dep. 138) Roese informed Burrus that his attendance difficulties were resulting in a lack of leadership in the Shipping Department and that the employees under Burrus' direction viewed him as having a poor attitude. (Burrus Dep. 139) Furthermore, Roese informed Burrus that the employees in his department had lodged complaints against him. (Burrus Dep. 140, 142) Finally, Roese commented upon Burrus' lack of ideas for storage and product rotation in the Shipping Department, asked Burrus what ideas he had to improve the Assumption Shipping Department's performance, and asked Burrus to think about strategies to improve employee morale in the Shipping Department. (Burrus Dep. 140, 141)

The next day, on February 12, 2003, Burrus contacted Great Western and informed the Company that he was resigning because he was "stressed out." (Burrus Dep. 145, 146, 148, 149) On February 13, 2003, Burrus went to the Assumption facility and signed resignation paperwork on which he noted that he resigned for personal reasons. (Burrus Dep. 146, 150, 151; Burrus Dep. Ex. 7) Burrus explained in his deposition that he resigned because his subordinate employees had lost their respect for him, because employee morale at the Assumption facility was poor, and because Great Western was not satisfied with his job performance. (Burrus Dep. 125, 152, 153, 154, 156, 164, 165) Significantly, Burrus admits that at no point prior to Burrus' February 13, 2003 resignation did Roese, Burrus' supervisor, threaten to discharge him. (Burrus Dep. 162)

As a result, the facts demonstrate that rather than being constructively discharged, Burrus had longstanding difficulties coping with the stresses associated with his position as the

29

Shipping Manager for Great Western's Assumption facility. In fact, Burrus' deposition testimony reveals that Great Western, on no less than two occasions, accommodated Burrus' decision to leave work because of "stress" and that on each of these occasions Great Western encouraged Burrus not to quit. Accordingly, based on Burrus' own deposition testimony, it was only when Burrus' subordinate employees lost their respect for him, and Burrus believed that Great Western was dissatisfied with his job performance, did he decide to resign.

As discussed in Part IV(B)(1), Burrus has not alleged conduct that comes close to meeting the threshold for a constructive discharge claim. In fact, Burrus has not even alleged any conduct from Great Western that adversely affected his work environment other than Great Western's increased operational procedures and its expectation that he perform his job diligently and successfully. As stated by the court in <u>Cuevas</u>:

> [a]n employer's communication of the risks of the job does not spoil the employee's decision to avoid those risks by quitting. Were it otherwise, an employee about whom there was dissatisfaction would have a jury case . . . even if the dissatisfaction were supported by objective indicators.

<u>Cuevas</u>, 752 F.Supp. at 1414-1415 (*quoting* <u>Henn v. National Geographic Society</u>, 819 F.2d 824 (7th Cir. 1987)). Consequently, to the extent Burrus is maintaining a claim for constructive discharge, there is no genuine issue of material fact and Great Western's Motion for Summary Judgment should be granted in its entirety.

### C.   Even If Burrus' Alleged Constructive Discharge Could Satisfy The Discharge Element Of The *Prima Facie* Case For A Retaliatory Discharge Cause Of Action, Burrus Cannot Point To Any Facts That He Was Retaliated Against

Finally, as a fundamental matter, Burrus does not state a legally cognizable cause of action for retaliation because he does not offer any facts that he was retaliated against. Burrus' retaliation claims are based upon four incidents related to:

(1)    Great Western's fumigation of popcorn shipments;

30

(2)    Great Western's remediation of loose product container lids;

(3)    Great Western's refusal to re-label mis-marked cheese and;

(4)    the Assumption facility's July of 2002 OSHA inspection.

However, as will be discussed below, and notwithstanding the fact that Burrus' retaliatory discharge claim fails because he was not discharged, Burrus cannot show that he was retaliated against.

Retaliatory discharge "is a limited exception to the general rule that an at-will employee is terminable at any time for any reasons." Chicago Commons Ass'n v. Hancock, 804 N.E.2d 703, 705 (Ill. Ct. App. 2004). "To establish a cause of action for retaliatory discharge, a claimant must show: (1) he was discharged in retaliation for his activities; and (2) the discharge violated a clearly mandated public policy." Id.

Putting aside the fact that Burrus' retaliatory discharge claim fails because he was not discharged, Burrus has not alleged any facts to show that he was retaliated against. Rather, Burrus admits that: (1) Great Western management agreed that the popcorn shipments should be fumigated (Burrus Dep. 49, 61, 63, 64, 70, 71, 72, 204); (2) he does not have any information that Great Western wanted to retaliate against him because of his reaction to the infested corn; (3) Great Western agreed that he should check the pepper container lids to make certain that they were affixed properly (Burrus Dep. 74, 75, 76); (4) he does not have any information that Great Western wanted to retaliate against him because of his reaction to the loose pepper container lids; (5) he does not have any information that Great Western wanted to discharge him because of his reaction to the mis-marked cheese (Burrus Dep. 213); and (6) Great Western management asked him to take steps to address OSHA's concerns after OSHA's July of 2002 inspection (Burrus Dep. 90, 91). Burrus simply believes that Roese "retaliated" against him

31

because Roese did not like the way Burrus managed the warehouse and because Burrus was providing customers with incorrect orders. (Burrus Dep. 164, 165).

Accordingly, Burrus admits that he was not "retaliated against" because of his concerns about mis-labeled cheese, the fumigation of popcorn, loose pepper lids, or the Assumption facility's July of 2002 OSHA inspection. In fact, Burrus testimony demonstrates that Great Western agreed that many of his concerns should be addressed. Moreover, Burrus admits that Roese, his supervisor, was unhappy with Burrus' because of his acknowledged performance inadequacies -- not because of Burrus' workplace concerns.

The record evidence shows that Great Western accepted Burrus' resignation in February, 2003, because, in light of his two previous resignation attempts, it was apparent that Burrus was struggling with his job and did not desire to remain with the Company. (Roese Aff., ¶ 4) Great Western's acceptance of Burrus' resignation in February, 2003, had absolutely nothing to do with Burrus' workplace concerns about fumigated popcorn, loose product container lids, mis-marked cheese, or the Assumption facility's July of 2002 OSHA investigation. (Roese Aff., ¶ 5) Notwithstanding the fact that Burrus was not discharged, Burrus' retaliation claim fails because he cannot provide any facts that show that Great Western "retaliated" against him. Summary judgment should be granted in Great Western's favor.[5]

---

[5] Moreover, Burrus cannot show that any of his workplace concerns impacted a clearly mandated public policy. "In order to constitute a clearly mandated public policy excepting justifying application of the tort of retaliatory discharge, the matter 'must strike at the heart of a citizen's social rights, duties, and responsibilities." Geary v. Telular Corp., 793 N.E.2d 128, 134 (Ill. Ct. App. 2003). Burrus' own deposition testimony demonstrates that his workplace issues were purely private work-related grievances and thus fail to implicate any recognizable Illinois public policy. See Shearson Lehman Bros., Inc. v. Hedrich, 639 N.E.2d 228, 233 (Ill. Ct. App. 1994) (Holding that "[p]urely private matters" do not support a wrongful discharge action and thus employees did not state a claim for wrongful discharge based upon their allegations that they were terminated for seeking to arbitrate their compensation disputes); Willcutts v. Galesburg Clinic Ass'n, 560 N.E.2d 1, 4-5 (Ill. Ct. App. 1990) (Private disputes

## V.    Conclusion

According to Burrus' deposition testimony, being the Shipping Manager at Great Western's Assumption facility was a difficult job -- a job filled with operational procedures and processes and customer complaints. As a result, for at least five years before his ultimate resignation, Burrus had experienced stress to such a degree that he took prescription medication in an effort to manage his anxiety. In 2002, the pressure was such that Burrus twice left his job. In February, 2003, Burrus voluntarily resigned for personal reasons because he felt that his subordinate employees had lost their respect for him, he realized that employee morale at the Assumption facility was poor, and he became concerned that Great Western was not satisfied with his job performance.

However, just because Burrus found his working environment to be stressful does not mean that he has an actionable retaliatory constructive discharge claim. In fact, Illinois law does not recognize such a cause of action. Moreover, Burrus' workplace experiences do not provide him with a legally actionable constructive discharge claim -- not surprising because at one time or another most Americans find their jobs, and their jobs' corresponding demands, to be stressful. Finally, putting aside the fact that he was not discharged, and thus his retaliation claim must fail, Burrus cannot proffer any facts to support his retaliation allegations. In fact, Burrus admits that Great Western agreed with many of his workplace concerns. As there are no genuine issue of material fact, Burrus' Complaint fails as a matter of law and Great Western's Motion for Summary Judgment should be granted.

among co-workers failed to implicate a clearly mandated public policy).

INIMAN2 886716v1

Respectfully submitted,

GREAT WESTERN PRODUCTS COMPANY,
INC.

By:_____s/ Stuart R. Buttrick_____
        David A. Given
        Stuart R. Buttrick

BAKER & DANIELS
300 N. Meridian Street, Suite 2700
Indianapolis, IN  46204
Telephone No.:  317-237-0300
Facsimile:  317-237-1000

Thomas H. Wilson
SORLING, NORTHRUP, HANNA
CULLEN & COCHRAN, LTD.
Suite 800
Illinois Building
607 East Adams Street
P.O. Box 5131
Springfield, IL 62705
Telephone: 217-544-1144
Facsimile: 217-522-3173

Attorneys for Defendant
Great Western Products Company, Inc.

## CERTIFICATE OF COMPLIANCE WITH
## LOCAL RULE 7.1(B)(2) LOCAL RULE 7.1(D)(4)

The aforementioned Motion for Summary Judgment complies with the type

volume limitations described in Local Rule 7.1(B)(2) and Local Rule 7.1(D)(4).  Specifically,

this Motion for Summary Judgment contains 4,520 words, exclusive of the Statement of Facts, as

calculated by Microsoft Word.

s/ Stuart R. Buttrick_____
Stuart R. Buttrick
Attorney for Great Western Products Company, Inc.

34

## CERTIFICATE OF SERVICE

I hereby certify that on this _____ day of November, 2004, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

Bradley B. Wilson
Gates, Wise & Schlosser, P.C.
1231 South Eighth Street
Springfield, IL 62703


s/Thomas H. Wilson