**E-FILED**
Tuesday, 30 November, 2004  10:46:25 AM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| GREG BURRUS | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CASE NO. 03-3225 |
| | ) | |
| GREAT WESTERN PRODUCTS CO. | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S DESIGNATION OF EVIDENCE
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

In support of its Motion for Summary Judgment, Defendant, Great Western

Products Company, Inc. ("Great Western" or "Company"), respectfully submits the following

evidence:

|  |  |
|---|---|
| Tab 1 | Portions of the deposition of Plaintiff Greg Burrus and deposition exhibits. |
| Tab 2 | Affidavit of Bob Roese. |

INIMAN2 903347v1

Respectfully submitted,

GREAT WESTERN PRODUCTS COMPANY, INC.

By: s/Stuart R. Buttrick
David A. Given
Stuart R. Buttrick

BAKER & DANIELS
300 N. Meridian Street, Suite 2700
Indianapolis, IN  46204
Telephone:  317-237-0300
Facsimile:  317-237-1000

Thomas H. Wilson
SORLING, NORTHRUP, HANNA
CULLEN & COCHRAN, LTD.
607 East Adams Street, Suite 800
P.O. Box 5131
Springfield, IL 62705
Telephone: 217-544-1144
Facsimile: 217-522-3173

Attorneys for Defendant
Great Western Products Company, Inc.

## CERTIFICATE OF SERVICE

   I hereby certify that on this _____ day of November, 2004, a copy of the foregoing was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

       Bradley B. Wilson
       Gates, Wise & Schlosser, P.C.
       1231 South Eighth Street
       Springfield, IL 62703

          s/Thomas H. Wilson

INIMAN2 903347v1

1

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

GREG BURRUS,                    )
                               )
            Plaintiff          )
                               )
    -vs-                       ) NO. 03-3225
                               )
GREAT WESTERN PRODUCTS CO.,    )
                               )
            Defendant          )


        Deposition of GREG BURRUS taken at the
instance of the Defendant, on the 7th day of
July, 2004, at 1231 South Eighth Street,
Springfield, Illinois, before Sandra K.
Haines, CSR and Notary Public, pursuant to
notice.

                              CSR NO. 084-002423

---

2

APPEARANCES

GATES, WISE & SCHLOSSER, P.C.
Attorneys at Law
1231 South Eighth Street
Springfield, Illinois 62703

    BY: MR. BRADLEY B. WILSON
        Appearing on behalf of the Plaintiff

BAKER & DANIELS
Attorneys at Law
300 North Meridian Street
Suite 2700
Indianapolis, IN 46204

    BY: MR. DAVID A. GIVEN
        Appearing on behalf of the Defendant


        PRESENT

Mr. Bob Roose


        INDEX

Direct Examination by Mr. Given ...  3 - 186
Cross Examination by Mr. Wilson ... 186 - 200
Redirect-Examination by Mr. Given . 201 - 214


        EXHIBITS

Deposition Exhibit Number  1 ......     98
Deposition Exhibit Number  2 ......    109
Deposition Exhibit Number  3 ......    115
Deposition Exhibit Number  4 ......    132
Deposition Exhibit Number  5 ......    140
Deposition Exhibit Number  6 ......    147
Deposition Exhibit Number  7 ......    150
Deposition Exhibit Number  8 ......    173
Deposition Exhibit Number  9 ......    184

---

3

                GREG BURRUS
called as a witness herein, at the instance of
the Defendant, having been first duly sworn on
his oath, was examined and testified as
follows, to-wit:
        DIRECT EXAMINATION
        BY MR. GIVEN:
    **Q.** Would you state your full name,
please.
    A. Gregory Paul Burrus.
    **Q.** Where do you live, sir?
    A. 618 Cherry Street.
    **Q.** Where is that?
    A. Pana, Illinois.
    **Q.** How long have you lived there?
    A. Since February.
    **Q.** Where did you live prior to there?
    A. 808 East Second Street, Pana.
    **Q.** Mr. Burrus, we met just prior to the
start of the deposition. My name is David
Given. I am a lawyer with Baker & Daniels,
and I represent Great Western Products Company
in the lawsuit that you have filed against it.
I am going to take your deposition today. I

---

4

am sure that your attorney has explained to
you the process, but I just want to make sure
that we are on the same page as it relates to
the ground rules. I am going to ask you a
series of questions. I would appreciate your
audible answers to those questions. If at any
time one of my questions is unclear to you in
any way, would you let me know so that I can
restate it for you?
    A. Sure.
    **Q.** Are you on any type of medication
today, or suffering from any sort of condition
that would prevent you from testifying
accurately today?
    A. No, sir.
    **Q.** Have you ever had your deposition
taken before?
    A. No.
    **Q.** Mr. Burrus, are you married?
    A. Yes, sir.
    **Q.** To whom?
    A. Lila Burrus.
    **Q.** How long have you been married, sir?
    A. Twenty-seven years this September.

**9**

1    A. No.
2    **Q.** Has it ever since '82?
3    A. No.
4    **Q.** So, you were a cook at Lake Lawn for
5    about a year?
6    A. Uh-huh.
7    **Q.** What was your reason for separating
8    employment at Lake Lawn?
9    A. Went to another job.
10    **Q.** What job did you go to?
11    A. I went to work for Max Hutchens.
12    **Q.** Is that an individual or a business?
13    A. That is the business. That is the
14    popcorn factory. He was the originator.
15    **Q.** What was your position with Max
16    Hutchens when you started at the time?
17    A. At the time it was a small company.
18    We bagged 50 pound corn, and I loaded the
19    trucks also.
20    **Q.** So, that was a popcorn company?
21    A. Uh-huh.
22    **Q.** You need to say yes or no so she can
23    get it down.
24    A. Yes.

**10**

1    **Q.** What year would you have started that
2    then? Would that have been about '83 time
3    frame?
4    A. No. It would have been about '85 to
5    the best of my knowledge. My wife has the
6    dates. I am saying around '85.
7    **Q.** How long did you work with Max
8    Hutchens?
9    A. I worked for Max for ten years.
10    **Q.** Until '95?
11    A. Yeah.
12    **Q.** Thereabouts?
13    A. Yeah.
14    **Q.** Then what happened?
15    A. There was another company that came
16    in, which was called Blevins Concession
17    Supplies.
18    **Q.** Did they buy out the popcorn factory?
19    A. They bought Hutch out. Blevins came
20    in.
21    **Q.** What was your position at the time
22    that Blevins bought out Hutchens?
23    A. I was shipping manager. At that time

**11**

1    **Q.** Still focused on popcorn though at
2    that time?
3    A. Yes, yes.
4    **Q.** Then once Blevins Concessions took
5    over, you became employed with them?
6    A. Yes, after Hutch I became employed
7    with Blevins.
8    **Q.** What was your position with Blevins?
9    A. Shipping manager.
10    **Q.** Who did you report to, do you recall?
11    A. Carol Hutchens.
12    **Q.** How long did you work for Blevins
13    then?
14    A. I think we was in business for about
15    four years.
16    **Q.** Then what happened?
17    A. They bellied up, and then Great
18    Western came in.
19    **Q.** You think that was sometime around
20    1999 or so?
21    A. When Great Western bought the place,
22    I don't recall the date.
23    **Q.** But as you recall Great Western
24    bought the company or the assets from Blevins?

**12**

1    A. Uh-huh.
2    **Q.** And then you went to work for Great
3    Western?
4    A. Yes. Leonard Penner hired me.
5    **Q.** Leonard who?
6    A. Leonard Penner.
7    **Q.** How do you spell Penner, do you know?
8    A. P-E-N-N-E-R, I believe.
9    **Q.** What was his position at the time?
10    A. He was hired through Carlos Bailey,
11    and Carlos Bailey was the one that owned Great
12    Western Products.
13    **Q.** At the time you became employed with
14    Great Western Products, and that was your
15    employer at that time once they bought it?
16    A. Right.
17    **Q.** What was your position?
18    A. Shipping manager.
19    **Q.** Who did you report to?
20    A. With Great Western?
21    **Q.** Yes, sir, when you initially started
22    your employment with Great Western.
23    A. Reese Harris, Scott Martin.
24    **Q.** What was Harris's position?

13

1    A. Production manager.
2    Q. Was he located in Assumption?
3    A. Hollywood, Alabama.
4    Q. What about Scott Martin, what was his
5    position?
6    A. He was the president of the company.
7    Q. So, he would have been above Reese?
8    A. Uh-huh.
9    Q. You need to say yes or no.
10   A. Yes.
11   Q. Was he also located in Hollywood,
12   Alabama?
13   A. Yes.
14   Q. Then how long did you work where you
15   were reporting to Reese Harris?
16   A. For about a year, and then I started
17   dealing with, I believe, Jerry Hulleback.
18   Q. What was Hulleback's position?
19   A. He was operations manager.
20   Q. Where was he located?
21   A. Hollywood, Alabama.
22   Q. Was there a plant manager at that
23   time at the Assumption facility for Great
24   Western?

14

1    A. Yes, sir.
2    Q. Who was the plant manager?
3    A. Phil Uphoff.
4    Q. How long did you report to Jerry
5    Hulleback?
6    A. About three years.
7    Q. Did you have employees that worked
8    under you in the Shipping Department that you
9    would oversee?
10   A. Yes, sir.
11   Q. When you were reporting to Jerry
12   Hulleback, approximately how many employees
13   did you have working in the Shipping
14   Department with you?
15   A. Four.
16   Q. What were the nature of your duties
17   and responsibilities as shipping manager when
18   you were reporting to Jerry Hulleback? I want
19   to focus in on that time period.
20   A. Trafficking of the trucks and
21   incoming products.
22   Q. When you say trafficking of the
23   trucks and incoming products, what do you mean

15

1    A. Letting me know, heads up what's
2    coming in, in the future what we got going
3    out, stuff like that.
4    Q. Were you responsible for coordinating
5    anything or overseeing anything? What did you
6    do on a day-to-day basis?
7    A. Worked with the people, pulled
8    orders. We would have like a pick ticket, and
9    that would be certain customer. Like I will
10   say Marjack in Portland, Oregon. They would
11   order so many bags of corn, so much cheese,
12   what have you. We had a number of products.
13   Once Great Western came in, they had a lot
14   more products than Blevins.
15   Q. When it was Blevins, was it just
16   popcorn?
17   A. No. We had basically all about what
18   Great Western has, but not as much.
19   Q. As I understand it Great Western's
20   products are in addition to popcorn?
21   A. It is concession supplies.
22   Q. Concession supplies primarily to
23   movie theaters?
24   A. Movie theaters, yes, sir.

16

1    Q. So, some of the supplies you would
2    get in from vendors, you warehouse them, and
3    then you would ship them out to customers as
4    orders would come in? Is that accurate?
5    A. Yes.
6    Q. How did you get along with Mr.
7    Hulleback as your manager?
8    A. Very well.
9    Q. When did Mr. Hulleback stop being
10   your manager, the person that you reported to?
11   A. Probably about six months prior to me
12   leaving the company.
13   Q. You left the company in February of
14   2003, is that right?
15   A. Yeah.
16   Q. So, about six months before that
17   would be August, September time frame?
18   A. It was around August, yeah.
19   Q. So, approximately August?
20   A. Uh-huh.
21   Q. What was the reason Mr. Hulleback was
22   no longer your manager?
23   A. I have no idea. He called me one day

**17**

1 the company, I am moving on.
2 **Q.** Now, up to that point in time when he
3 called you, which you think was around August
4 of 2002, had you ever had any problems with
5 Mr. Hulleback?
6 **A.** No.
7 **Q.** There had been a time though about a
8 month before that where you had quit when Mr.
9 Hulleback was your manager, right?
10 **A.** You could say it was quit. I just
11 left the premises.
12 **Q.** Did that occur in July of 2002?
13 **A.** To my recollection, yeah.
14 **Q.** What occurred that made you leave the
15 premises?
16 **A.** Well, my job duties, I come to work
17 that morning, and I had, Bob was out there
18 going through the warehouse with my employees,
19 moving stuff out of the racks, and just kind
20 of rearranging it.
21 **Q.** You said Bob, you mean Bob Roese?
22 **A.** Uh-huh.
23 **Q.** And at the time he was the plant
24 manager?

**18**

1 **A.** Yeah.
2 **Q.** So --
3 **A.** He took Phil Uphoff's position. Phil
4 had to keep more an eye on the corn.
5 **Q.** So, about how long had Mr. Roese been
6 with the company at this point in time?
7 **A.** I am going to say about six months.
8 **Q.** So, you come to work, go to the
9 warehouse, and people are moving things out of
10 the rack --
11 **A.** Uh-huh.
12 **Q.** -- or racks?
13 **A.** My employees that was under me, yeah.
14 **Q.** Was that a problem for you?
15 **A.** It was an embarrassment to me like I
16 wasn't doing my job properly.
17 **Q.** So, what did you do in response to
18 that?
19 **A.** In response to this?
20 **Q.** Yes, seeing that.
21 **A.** I went home.
22 **Q.** Did you talk to anybody?
23 **A.** No.
24 **Q.** You just left the facility?

**19**

1 **A.** Uh-huh, and before I got in the door
2 Jerry was calling me and telling me that he
3 realizes the stress, and the overcrowding of
4 the product that's coming in, and he told me
5 to go ahead and take the rest of the week off,
6 and go back to work Monday.
7 **Q.** Did you tell him you quit in that
8 conversation?
9 **A.** No.
10 **Q.** Did you ever tell Mr. Hulleback that
11 you quit your employment?
12 **A.** I just told him I was upset, and I
13 walked out.
14 **Q.** Did you ever tell him though that you
15 quit?
16 **A.** No.
17 **Q.** Did you ever tell anyone at that time
18 that you were quitting?
19 **A.** No.
20 **Q.** Your testimony is he just told you to
21 take the week off, and come back on Monday?
22 **A.** He told me to relax, chill out, and
23 report, please come back to work Monday, you
24 are a good employee.

**20**

1 **Q.** Did you tell him you would come back
2 on Monday?
3 **A.** I was there on Monday.
4 **Q.** No, but I am talking about in your
5 conversation with him, what was your response?
6 **A.** I said I will do what you say, Jerry,
7 and I will be back there Monday.
8 **Q.** Do you know --
9 **A.** Prior -- can I say something now? He
10 had sent me, he had talked to me on the phone,
11 and I had to sign a piece of paper saying that
12 I left the facility in an improper way. I had
13 to sign that paper understanding that the
14 procedure that I did was the wrong way of
15 leaving.
16 **Q.** So, he disciplined you for the way
17 that you had left the premises?
18 **A.** Yes, sir, verbally on the phone, and
19 then he faxed me some paperwork, and I signed
20 it.
21 **Q.** Did you ever talk with Mr. Roese
22 about this incident?
23 **A.** Yes, me and Bob talked.

21

1    conversation.
2        A. Bob told me just hang in there, and
3    do your job.
4        Q. What did you say to him?
5        A. I did.
6        Q. Do you know if the company advertised
7    your position when you were off those days
8    before you came back on Monday?
9        A. I can't recall any, no.
10       Q. Anybody ever tell you that?
11       A. Well, they said they was wanting a
12   college person in there to run the warehouse.
13   That's hearsay though.
14       Q. When you say that's hearsay, where
15   did you hear that?
16       A. Just from other employees.
17       Q. What other employees?
18       A. I can't recall.
19       Q. Were these people above you in
20   management? Were these coworkers, what?
21       A. It was coworkers.
22       Q. Now, prior to that time in July of
23   2002 had you ever had any sort of run-ins with
24   Mr. Roese at all?

22

1        A. No. When Jerry called me and said he
2    is no longer with the company, he said he
3    already had a replacement, his name was Reg
4    Bryant.
5        Q. We will talk about Mr. Bryant. Up
6    until this time in July you said Mr. Roese had
7    been there about six months or so?
8        A. Yes. I am not really close on them
9    dates. I ain't for sure when Bob come in.
10       Q. Well --
11       A. Bob could tell you.
12       Q. From the time that Bob came in until
13   this incident that you had left the facility,
14   which was in July of 2002, had you ever had
15   any problems or issues with Mr. Roese?
16       A. Other than me coming to work that
17   morning, and having my people out there
18   rearranging like he was taking my job from me.
19   I mean he wanted to run it his way.
20       Q. But other than that you hadn't had
21   any problems with him?
22       A. No, no.
23       Q. As the plant manager was Mr. Roese

2⸱

1    organization?
2        A. Yes.
3        Q. So he could pull rank on you if he
4    wanted to?
5        A. Well, not at this point he couldn't,
6    not until Reg told me.
7        Q. So, when Hulleback tells you that
8    he --
9        A. Had been replaced.
10       Q. -- he is no longer with the company,
11   and his replacement is going to be a guy named
12   Reg Bryant, did you know Mr. Bryant before
13   that?
14       A. No, sir.
15       Q. Did your job change at all with Mr.
16   Bryant now as your supervisor?
17       A. I was supposed to communicate with
18   him, but when I called down there, he would
19   not respond to my call. If I had a problem,
20   he wouldn't call me back. I would always get
21   his voice mail.
22       Q. But did your job duties change at
23   all, or was it still the same as far as you
24   knew?

24

1        A. Well, he come to tighten it up,
2    tighten the ship up over the whole company,
3    because evidently there was a problem. They
4    were getting rid of a lot of higher up people
5    in Hollywood.
6        Q. You say he came to tighten the ship,
7    did he come up to Assumption?
8        A. He come up there, one time I met Reg,
9    yes.
10       Q. Is that what he indicated to you that
11   he needed to --
12       A. He just come up because he never been
13   there before, and just wanted to see how the
14   operation ran.
15       Q. What, if anything, did he implement
16   for the Shipping Department of Assumption that
17   was different from how you had been doing
18   things?
19       A. We needed to do more rotation of our
20   stock.
21       Q. What do you mean when you say
22   rotation of stock?
23       A. First in, first out, rotate your

25

1    **Q.** You weren't doing that before?
2    A. To my best ability, yes.
3    **Q.** What changed when Reg came on board?
4    A. Overstocking of products, which that
5    was in purchasing. We would have 13, 14 loads
6    of chips on the floor at one time, and at the
7    same time you're processing your oil, and your
8    sauce, and your corn. It was just so
9    unorganized. After a period of time it was
10    almost impossible to rotate your stock.
11    **Q.** So, you were having a hard time
12    rotating it because?
13    A. Due to space.
14    **Q.** This is something Mr. Bryant wanted
15    to change?
16    A. Right. He wanted to go with the
17    different way of doing it, tried to tell me
18    how he wanted it done, and I tried to
19    correspond and do it the way he wanted to do
20    it. It was almost impossible due to space.
21    **Q.** What did he tell you that he wanted
22    done differently that you had to try to
23    implement?
24    A. Straighten up the place,

27

1    **Q.** Is that accurate?
2    A. Yeah, real accurate.
3    **Q.** What sort of stress were you
4    encountering in July of 2002?
5    A. The stress of trying to do my job
6    right and not being able to.
7    **Q.** Is that something that had been going
8    on for some time as of July of 2002?
9    A. Well, it was something that you, if
10    you are in command and you're telling your
11    employees that this is the way you're going to
12    do it, then you have other people telling
13    them, they don't correspond. They don't know
14    who to listen to, me or certain other people.
15    **Q.** How long had that condition been in
16    existence that was creating this stress?
17    A. A few months. This was after the
18    time we are talking whenever I walked off the
19    job. The stress continued on months after
20    that.
21    **Q.** But up into that time it had been
22    ongoing for a couple months or a few months?
23    A. Yeah, yeah.
24    **Q.** So, what was it about your job that

26

1    housekeeping.
2    **Q.** Was he a stickler for that?
3    A. Evidently he was, yeah.
4    **Q.** What else did he want you to
5    implement?
6    A. That was about it. Try not to short
7    no customers. Shortages that we had would
8    have been, could have been stock item, or
9    could have been something shipped in too.
10    **Q.** Is it fair to say that he was less
11    tolerant of mistakes than Hulleback had been?
12    A. Well, it run pretty smooth when Jerry
13    was there. Then when Reg come in, things got
14    more hectic.
15    **Q.** Was he more demanding than Hulleback
16    was?
17    A. Yes, sir.
18    **Q.** He was located in Hollywood?
19    A. Hollywood, Alabama.
20    **Q.** You mentioned earlier when we talked
21    about that July incident when you left the
22    facility, that you were experiencing stress I
23    think you said?
24    A. Uh-huh.

28

1    you couldn't do right that other people were
2    conflicting with what you were telling your
3    people to do?
4    A. Well, I had to give them different
5    job tactics, and tell them this is the way it
6    is going to be, and we have to keep a good eye
7    on this product, and some of them complied. I
8    was on the phone a lot with purchasing,
9    customer service. I had to talk to them. I
10    couldn't be at two places at once.
11    **Q.** Were these people in Alabama that you
12    were trying to deal with?
13    A. Yes, they would always call me and
14    say, Misti, the secretary, would say that Mary
15    Smith is on the phone, wants to know about
16    order number 145, for instance. They claim
17    they was shorted on cheese, or their cheese
18    was expired, and they were going to ship it
19    back to you.
20    **Q.** Is that not something as a shipping
21    manager you would be responsible for dealing
22    with?
23    A. Yeah, I was to deal with it, but
24    when they are doing orders out here in the

**29**

1 plant, and here I am on the phone, and they
2 are loading the truck, I can't be there to
3 baby-sit them and make sure they have all of
4 the product there.
5    **Q.** But you are supposed to have systems
6 in place as manager to make sure they get the
7 product in the truck in the right way and you
8 can document that I would assume, is that not
9 right?
10    A. Yes, I had shipping and receiving
11 documents I had to fill out. It is called an
12 evaluation, shipping evaluation form, which
13 consists of condition of trailer, trailer
14 number, how many pallets, shrink wrap if it
15 was good, tight, condition of the pallets, the
16 way the product was stacked, which we didn't
17 do that. The processing people did that.
18    **Q.** But it would have been the Shipping
19 Department's job to record it so that you
20 would know what went out?
21    A. We had inventory, yes. We knew it
22 went out, what came in to our best ability.
23    **Q.** Then what would be difficult about
24 responding to the customer query about whether

**30**

1 they were shorted product or not?
2    A. How would I know if I am in there
3 talking to them, and my people is out here
4 shipping orders?
5    **Q.** Don't you have a mechanism you can
6 look up to see what was shipped the person?
7    A. No. It was all numbers. There was
8 no computer system set up on that part at all.
9    **Q.** You didn't have a hard copy of what
10 went out?
11    A. Yes, I had a hard copy of what went
12 out.
13    **Q.** You couldn't look that up to see what
14 was actually shipped?
15    A. The numbers was never right. The
16 inventory was never right.
17    **Q.** So, the inventory your people put on
18 the documentation wasn't right?
19    A. Well, the production people had a
20 production sheet. They say they ran 900 cases
21 of coconut oil, and they might have run only
22 eight, which is pretty easy to do the way they
23 run the people through there, I would be

**3:**

1 distributor just like Assumption was. But you
2 had your customers too. So, you don't know
3 who to short. You're going to short
4 Hollywood. They have customers too, plus we
5 had our customers.
6    **Q.** I am a little bit confused. If you
7 are sending out coconut oil, for example.
8    A. That was just an example.
9    **Q.** I assume it is on pallets.
10    A. We had a board, and it says we had so
11 many cases of coconut oil. Sit down with the
12 orders and figure out, we have enough to cover
13 this one. We have enough to cover this one,
14 okay. If we didn't, I would get a hold of
15 Tim, which was production manager there, and
16 say Tim, I need 90 cases of coconut oil to
17 ship to Regal Distributors in Springfield,
18 Illinois, we are short. All we had was a
19 number there. That would be added in at the
20 end of the day with the production report,
21 which I didn't have nothing to do with it, and
22 put on a board, and when one of those loads
23 was shipped out, I would deduct that from that
24 board.

**32**

1    **Q.** It would be the Shipping Department's
2 job to know what was shipped out, how many
3 cases, or how many pallets, whatever it might
4 be?
5    A. I had no idea. I didn't get no
6 report of what was, the future was of what
7 they was shipping out. We would get the
8 order. We would get orders that same day, and
9 they would want to ship them out that day, and
10 we wouldn't have the product.
11    **Q.** But you would get an order, and it
12 was the Shipping Department's responsibility,
13 I assume, to pull that order?
14    A. If we had the product.
15    **Q.** Get it ready, put it on a truck, and
16 make sure that it goes out?
17    A. Right.
18    **Q.** You would document what actually went
19 out from the plant?
20    A. We had a pick ticket. Whatever that
21 pick ticket said, that's what was on the
22 pallet.
23    **Q.** Somebody had to confirm that's what

1    A. That's when I started in with the
2  shipping evaluation sheet and receiving
3  evaluation sheet.
4    Q. But you found this stressful because
5  there were errors, and there were shortages in
6  production. That's what was stressful about
7  it?
8    A. I can't determine how many pallets of
9  corn they are going to run that day versus
10  what they want to ship out. You follow me.
11    Q. I do, but how did that put stress on
12  you?
13    A. The employees would come to me and
14  say hey, we don't have it. Well, then we
15  would have to go tell Tim. Tim would try to
16  get it if he could. Well, if I didn't get it
17  to a certain customer and I chose to send it
18  to Hollywood when they didn't really actually
19  need it, but yet they might have needed it, I
20  didn't know where to go. I wasn't involved in
21  nothing, what they was making. They would
22  have their meetings, Tim, Bob, and a guy named
23  Neil Kaiser, and it might say on the board it
24  was there, but yet it wasn't there. So, then

1  they laid the finger on me. Well, you go out
2  there and count it. They say it is not there.
3  They would say okay, well, then you have
4  overshipped it, you made a mistake. I had a
5  good crew. The people didn't make mistakes.
6  I done this job for 15 years at this point,
7  and I was good at my job.
8    Q. So, this was putting stress on you
9  because there were errors, and people were
10  thinking that you were creating the errors?
11    A. The stress was the people was coming
12  back on me, my employees, yeah.
13    Q. Did that stress increase after Reg
14  Bryant took over as your manager?
15    A. Oh, yeah.
16    Q. In what way?
17    A. Oh, communication.
18    Q. Any other ways?
19    A. Just over, giving me more job
20  procedures, and I dealt with them, and I did
21  them. I did my job procedures.
22    Q. What type of job procedures?
23    A. To sit out there and baby-sit them,
24  and they would pull the lead. I had the piece

1  of paper. I would go along and check it off
2  to make sure all of the products was there. I
3  would sign my John Henry that the order was
4  complete. If there was a shortage, I would
5  state on there what the shortage was, who the
6  customer was, and who the PO, purchase order
7  number was.
8    Q. That was something new you hadn't
9  done before?
10    A. No, that's when I had to report to
11  customer service, like a lot of them was out
12  of there. Now, I reported to Mary, Ken
13  Walker, say hey Ken, you better let
14  Springfield Regal know they are not going to
15  get their cotton candy, we don't have it.
16  Therefore, he would have to call the customer
17  and tell them. Then he would get on me about
18  it when I am not the one that's purchasing
19  this product, and these people know what
20  orders they got going out.
21    Q. So, one of the procedures that Reg
22  Bryant implemented that you had to do was to
23  alert the purchase order people so they could
24  tell the customer that they weren't going to

1  get --
2    A. If they had a shortage.
3    Q. If there was going to be a shortage.
4  Prior to that you didn't alert the customer or
5  forewarn them that there was going to be a
6  shortage, is that right?
7    A. Yes, I always did.
8    Q. So, what changed about the process
9  that Reg Bryant put on you? I thought, you
10  just told me there was a new process that you
11  had to do this, you had to alert certain
12  people?
13    A. I had to clean my desk. I had no
14  telephone communication, clean your desk out,
15  get down at the end of the warehouse with
16  these papers, which was in folders, shipping
17  evaluation and receiving evaluation. I was no
18  longer put on the fork truck. I had the other
19  people do it. I had to stand there and
20  baby-sit them, and watch them, and I would
21  check it off, okay, 350 bags of corn going on
22  that, that would be seven pallets of 50. A
23  pallet of cheese, whatever, I was there to

37

1  took out.
2  **Q.** You disagreed with that process?
3  **A.** At the same time I might have a phone
4  call and have to run off and talk to somebody
5  in purchasing, or they might want to ask me a
6  question. Or even customers, I had customers
7  from Canada, Claud, calling me asking me hey,
8  when did this order go out. I had no idea.
9  He would make an order one day, and he would
10  want it the next day. That was beyond my
11  control. That's when they had to produce it.
12  I am just the shipper. They're producers.
13  **Q.** I am trying to get back --
14  **A.** Frustrating was when they had the
15  order, and you didn't have the product.
16  **Q.** But I assume that's a condition that
17  has always existed, somebody calls for an
18  order?
19  **A.** No, we was pretty prompt there for
20  awhile. The people higher up was not ordering
21  enough stuff, or they was ordering too much
22  stuff. They might be ordering the wrong
23  product. You get the product in, you would
24  write a receiving report out what came in.

38

1  **Q.** Well, getting back to your comment
2  about Reg Bryant and putting more job
3  procedures on you, tell me about any other job
4  procedures that he placed upon you that were
5  different from what you had been doing.
6  **A.** The shipping evaluation sheet and the
7  receiving.
8  **Q.** That was brand-new?
9  **A.** That was new. That was a way for
10  them to try to improve their system, yes.
11  **Q.** I take it you didn't like that?
12  **A.** I didn't mind it. I did it.
13  **Q.** It just created stress for you?
14  **A.** Yes. You can't be at two places at
15  one time. At the time we are shipping out, we
16  might have a lot of jugs come in. I have to
17  go over there and make sure all those are
18  there. Say there is 240 just supposed to come
19  on this truck, and we are short two pallets
20  which is 96, I sign my John Henry that that's
21  there. It might not be there. It might get
22  damaged. The pressure comes back to me.
23  **Q.** Any other procedures that Reg Bryant

39

1  Department?
2  **A.** Stress with Reg was, there was no
3  communication. I could hardly ever get ahold
4  of him to talk to him.
5  **Q.** Why did that create stress for you?
6  **A.** You have to know what's going on. If
7  I was supposed to report to Reg, I think you
8  need to know what's going on in the future,
9  what's got to be done. That was real
10  stressful for me. When you are supposed to
11  have somebody that you are supposed to be
12  commanded by, and you can't get a hold of the
13  man, leave him a voice mail, and he does not
14  contact you back.
15  **Q.** When you say your experience in
16  stress, how did the stress manifest itself?
17  What was its effect on you?
18  **A.** I wasn't happy. It drove me crazy.
19  **Q.** This started sometime in the summer
20  of 2002?
21  **A.** It all added up after awhile.
22  **Q.** The major onset of it was around the
23  summer of 2002?
24  **A.** Pretty well, yeah.

40

1  **Q.** Did you see a doctor about this
2  stress?
3  **A.** Well, yeah, I seen a doctor.
4  **Q.** What doctor did you see?
5  **A.** Dr. Bilyeu in Moweaqua, Illinois.
6  **Q.** Dr. Bilyeu?
7  **A.** Dr. Bilyeu in Moweaqua.
8  **Q.** Spell the last name.
9  **A.** B --
10  **Q.** He is from Moweaqua?
11  **A.** Yes.
12  **Q.** Thomas Bilyeu is his name?
13  **A.** Alan and Tom.
14  **Q.** When did you see Dr. Bilyeu about
15  this stress?
16  **A.** I would have to look on my report. I
17  don't recall that, but it is kind of hard to
18  explain. You are not the same person. It was
19  hard to remember dates. My blood pressure was
20  up, what have you, cholesterol. He put me on
21  Xanax.
22  **Q.** The antidepressant?
23  **A.** Yeah, which me and him discussed it,

41

1   Q. Was that part of the reason that you
2   had walked off the facility in July because of
3   the stress that you were experiencing?
4   A. No. It was the idea that I was
5   supposed to be their supervisor, and there was
6   another man out there, which he knows who he
7   was, out there directing my people, which made
8   me feel like I was no longer needed to be
9   their manager. He wanted to take over and do
10  the job. Well, then he can take her over.
11  That day I got upset and I went home.
12  Q. But your testimony is you didn't quit
13  then?
14  A. No, I didn't quit. I just went home.
15  I didn't sign no papers saying I quit.
16  Q. You were off for how many days then
17  after you went home?
18  A. I think it was a Thursday when I
19  left, and I took off Friday, and came back
20  Monday. Might have been Friday when I left.
21  I come back on a Monday. I know that.
22  Q. Now, Mr. Burrus, in this lawsuit that
23  you filed against Great Western, you alleged
24  that there was a shipment that was discovered

42

1   of corn that was infested with weevil bugs?
2   A. Uh-huh.
3   Q. Do you know the allegation I am
4   speaking of?
5   A. Yes, I do.
6   Q. When did that occur?
7   A. That occurred around the same time
8   that we was doing these receiving reports,
9   or receiving evaluations and shipping
10  evaluations. Tony from Hollywood called me
11  and gave me a heads up that there was 35 pound
12  bags of PA popcorn that was to be dumped and
13  fumigated.
14  Q. You said Tony from Hollywood?
15  A. Yes. He was shipping manager down
16  there.
17  Q. What was his last name?
18  A. Tony is all I knew him by. I didn't
19  work with the man. I just asked for Tony,
20  Tony Wheeler.
21  Q. Wheeler?
22  A. I believe so, yes.
23  Q. Now, he calls you and tells you there

4

1   A. Thirty-five pound bag, 70 bags coming
2   back, one pallet. Thirty-five pounds was
3   shipped, that's 70 bags on a pallet.
4   Q. These half pound bags?
5   A. Thirty-five pound bags.
6   Q. So, there is 70 35 pound bags --
7   A. Right.
8   Q. -- shipped on a pallet?
9   A. Yes.
10  Q. Give me the time frame, is this June,
11  July, August, September?
12  A. I want to say around September, but
13  we can't go by that. Like I said, I can't
14  recall dates.
15  Q. Why was Hollywood shipping it to
16  Assumption?
17  A. Because that's the processing plant
18  that does the popcorn and fumigates it.
19  Q. Had the corn originated in
20  Assumption?
21  A. Yes, sir.
22  Q. You shipped it down to Hollywood?
23  A. Right.
24  Q. He said now it needed to be

44

1   fumigated?
2   A. I shipped it down there, yeah, and it
3   come back.
4   Q. He is sending it back to you. What
5   does he tell you when he calls you?
6   A. He says I have a pallet of 35 pound
7   bags of corn coming back, it is old. It has
8   weevil in it. It starts out with worms,
9   little white worms on the shrink wrap that you
10  can see plain as day. Me and a coworker
11  Beverly Beck took it to Phil Uphoff. Phil
12  Uphoff said just cut the shrink wrap off,
13  restack the pallet, cut the shrink wrap off,
14  and ship it back.
15  Q. What was Phil Uphoff's position?
16  A. Phil Uphoff's position was corn
17  manager at that time, and Bob Roese took his
18  job over so Phil could see his overseeing of
19  his corn, because he had a lot of corn out
20  there that he wasn't, had the proper procedure
21  of running air on it.
22  Q. So, he was the corn manager?
23  A. I reported that me and Bev took that

45

1  Q. What was Bev's last name?
2  A. Beverly Beck.
3  Q. Beverly Beck, okay.
4  A. He was in the chemical room at the
5  time. He was frustrated over something. He
6  just said just ship it back. That same pallet
7  of corn was shipped back to us.
8  Q. So, he said take shrink wrap off,
9  restack it?
10  A. Wrap it.
11  Q. Rewrap it, and ship it back?
12  A. Right.
13  Q. After you took the shrink wrap off,
14  did you see any infestation in the corn?
15  A. Yes, you could see the worms on the
16  bags. It didn't go to a customer. It went
17  to our warehouse in Hollywood, Alabama.
18  That's when the crap hit the fan, and Tony
19  sent it back again. That pallet of corn was
20  taken back into the production room, and sat
21  for probably two months before they dumped it
22  up.
23  Q. So, you did what Phil Uphoff told
24  you --

46

1  A. I did what Phil --
2  Q. Let me finish my question. You did
3  what Phil Uphoff told you to do?
4  A. Uh-huh.
5  Q. You shipped it to Hollywood?
6  A. Right.
7  Q. Then later on, a week later, two
8  weeks later, a month later, I don't know how
9  long, how long was it?
10  A. A couple weeks prior to that it come
11  right back with the same code date because you
12  went by code dates. You had to record that
13  code date when you shipped it out. I have no
14  paperwork on that, because I was told to clean
15  my desk out, and head out to the warehouse,
16  which you will have a desk out there and a
17  phone, which I never got.
18  Q. So, you sent it to Hollywood. A
19  couple weeks later it comes back because it is
20  infested with these weevils?
21  A. Sure, and why didn't you do what you
22  was told to do.
23  Q. Okay. Who did you talk to in
24  Hollywood that sent it back to you? Was that

47

1  Mr. Wheeler again?
2  A. Yes, again.
3  Q. What did he say to you?
4  A. This pallet of corn is back again. I
5  said I know, I went to Phil. He said it was
6  okay.
7  Q. So, he sends it back. You take it,
8  and then do you take it back to Phil?
9  A. I took it back there, and put it in
10  the room. That's when they didn't like my
11  procedure then. See, they was higher up than
12  me.
13  Q. Let's slow down here. Who is they
14  that didn't like that you took it, put it in
15  the room?
16  A. Phil didn't like it. The people that
17  was running the corn didn't like it.
18  Q. You put it in the production room?
19  A. I put it where they store the corn in
20  the corner, put a red tag on it.
21  Q. To be what, fumigated?
22  A. Yes, sir.
23  Q. Did it get fumigated?
24  A. Not to my knowledge, no.

48

1  Q. Do you know what happened to it?
2  A. No.
3  Q. You don't know if it got fumigated or
4  not. You don't know if it was ever shipped
5  out or not?
6  A. I don't know if they dumped it, what
7  they did with it. Warehouse is here, you
8  drive through here, you got production here.
9  The far building is where they done the corn.
10  Things have been changed around since then.
11  Q. But you took it where they store the
12  corn, and you don't know what happened to it
13  after that?
14  A. I put a red tag on it.
15  Q. You put a red tag. Did you talk with
16  Mr. Uphoff about it?
17  A. I talked to, I think I talked to
18  Reggie about it. Yes, I did talk to Reggie
19  about it.
20  Q. Tell me about your conversation with
21  Reg Bryant about this corn that came back from
22  Hollywood.
23  A. He told me that I didn't need to
24  worry about that, and that Phil better go with

**49**

1  the procedure on that part, and get the corn
2  fumigated, and make it right.
3      Q. So, he was in accord to how you
4  wanted to handle it?
5      A. Reg?
6      Q. Yes.
7      A. Basically, yes.
8      Q. Did you talk with anyone else about
9  it?
10     A. No. It didn't go to no customer.
11  So, it was in line with the companies.
12     Q. So, Reg agreed with you that it
13  needed to be fumigated, or treated, or dumped?
14     A. Whatever Tony says, do it.
15     Q. So, there was no problem between you
16  and your boss about what to do with this
17  infested corn?
18     A. No. It was properly being treated,
19  and fumigated, and rebagged, or whatever have
20  you that they wanted to do with it.
21     Q. You made a comment earlier that Phil
22  didn't like it. Did you have any discussions
23  with Phil about this?
24     A. I told Phil this is what the transfer

**50**

1  detail sheet says to be done, and he ignored
2  it.
3      Q. When you say he ignored it, you don't
4  know what he did with it?
5      A. No, I don't know what he did with it
6  after that. They might have dumped it up for
7  hog feed for all I know.
8      Q. You just don't know?
9      A. I am on this other end. I am running
10  around like a chicken with my head cut off.
11     Q. You don't know if Phil agreed or
12  disagreed with what the transfer sheet said to
13  do?
14     A. He disagreed the first time, yeah.
15     Q. You don't know what he did the second
16  time?
17     A. I don't know what he did the second
18  time with it, no. I think he probably took
19  care of it.
20     Q. But you didn't have any more
21  discussion with him about it after that?
22     A. No, no, there was more that came back
23  in. Robert Lee gave me a heads up that I got

**51**

1  weevil. Actually it wasn't weevil. They are
2  worms, and they turn into weevil, and that I
3  was to get it off the trailer, and store it to
4  where it could be treated with what they call
5  a fox toxin, which I had a storage trailer
6  that I found out back, backed it up to the
7  dock, put that corn in the trailer, and that
8  corn sat for two or three months before they
9  even got around to putting fox toxin in there.
10  That was his part of the job. My job was
11  receive the stuff in, and ship out the right
12  product. There was many trailer loads of corn
13  that was infested.
14     Q. You said Robert Lee called you?
15     A. Uh-huh, he was dispatcher.
16     Q. From where, Hollywood?
17     A. Hollywood.
18     Q. This was corn that had gone to
19  Hollywood facility?
20     A. It had come back from customers.
21     Q. So, it came back from customers, but
22  this was the first you knew that it was
23  infested?
24     A. Well, yeah.

**52**

1      Q. It comes back?
2      A. The 50 pound bags of corn, yeah.
3      Q. You didn't send any infested corn to
4  customers that you knew about, did you?
5      A. Not to my knowledge, no. I mean
6  other than the 70 pound, the 35 pound bags of
7  corn.
8      Q. Those went to Hollywood to the
9  warehouse, and they came right back?
10     A. Distributed out to their customers.
11     Q. They didn't get distributed because
12  they sent them back to me.
13     A. They sent them back to me, and they
14  called for transfer detail sheet saying they
15  need one pallet of 35 pound bags of corn.
16  That was the same pallets that should have
17  been fumigated and wasn't.
18     Q. But then those came back?
19     A. They came back the second time.
20     Q. As far as you know they didn't go to
21  any customers?
22     A. No.
23     Q. So, these other ones that the
24  dispatcher called you on, said that they are

53

1  infested, these were the 50 pound bags?
2      A. Uh-huh.
3      Q. You need to say yes.
4      A. Yes.
5      Q. So, you were told to store them in a
6  trailer?
7      A. Uh-huh. Yes, I was told to get them
8  off the trailer, store them somewhere in a
9  confined area, and get the trailer cleaned out
10  and ready for another shipment of product to
11  go out, food product to go back out.
12      Q. You were told to store them in a
13  confined area so that they would be segregated
14  from the other good product?
15      A. Right.
16      Q. Ultimately they were treated with fox
17  toxin?
18      A. Fox toxin, it is a pill form that
19  dissolves, that turns to ash.
20      Q. But it is to rid the corn of the
21  problem?
22      A. It basically kills the worms, and
23  then they run it through a bulk tank, and run
24  a gas called bromine.

54

1      Q. So, any time there is an infestation
2  in the corn, the procedure is that you
3  fumigate it or cleanse it somehow so that it
4  is then good product again that can be
5  utilized?
6      A. That was their job duty. It wasn't
7  my job duty.
8      Q. Any other instances that you recall
9  that infested product would come back?
10      A. As far as corn?
11      Q. Yes, sir. We are talking with corn
12  right now.
13      A. They create a big problem with corn
14  being infested. That's how Phil lost his
15  plant manager's job, and they appointed Bob
16  Roese so Phil could keep a better eye on his
17  corn.
18      Q. Because that's a big issue, I guess,
19  if you are selling popcorn, you don't want it
20  infested?
21      A. You don't want little kids eating
22  that stuff, or adults, or anybody.
23      Q. You don't know of any instance when
24  Great Western would have shipped out infested

55

1  popcorn to any customer?
2      A. I can't recall any right now, but I
3  probably can if I think about it more.
4      Q. Would you have allowed that to happen
5  as the shipping manager?
6      A. Well, no.
7      Q. So, if you were aware of it, you
8  wouldn't have allowed the shipment to go out?
9      A. If I knew it was infested, I wouldn't
10  let it go out, no. I can't tell by looking at
11  the corn. After awhile it is inside the
12  kernel. It will come out.
13      Q. I am talking those where you seen the
14  infestation.
15      A. If I seen the infestation, I would
16  not ship it, no.
17      Q. No one ever told you to ship out
18  infested corn to a customer, did they, from
19  Great Western?
20      A. If Tony told me it was infested, and
21  I could see the worms, and Phil told me, I
22  told you Phil Uphoff told me that yes, ship it
23  back out.
24      Q. He told you to ship is back to

56

1  Hollywood?
2      A. Yes.
3      Q. He didn't tell you to ship it to a
4  customer?
5      A. At that point it is going to go to a
6  customer.
7      Q. In that case it did not. It came
8  back from Hollywood?
9      A. It came back from Hollywood. It was
10  shipped back from Hollywood, from Hollywood.
11  I don't know if it was going to a customer or
12  not.
13      Q. As far as you know none of it went to
14  a customer because it all came back to
15  Assumption to be fumigated?
16      A. Yes, yes, that was the corn
17  processing plant. They didn't process corn in
18  Hollywood.
19      Q. Other than Reg Bryant did you ever
20  talk with anyone about Phil Uphoff and this
21  infested corn that he told you just to ship
22  back to Hollywood?
23      A. Scott Martin.
24      Q. Who is Scott Martin?

57

1    A. Scott Martin was the president that's
2  no longer there.
3    Q. When did you talk with Mr. Martin?
4    A. After many occurrences of the corn
5  being infested with weevil.
6    Q. Was this when Uphoff was the general
7  manager?
8    A. He was doing both jobs at that point
9  probably.
10    Q. Then what time frame are we talking
11  about here when you would have talked to Mr.
12  Martin?
13    A. I am going to say after the third
14  time of them not going through the procedure
15  of the corn, because it says in the handbook
16  if you don't get nowhere with your manager, to
17  call the president at that point, which would
18  have been probably let's say around September.
19    Q. So, approximately September of 2002?
20    A. Yes.
21    Q. You say the third time, the third
22  time with Mr. Uphoff and the popcorn?
23    A. With the fumigation ordeal, yes,
24  about the third time.

58

1    Q. You have told me about one time where
2  you went to him, and he told you just to put
3  new shrink wrap on it.
4    A. Right.
5    Q. What was the second or third time
6  whenever that occurred?
7    A. When that same pallet came back.
8    Q. You took it to the storage area?
9    A. And he knew about it, and I red
10  tagged it. Red tagging it means that it is
11  not to be shipped.
12    Q. Right.
13    A. It sat there and collected dust
14  probably for awhile.
15    Q. So, what's the issue then with that
16  corn?
17    A. There wasn't no issue. It was his
18  problem. It wasn't my problem to take care of
19  that.
20    Q. How is that the second time? I am
21  confused.
22    A. That was the same pallet of corn that
23  was shipped to me, which was sent back to
24  Phil, and he said put new shrink wrap on it.

5

1  and ship it back out. Okay, it went back down
2  to Hollywood. They caught it, and shipped it
3  back again. That's when I refused to ship it
4  back out, and red tagged it.
5    Q. So, are you saying when this came
6  back from Hollywood, Mr. Uphoff told you again
7  just to ship it straight back to Hollywood?
8    A. That was the first time.
9    Q. The first time, but once she came
10  back from Hollywood --
11    A. The second time.
12    Q. -- you don't really have any
13  conversation with Mr. Uphoff where he
14  instructed you to do anything with the corn?
15    A. No. At that point he knew that he
16  had to take care of it.
17    Q. So, it is not your problem anymore?
18    A. Not my problem, no.
19    Q. That's what you call the second time.
20  What's the third time that you had issued?
21    A. Now we are into 50 pound bags of
22  corn, not 35.
23    Q. That's what you told me came back on
24  the trailer. You unloaded it. You had to

60

1  clean out the trailer, and find some storage
2  space?
3    A. Which I did, which I had a closed in
4  refrigerator unit, a storage trailer I had in
5  there, and it was put in there.
6    Q. Nobody had told you to ship that corn
7  back out?
8    A. No, I didn't ship that corn. It was
9  bad.
10    Q. So, are you just talking about three
11  instances where there was infested corn? Is
12  that what you call the three incidents?
13    A. To my knowledge when I could see the
14  infestment of the corn. There was a lot of
15  complaints about the corn being infested.
16    Q. So, you were calling Mr. Martin
17  because there was a problem of how they were,
18  how the corn, or Mr. Uphoff was storing corn
19  that would cause it to be infested, or what
20  was the purpose of calling Mr. Martin?
21    A. Telling him the problem wasn't ceased
22  yet. I am still seeing weevil. They process
23  the corn, and put it in the racks. It might
24  sit there for awhile, and we have to get the

1  shrink off because it had a little dust on it.
2  Restack it. There could have been some mice
3  droppings that might got in there. That was
4  the procedure, restack it.
5      Q. Did you talk to Mr. Bryant about this
6  issue?
7      A. There was no communication with me
8  and Reggie. He didn't want -- I couldn't talk
9  to the man.
10     Q. So, I take it that you didn't talk to
11  him about this issue?
12     A. I could not never get a hold of him.
13     Q. You told me earlier you had talked to
14  him about the shrink wrap issue with Mr.
15  Uphoff, and he agreed with you that that corn
16  needed to be fumigated?
17     A. That was about the only time I was
18  able to talk to Reg. After that there was no
19  communication with me and Reg on the
20  infestation of the corn.
21     Q. But he was in agreement with how you
22  wanted, how you thought it should be handled?
23     A. I said whatever Tony said that's what
24  needed to be done, just like I said a moment

1  ago.
2      Q. So, you go ahead and call Mr. Martin
3  on the telephone. Is that what you did?
4      A. Uh-huh.
5      Q. Tell me about that conversation with
6  Mr. Martin.
7      A. Mr. Martin, he said you need to
8  report to Reggie. I said well, I have tried
9  to, but there is no communication with Reggie.
10  You always get his voice mail, have him return
11  your calls. He would not return my calls. He
12  was more into active transportation, the
13  trucking company. He was trying to bring them
14  out of a bind that they was in.
15     Q. What else did Mr. Martin say, if
16  anything?
17     A. You disagree with Reg. I said yes, I
18  do.
19     Q. How did you disagree with Reg?
20     A. On the way that they wanted to do the
21  processing and the things with corn.
22     Q. What did you and Reg disagree about?
23     A. That the corn being shipped out was

1  taken care of and gassed, and he would take, I
2  think he was going to take care of it with
3  Phil at the time. As a matter of fact, they
4  sent Phil over to a foreign country one time
5  because it was sunglow corn. That's just the
6  name of the bag, was infested with weevil. I
7  have an inspector which was there, Jackie
8  Farris, which they tell them hey, this corn is
9  no good. Well, that's all of the corn they
10  had. They shipped it out.
11     Q. I want to break this down. You said
12  that in your conversation with Mr. Martin that
13  you disagreed with Reggie. I don't understand
14  what you disagreed with Reggie about.
15     A. Over the agreement that Phil wasn't
16  doing his job.
17     Q. I thought you told me you and Reggie
18  agreed that it needed to be treated the way
19  Tony said.
20     A. We agreed it needed to be fumigated.
21     Q. So, what was the disagreement with
22  Reg?
23     A. You have lost me.
24     Q. I am just trying to get to what you

1  mean by your testimony, and maybe you
2  misspoke. You said in your conversation with
3  Mr. Martin that you had disagreed with Reg,
4  Reg Bryant. Did you mean disagreed with Phil
5  instead?
6      A. Yeah. I disagreed with Phil on the
7  way he --
8      Q. He wanted to handle the shrink wrap?
9      A. Right, right. I didn't think that
10  was right.
11     Q. You and Reg were in agreement on
12  that?
13     A. Agreement.
14     Q. That Phil should have handled it
15  differently?
16     A. Phil should have dumped the corn and
17  handled it differently, yeah.
18     Q. Anything else you told Mr. Martin in
19  that conversation?
20     A. Yes.
21     Q. Now, you were talking about an
22  inspector who had looked at some corn. I
23  think you said his name was Farris?

65

1    **Q.** Is that a woman?
2    A. Woman.
3    **Q.** When was this that Ms. Farris, is she
4    an FDA inspector?
5    A. No. She was just quality control.
6    **Q.** She detected some popcorn that was
7    infested?
8    A. Uh-huh.
9    **Q.** When was that?
10   A. I can't recall that date.
11   **Q.** What year are we talking about?
12   A. We are talking 2001 probably. Jackie
13   left the company. I don't recall the date
14   that she left the company.
15   **Q.** What did she tell you about any
16   infested corn?
17   A. That it needed to be taken back to
18   processing, and be dumped and reprocessed.
19   **Q.** Did you do that?
20   A. It was taken back there. I don't
21   know if it got reprocessed or not.
22   **Q.** You didn't ship it out?
23   A. No, I didn't ship it out. If I seen
24   weevil or worms, I wouldn't ship it out. I

66

1    was told to ship some out, and I did that, and
2    I got in trouble for it through the higher up
3    people.
4    **Q.** When were you ever told to ship out
5    corn that was infested with weevils? Was it
6    just that one time when Uphoff just said just
7    put shrink wrap on it, and send it back to
8    Hollywood?
9    A. Yes, to my knowledge that definitely
10   had weevil in it, and it was shipped back.
11   **Q.** Any other time that that ever
12   occurred other than the incident you have
13   already described where Phil Uphoff told you
14   just to put new shrink wrap on it, and ship it
15   back to Hollywood?
16   A. No, only time is when it could come
17   back if it was processed there. It might take
18   two months. It might take a month. It would
19   come back to my warehouse. We had truck loads
20   of corn that needed to be dumped up.
21   **Q.** You were never told to ship that corn
22   out?
23   A. I have shipped some of that corn out
24   not knowing that it was infested. When it is

67

1    in a clean bag and it is all shrinked up, what
2    am I suppose today do, open the bags up and
3    look inside the bags?
4    **Q.** Well --
5    A. It was shipped out, yes, but not on
6    me knowing that it was infested; but yes, I
7    shipped out infested corn, but to my knowledge
8    I did not know it was infested unless you
9    actually open the bag where it is sealed up,
10   threaded, you can open it up. You can see the
11   weevil in there if there is any in there.
12   Actually we was told to take and pull a bag
13   off once in a while and check it.
14   **Q.** To make sure that --
15   A. To make sure because they wasn't sure
16   that the corn was, the chemical they were using
17   wasn't working, or wasn't getting enough of
18   it, or whatever.
19   **Q.** But as far as you know nobody with
20   knowledge that there was infestation of weevil
21   told you to go ahead and ship product out from
22   Great Western other than the one incident on
23   the shrink wrap with Phil Uphoff where you
24   sent those 35 pound bags back to Hollywood?

68

1    A. That incident and there might have
2    been a couple more, but I can't remember when
3    or who told me because there was more.
4    **Q.** You can't remember any of them where
5    somebody knowingly told you to ship out
6    infested popcorn?
7    A. Well, no, they are not going to say
8    ship infested popcorn out. They are not going
9    to tell me that.
10   **Q.** Can you identify an instance for me
11   where you would have shipped out infested
12   popcorn knowing it was infested?
13   A. No, I just told you I wouldn't ship
14   nothing out that I know was infested.
15   **Q.** Nobody at the company ever told you
16   you were supposed to ship it out infested?
17   A. They are not going to say ship
18   infested corn out. No, they are not going to
19   tell me that.
20       MR. WILSON: Can we take a five
21   minute break.
22       MR. GIVEN: Sure.
23       (Whereupon the deposition was in
24   recess.)

69

1    **Q.** Mr. Burrus, did you ever talk with
2    Bob Roese about any of these issues relating
3    to any infestation in popcorn?
4    **A.** Yes.
5    **Q.** When did you do that?
6    **A.** Probably when we had the problems. I
7    would have to look at my paperwork. I don't
8    recall it right now the dates. Like I say, I
9    can't recall dates, but yes, me and Bob has
10   talked, and Bob told me it was Phil's problem
11   to take care of it.
12   **Q.** So, Mr. Roese like Mr. Bryant agreed
13   with you that it needed to be taken care of?
14   **A.** We are a little bit too far into
15   this. At this certain point where we are at I
16   was informed through Reg Bryant that I had to
17   go through Bob Roese, which you know that,
18   Bob, is that correct?
19        MR. WILSON: You can't ask him
20   questions.
21   **A.** At this point now we got too far to
22   where Reg is out of the picture now, and now I
23   have to deal with Bob, because Reg said here,
24   I am down here in Hollywood, and now Bob Roese

70

1    is going to be your boss. You and Bob have to
2    work together.
3    **Q.** Right. At a certain point Mr. Roese
4    became your boss, your supervisor?
5    **A.** Right.
6    **Q.** And you would have had a discussion
7    with him at that time about the infested
8    popcorn?
9    **A.** Yeah, Bob was aware of the 70 pound
10   bags of corn we had took back up there.
11   **Q.** He agreed with you that Uphoff needed
12   to correct the problem?
13   **A.** Yes, naturally.
14   **Q.** So, you didn't have any issue with
15   Mr. Roese about how infested popcorn should be
16   handled?
17   **A.** No, it wasn't me and his job, we were
18   not, we didn't take no schooling to take care
19   of infested corn.
20   **Q.** But you didn't have any disagreement
21   as to what you all considered would be the
22   proper treatment of the popcorn, that it
23   needed to be fumigated or debugged?

7?

1    **Q.** You both agreed that --
2    **A.** If you have infested corn, you take
3    it to the man that has to take care of it. It
4    wasn't our call. Our call was that the corn
5    was infested, do not ship it out.
6    **Q.** Mr. Roese would agree and you agreed
7    on that?
8    **A.** Right, we sure did.
9    **Q.** Now, you have also made some
10   allegations in this lawsuit, Mr. Burrus, that
11   there were certain shipments of jalapeno
12   peppers that had a problem with the lids
13   coming off.
14   **A.** Many, many, many shipments.
15   **Q.** What was the nature of that problem?
16   Can you describe it for me.
17   **A.** The lids was popping off.
18   **Q.** These would be peppers that you would
19   buy from a vendor?
20   **A.** Yes.
21   **Q.** Do you recall who the vendor was?
22   **A.** We got them from a few different
23   vendors, Louisiana Foods. At this point I
24   don't have that information, but I can get

72

1    it.
2    **Q.** Whatever you can recall is fine.
3    Would they pop off during shipment, or while
4    they were in storage? When would this pop off
5    of the lids occur?
6    **A.** After storing them awhile I think
7    they got hot, and they would pop off to the
8    point where at the vendor they wasn't getting
9    the lids tight enough. At one point they had
10   some go bad where we had to lay out like three
11   truck loads of them, and we all went through,
12   and they brought like five people in. We
13   would pull a jar out of every case, and they
14   had a taste sample. They would all taste
15   them. They tasted good, put the lid on, and
16   ship them out.
17   **Q.** What was the issue with the jalapeno
18   peppers with the lids coming off? What was
19   the concern that you had about that?
20   **A.** You don't want -- when you send a
21   container to Germany, and they open the door,
22   you don't want a bunch of peppers falling on
23   them. That was my concern.

73

1    A. Yes.
2    **Q.** I assume everyone had that same
3    concern?
4    A. Yes. There was a lot of complaints
5    on that.
6    **Q.** So, who did you discuss this problem
7    with internally?
8    A. Rocky Franklin.
9    **Q.** Rocky Franklin, who is Mr. Franklin?
10   A. He is the purchasing man down in
11   Hollywood.
12   **Q.** For Great Western?
13   A. Uh-huh.
14   **Q.** What did you and Mr. Franklin discuss
15   as it relates to these pepper lids coming off?
16   A. He would talk to the vendor, and cure
17   the problem.
18   **Q.** Did you have any disagreement with
19   Mr. Franklin that the problem needed to be
20   cured?
21   A. Well, it had to be taken care of.
22   Rocky was beyond me. Rocky done what he
23   wanted to do. I told Rocky about it. Rocky
24   was aware about it.

74

1    **Q.** Did anybody at Great Western indicate
2    to you that it wasn't a problem, don't worry
3    about it?
4    A. Yeah, it was a problem. I take care
5    of it, do what you got to do. If you had a
6    bad pallet of peppers, don't ship them out,
7    short the customer.
8    **Q.** That's what you were instructed, if
9    you had a bad pallet, you should not ship it
10   to customers?
11   A. Right, but when you load a container
12   from Assumption, Illinois, and it goes on rail
13   all of the way to Dachau, Germany, and it gets
14   on the other end, I don't know what it looks
15   like. They never sent me to Germany.
16   **Q.** But you and others at Great Western
17   wanted to make sure that when it got to
18   Germany or wherever its ultimate destination
19   was, that the lids were on properly, and it
20   could be utilized?
21   A. That's where your stress comes in,
22   check every case, tighten the lids up. Your
23   employees don't want to be doing that. We are

75

1    We don't have time to do that. We done the
2    best we could.
3    **Q.** That's what you were being instructed
4    is to check all of the cases and make sure?
5    A. Yes.
6    **Q.** It was putting added work on you and
7    your staff to do these checks to make sure the
8    pepper lids were properly on there, and that
9    they would get to the customers appropriately?
10   A. Right.
11   **Q.** What is your complaint about what the
12   company did with respect to the pepper lids
13   then?
14   A. There was no response. The pepper
15   still came in like same way. It was never
16   resolved. There was nothing done about it.
17   **Q.** So, Mr. Franklin didn't do what he
18   was supposed to do with the vendors to make
19   sure this problem didn't keep occurring as far
20   as you know?
21   A. Evidently not, as far as I know he
22   didn't.
23   **Q.** Other than not being able to cure the
24   problem with the vendors, is there anything

76

1    else that the company did or didn't do that
2    you disagreed with as it relates to these
3    jalapeno peppers?
4    A. He would take a pallet of them off,
5    and if you have one that's busted, it slides
6    all over the place, you can get your employees
7    hurt with the fork trucks. That was one of my
8    complaints.
9    **Q.** Who would you make that complaint to?
10   A. Rocky, everything went back on Rocky.
11   **Q.** Rocky would say he had to fix that
12   problem with the vendors?
13   A. Uh-huh.
14   **Q.** You need to say yes or no. I keep
15   telling you that. I am sorry.
16   A. He would say yes, I need to take care
17   of that.
18   **Q.** Did you ever talk with Mr. Roese
19   about this problem?
20   A. Bob was aware of the problem.
21   **Q.** That wasn't my question. Did you
22   ever talk to Mr. Roese about the problem?
23   A. Yes.

1 Mr. Roese about these jalapeno pepper jars.
2 　A. His conversation was with me. He
3 come up and said we had a problem with these
4 peppers, and I realize that.
5 　Q. What did he say?
6 　A. We have to check them like I told
7 you.
8 　Q. So, Mr. Roese instructions to you was
9 make sure you check the peppers, that the lids
10 are properly on there so they don't come ajar
11 in shipment?
12 　A. If we have to tighten them up,
13 tighten them up, retape the box. Yes, you
14 have to do that.
15 　Q. Did you agree with that precautionary
16 step?
17 　A. Well, yeah.
18 　Q. Any other discussions you had with
19 Mr. Roese that you can recall about these
20 jalapeno peppers?
21 　A. No, not to my knowledge.
22 　Q. What about Reg Bryant, did you ever
23 have any discussions with Reg about these
24 jalapeno peppers?

1 　A. I think Reg was aware of the peppers
2 too. There wasn't too much communication with
3 me and Reggie.
4 　Q. You don't recall anything specific
5 that you would discuss with him?
6 　A. No, no, they would pass it onto
7 Rocky. He would say talk to Rocky about it.
8 　Q. Anything else about the jalapeno
9 peppers we haven't talked about that was a
10 problem?
11 　A. Other than the lids coming off and
12 the leakage, seepage out of the jars, the box
13 would get wet. It wasn't suitable for
14 shipment.
15 　Q. Anything else though?
16 　A. No.
17 　Q. You have also made an allegation in
18 your lawsuit, Mr. Burrus, about some cheese
19 that had been returned by a customer. I
20 believe you claim this occurred sometime
21 around November of 2002. Do you recall?
22 　A. That cheese expired in December of,
23 right at the end of the year. You would get a

1 would expire like a month to two months later.
2 They would return it to our facility.
3 　Q. Is there a specific incident that you
4 remember when that occurred?
5 　A. Oh, yeah, there was many, many
6 incidents where I can tell you the item
7 number. I can tell you what type of cheese it
8 was, where it came from.
9 　Q. Let me do this. In your complaint
10 you allege that in November, 2002 and I will
11 quote, Plaintiff's warehouse received some
12 cheese, which was being sent back from a
13 customer. I will go on to quote the next
14 paragraph, paragraph 12 of your complaint, the
15 expiration date which appeared on the cheese
16 label had lapsed. Then go on to paragraph 13,
17 and I will quote, rather than destroying the
18 cheese, Plaintiff was told that new labels
19 would need to be obtained from the cheese
20 manufacturer so that the cheese could be
21 relabeled with new expiration dates so that it
22 would appear to be fresh cheese.
23 　A. That is true, yes.
24 　Q. Who was the customer that sent back

1 that cheese in November of 2002?
2 　A. Numerous of them.
3 　Q. So, there were more than one?
4 　A. Regal Distributing, Springfield,
5 Missouri, Marjack Company.
6 　Q. This is all in November of 2002?
7 　A. I am not going to say it is all in
8 November. I can't recollect all of the dates.
9 November was pretty darn close because it
10 expired December.
11 　Q. So, it expired in December of, the
12 following month in December?
13 　A. Right.
14 　Q. The expiration had not lapsed at that
15 point?
16 　A. Not at that point, no.
17 　Q. Any other customers that you can
18 recall that would have sent back cheese
19 because the expiration date was getting short?
20 　A. Some would send it back, and it had
21 already been expired. Now, to my knowledge do
22 they hold it in their warehouse or what, I
23 don't know.

81

1    records?
2       A. Well, it could have come from
3    Hollywood, Alabama.
4       Q. Tell me about this incident that you
5    allege in your complaint where cheese is sent
6    back and new labels are obtained. With
7    respect to what customer did that occur?
8       A. That was with Rocky, purchasing
9    telling me we are going to get you some
10   labels. That the cheese is still good. That
11   is a misprint on Gil's part.
12      Q. Who is Gil?
13      A. That was the distributor in
14   Germantown, Wisconsin on the cheese. They
15   claim that that lot number, they had put the
16   wrong date on the box, and that the cheese was
17   still good. But yet on the box the expiration
18   date was expired.
19      Q. Did Rocky then get new labels from
20   Gil?
21      A. I never got no labels. We basically
22   refused it. My people in the shipping area
23   refused it. We wasn't going to relabel cheese
24   that says it was expired.

82

1       Q. Did you ever talk to Gil?
2       A. No, that wasn't my, I never had
3    access to them.
4       Q. So, when Rocky said I will get you
5    some new labels, what did you tell him?
6       A. I just said, well, whatever. I never
7    seen the labels, and I never attempted to
8    relabel any cheese because I wasn't going to.
9    We had to relabel. We relabeled some that was
10   for Germany with a different language. I
11   can't speak German. I don't read German. I
12   don't know.
13      Q. I want to continue to focus on this
14   one where Rocky said he would get you some new
15   labels. He never got you the labels, and it
16   was a non-issue after that?
17      A. I was probably gone after that.
18      Q. Did you ever relabel any cheese?
19      A. Yes, we relabeled cheese. We put
20   labels for Camacho Saidora in Mexico. We had
21   to put a label on that.
22      Q. Did you ever relabel as it relates to
23   the expiration date of the cheese?

83

1    because it basically was stamped on there with
2    a stencil. They might have, even was going to
3    send new boxes that had it stenciled on there,
4    and you take the bags, four bags out, and put
5    them in, and then hot glue it with the glue
6    gun.
7       Q. But that never occurred?
8       A. Not when I was there, no.
9       Q. Did you ever tell Rocky or anybody
10   else that you weren't going to do that?
11      A. That I wasn't going to relabel
12   cheese?
13      Q. Yes, sir.
14      A. I wasn't going to relabel no cheese.
15      Q. That's not my question, Mr. Burrus.
16   My question is did you ever tell Rocky that
17   you were not going to relabel any cheese?
18      A. No, no.
19      Q. Did you ever tell anybody else that?
20      A. Well, yeah, my employees.
21      Q. The people underneath you?
22      A. Yes, they agreed that they wasn't
23   going to do it either.
24      Q. You just ignored it, and the problem

84

1    went away?
2       A. The cheese was still there, but no
3    labels got returned, didn't get no labels to
4    put on, put it that way.
5       Q. This would have occurred around
6    November of 2002?
7       A. Yes.
8       Q. Did you ever discuss the issue with
9    Reg Bryant?
10      A. At that point I was commanded by Bob
11   Roese.
12      Q. That's not my question, Mr. Burrus.
13      A. No.
14      Q. My question is --
15      A. No, no.
16      Q. -- you never discussed it with Reg
17   Bryant?
18      A. No.
19      Q. Did you ever discuss it with Mr.
20   Roese about this potential relabeling of
21   cheese?
22      A. I believe I have, yeah.
23      Q. When did you discuss it with Mr.

85

1    A. Around that time.
2    Q. Tell me about that discussion.
3    A. Discussion was that Rocky wanted to
4    have me relabel cheese, and he said well,
5    whatever Rocky wants to do, that's what we
6    will have to do then.
7    Q. What did you say?
8    A. I refused to do it. So did my
9    employees. They wasn't going to relabel
10   cheese.
11   Q. Is that what you told Mr. Roese? I
12   am trying to focus on what you said to Rocky.
13   A. I told you not to my knowledge, I
14   don't think I said anything to Bob about the
15   cheese.
16   Q. You don't think you had a
17   conversation with Mr. Roese about the cheese?
18   A. He was aware of the cheese coming
19   back.
20   Q. That's not my question, Mr. Burrus.
21   I want to know what discussions you had with
22   Mr. Roese about the cheese, if any. Do you
23   recall any discussions with him?
24   A. My discussion with Bob about the

86

1    cheese, his discussion with me was to talk to
2    Rocky Franklin.
3    Q. You get the cheese back from the
4    customer, and Bob says talk to Rocky, see what
5    he wants to do?
6    A. Right.
7    Q. That's the only discussion that you
8    had with Mr. Roese about the cheese?
9    A. Yeah.
10   Q. Did you talk with anybody else at
11   Great Western about this cheese? You didn't
12   talk to Mr. Bryant. You told me what you
13   talked with Bob Roese about, and you told me
14   your discussion with Rocky Franklin. Did you
15   talk with anybody else at Great Western about
16   this cheese issue?
17   A. Trish Hardick.
18   Q. Who is Trish Hardick?
19   A. Hardick I believe her name is. They
20   change so many people down there. It is
21   always somebody different and Mary Smith. She
22   was customer service.
23   Q. Let's take Trish Hardick first. What
24   was your discussions with Trish about the

87

1    cheese?
2    A. She said that we have a lot. We have
3    overstocked ourselves on this cheese, and you
4    are going to have a lot coming back. She
5    wasn't aware of no relabeling.
6    Q. What about with respect to any
7    discussions with Mary Smith?
8    A. The same with Mary, Mary was just
9    Mary.
10   Q. All your discussion with them was
11   gee, we have overstocked it?
12   A. Not gee we -- they did.
13   Q. Somebody overstocked the cheese, and
14   you are, you should expect to get a lot back?
15   A. Expect to get a lot of it back, yes.
16   Q. But other than that you didn't have
17   any other discussions with anybody else at
18   Great Western about this cheese issue?
19   A. Just purchasing and customer service.
20   Q. And purchasing is Rocky?
21   A. Right.
22   Q. I take it you didn't report to Rocky.
23   He wasn't your boss?
24   A. No. He done all of the ordering of

88

1    everything.
2    Q. Do you even know who Rocky's boss
3    was?
4    A. No, I don't know. That was down in
5    Hollywood, Alabama. Probably Mr. Martin at
6    the time.
7    Q. But you don't know, you are just
8    guessing?
9    A. No, I don't know.
10   Q. Mr. Burrus, did you ever file an OSHA
11   complaint against Great Western?
12   A. No.
13   Q. No? Did you say no?
14   A. No.
15   Q. Did there ever become an issue at
16   Great Western while you were employed there
17   about any sort of OSHA, potential OSHA
18   violation or inspection?
19   A. Yes, there was somebody that OSHA
20   came in. They had some violations, yes.
21   Q. When did that occur?
22   A. Around, it was right after inventory,
23   I believe. We done inventory I am going to
24   say around July.

89

1    Q. Do you know what year?
2    A. It would have been 2002.
3    Q. Do you know what the issues were?
4    A. Falling racks, oil on the floor, I
5    ain't for sure. I have a copy of that.
6    Q. Of the OSHA letter?
7    A. Yeah.
8    Q. How did you get that?
9    A. It was posted. Anybody could have a
10   copy of it.
11   Q. It was posted at work?
12   A. Yeah.
13   Q. You made a copy of it?
14   A. No. There was copies. Everybody
15   could have a copy.
16   Q. Do you know what caused OSHA to look
17   into those issues?
18   A. Looks like they got reported.
19   Q. But you don't know?
20   A. But I don't know who reported them,
21   no.
22   Q. Did you ever have any discussions
23   with anybody at Great Western about the issue
24   raised by the OSHA letter?

90

1    A. As far as?
2    Q. Anything.
3    A. Falling racks or anything?
4    Q. Just gee, we have this letter, what's
5    it mean, or anything relating?
6    A. You get a letter, it is basically
7    what they are telling you has to be fixed.
8    So, we all proceeded to get it done.
9    Q. That's not my question. My question
10   is did you discuss those issues with anybody
11   within Great Western?
12   A. The company discussed it with us.
13   Q. Who is the company that discussed it
14   with you?
15   A. Management there.
16   Q. Tell me who the individuals were.
17   A. Well, it could have been Bob. It
18   could have been Phil.
19   Q. I know it could have been a lot of
20   people, but who actually? Do you recall
21   somebody discussing it with you?
22   A. Discussing it with me, they had to
23   take care of that problem.
24   Q. Mr. Burrus, I appreciate if you would

91

1    listen to my question. Did you have any
2    discussions with anyone, or did anybody have
3    any discussions with you about any --
4    A. I had discussion to get the racks
5    fixed.
6    Q. Could you wait until I finish my
7    question. It is real hard on her if we are
8    both talking at the same time, and sometimes I
9    am slow, so you have to bear with me.
10   A. All right.
11   Q. Did you have any discussions with
12   anyone in the management of Great Western
13   about any of the issues that were raised by
14   OSHA?
15   A. I think Reg. That's when I had to
16   ask about purchasing racks, have the racks
17   fixed.
18   Q. So, you think maybe you discussed it
19   with Reg Bryant?
20   A. I think I was still under Reg at that
21   point.
22   Q. What did you and Mr. Bryant discuss
23   about the racks?
24   A. That the welds was breaking, and that

92

1    we needed to get somebody in there to either
2    get new racks or get them welded.
3    Q. What was Reg's response to that?
4    A. For me to go ahead and pursue it.
5    Q. He wanted it fixed?
6    A. Yeah.
7    Q. Did you pursue it to get it fixed?
8    A. Yes, I got a hold of Jeff Pennell,
9    Pennell Fork Truck Service, Jacksonville
10   Illinois. Plant manager Bob had a local
11   welder come in from Moweaqua, Illinois and
12   weld the racks.
13   Q. So, Bob Roese had arranged for that?
14   A. Bob did, yes. Bob took care of that.
15   Q. Any other discussions you had with
16   anybody at Great Western about any issues
17   raised by the OSHA letter?
18   A. Other than Hollywood, Alabama, the
19   purchasing, that we're being overstacked,
20   pallets being stacked on top of each other,
21   could be falling on people.
22   Q. You had discussions with Rocky?
23   A. With Rocky, yes, that kind of slowed
24   down a little bit on purchasing, and we are

93

1 getting overcrowded up here pretty bad.
2   **Q.** So, you were just instructing Rocky,
3 to the extent he could, not to send you so
4 much merchandise?
5   **A.** The best of his ability of what he
6 could, yeah.
7   **Q.** Was he agreeable to that as far as
8 you knew?
9   **A.** Yes. He would always say yeah, but
10 you wouldn't get no response.
11   **Q.** Any other discussions you had with
12 anybody at Great Western about the OSHA
13 issues?
14   **A.** No.
15   **Q.** Had you ever complained to anybody
16 about any of the issues that OSHA had raised?
17   **A.** Just that pertained to my department,
18 like I said with Reggie. Other than that
19 nobody else, no.
20   **Q.** So, once the issues were identified
21 and they were within your scope to correct,
22 you went about correcting them issues?
23   **A.** Right, but it went to the point where
24 it was taken over by another person, and it

9

1 areas, and pulling product off the shelves,
2 and getting orders ready. I have numerous
3 trucks that had to wait because it took a long
4 time to get the order, to get the product, and
5 yet make sure it was right.
6   **Q.** This was sometime in the summertime.
7 Do you recall what year this occurred?
8   **A.** This was the last year that I was
9 there in the summer months.
10   **Q.** 2002?
11   **A.** Yes.
12   **Q.** Who did you talk to about this issue?
13   **A.** At that point Jerry was there, and I
14 told Jerry I didn't think it was a very good
15 idea. He basically said well, we have to stay
16 and do it. We have to get the product to the
17 customer on time.
18   **Q.** That was the only time that you had
19 ever talked to anybody about any sort of
20 safety issue?
21   **A.** To my knowledge, yeah.
22   **Q.** It was just with Mr. Hulleback?
23   **A.** Yes, at that point Jerry was, I think
24 Jerry was still -- no, I take that back. It

94

1 was taken care of. They took care of it.
2 They had them welded up by a local person
3 there in Moweaqua.
4   **Q.** Had you ever complained about any
5 sort of safety issues yourself?
6   **A.** Well, it was like on the energy saver
7 where he shut the power off at 1 o'clock in
8 the afternoon. They would have us stay there,
9 my people, the Shipping Department, and use
10 flashlights, and your lights off your fork
11 trucks in a pitch dark warehouse to pull
12 products, and keep the trucks coming in. That
13 was my only complaint. That was endangering
14 me and my employees.
15   **Q.** When did that occur?
16   **A.** That was in the summertime hours when
17 there was over usage of power. People was
18 using air conditioners and stuff like that,
19 and they would shut, you was supposed to shut
20 the power off and not use none, and they would
21 get to go home early. We would stay and load
22 trucks. That one night we was there until 11
23 o'clock for the fact that we was using
24 flashlights, and driving fork trucks in dark

96

1 was Reggie. Reggie had to be the one, because
2 Jerry was long gone by then.
3   **Q.** So, it wasn't --
4   **A.** It would have been Reg.
5   **Q.** Do you recall what Mr. Bryant said
6 about it?
7   **A.** Take care of it, but I know that
8 there was two episodes when I did talk to
9 Jerry about it, and then with Reggie too.
10 That was about the only as far as safety, but
11 that wasn't on no OSHA report. You asked me
12 if I had a complaint of safety.
13   **Q.** Of safety, right.
14   **A.** That's the only thing there. Other
15 than that and the contamination of the corn.
16   **Q.** But this is the only safety issue you
17 had ever raised with anybody was this, when
18 the power was shut off, and having to use
19 flashlights?
20   **A.** Yes, yes.
21   **Q.** Was this a situation where the power
22 company would actually cut off the power?
23   **A.** They wouldn't cut it off. They would
24 monitor it. We would go back there and hit

97

1  the breaker.
2  **Q.** But it was sometime in the summer of
3  2002?
4  **A.** Yes, and '1.
5  **Q.** And what?
6  **A.** They was on that program for quite
7  awhile.
8  **Q.** So, it was probably the prior year as
9  well?
10  **A.** Where we are getting into on the OSHA
11  deal that was falling stuff coming out of the
12  racks. When it is dark, and a guy nudges a
13  pallet, you know, and puts it a little
14  sideways, it could fall on you. That's where
15  we are getting back to where some of those
16  complaints was probably brought in by an
17  employee for all I know.
18  **Q.** But you just don't know who that
19  employee is?
20  **A.** No, I don't know who that employee
21  is.
22  **Q.** Nobody from the company ever accused
23  you of being an employee that complained to
24  OSHA, did they?

98

1  **A.** Not in so many words, but in a
2  different way. No, no, my answer is no on
3  that.
4  **Q.** So, nobody at Great Western accused
5  you of doing that?
6  **A.** No, no.
7  MR. GIVEN: Mark this as One.
8  (Whereupon said document was duly marked,
9  for purposes of identification, as
10  Exhibit Number One, as of this date.)
11  **Q.** Mr. Burrus, I am going to hand you
12  what has been marked as Exhibit One. Take a
13  second to look at that, sir. I am going to
14  ask you a question or two about it. Okay, can
15  you tell me, this appears to be a memo from
16  Reg Bryant to you regarding a performance
17  review. Have you seen this document before?
18  **A.** Sure have.
19  **Q.** Did Mr. Bryant go over this document
20  with you at some point in time?
21  **A.** Uh-huh, on the phone conversation.
22  **Q.** When did that occur?
23  **A.** On this date here.

99

1  **A.** Yes. He faxed it to me, I believe,
2  to my knowledge.
3  **Q.** So, you saw a copy of it?
4  **A.** He discussed it with me on the phone,
5  and faxed me shortly after that.
6  **Q.** Tell me what you recall about your
7  discussion with him when he advised you of his
8  performance review?
9  **A.** Lots of this is a bunch of bogus here
10  because I done every procedure that he has got
11  in here. Like this forwarded from Assumption
12  without proper documents, I faxed all my
13  proper paperwork down to him, for example.
14  The shipment, refusal of chips, they kept
15  bringing in the chips. I never refused no
16  chips. It wouldn't do no good. I tried.
17  **Q.** Mr. Burrus, listen to my question.
18  **A.** Okay.
19  **Q.** Do you recall the discussion that Mr.
20  Bryant had with you about this performance
21  review?
22  **A.** Uh-huh.
23  **Q.** Tell me what he said to you, sir.
24  **A.** As far as what?

100

1  **Q.** I don't know. I wasn't part of the
2  conversation. That's what I want to know. I
3  want to know what he said to you. Did he just
4  read it to you?
5  **A.** He covered the bases of everything
6  that it says right here, yes.
7  **Q.** What did you say in response?
8  **A.** I will do the best I can. I did.
9  **Q.** Is that your only response?
10  **A.** My response that I would go with his
11  recommendations of what he wants to be made
12  here. That was my response.
13  **Q.** So, you didn't disagree or argue with
14  him about the items that he identified here in
15  Exhibit One?
16  **A.** The 169 customer complaints wasn't
17  brought to my attention.
18  **Q.** You say it wasn't brought to your
19  attention. That's what it states in this
20  document, correct?
21  **A.** But it wasn't brought to my
22  attention.
23  **Q.** Did you have discussions with him

101

1      A. No. This just all one day come up,
2    said you have 169 customer complaints. I
3    asked him let's see them.
4      Q. What did he say?
5      A. He couldn't, okay. He couldn't show
6    me 169 complaints.
7      Q. Did you follow up with him after
8    this?
9      A. Yes. Everything in this, what he
10   wanted here, I followed up with him on this.
11   See, here is where you're going to get me on,
12   the dates. I can't remember these dates.
13     Q. He also sets out some goals for 2003
14   on, starting on Page 2 of Exhibit One. See
15   those.
16     A. Starting at the top.
17     Q. Well, starting about a third of the
18   way down the page where it sales goals for
19   2003.
20     A. Communication of weekly activity
21   report will be faxed, yes, I did that.
22     Q. So, you were required to do weekly
23   activity reports?
24     A. Uh-huh.

102

1      Q. And you would have faxed those to Mr.
2    Bryant?
3      A. Uh-huh.
4      Q. You need to say yes or no.
5      A. Yes.
6      Q. With the information that he wanted?
7      A. Yes.
8      Q. That was done every week?
9      A. If I had time, yeah.
10     Q. If you didn't have time, you wouldn't
11   do it?
12     A. I would do it on a Monday.
13     Q. Was there an unannounced inspection
14   of the warehouse in Assumption that occurred
15   after this?
16     A. It says during the review warehouse
17   must be clean and orderly. I proceeded with
18   that procedure, and I did it.
19     Q. But was there an unannounced
20   inspection of the warehouse by anyone from
21   Great Western's management?
22     A. Not that I can recall, no.
23     Q. Were customer service complaints then

103

1    respond to them in writing?
2      A. Yes, they was.
3      Q. Would you respond to them?
4      A. Yes, I would.
5      Q. Who would you send the response to?
6      A. Well, it would have been Trish, but
7    they got somebody else in here. Who was that,
8    the first page here.
9      Q. It says after his review Greg will be
10   required to submit in writing to Reg Bryant
11   corrective action to take and to prevent --
12     A. To prevent this from happening.
13     Q. Would you send Reg these things?
14     A. Yes.
15     Q. Did you do that?
16     A. Yes, I did.
17     Q. What about when he ceased to be your
18   supervisor, what would you do?
19     A. From there on it is kind of like
20   blank in my mind. That's when I kind of went
21   off on the edge.
22     Q. You say went off on the edge. What
23   do you mean?
24     A. I just, everything was, I was hitting

104

1    rock bottom then.
2      Q. You don't remember what happened
3    after that?
4      A. I remember that I done everything --
5    this was for me to take care of, and at this
6    point I done all this. Then from this point
7    on I think I was gone from the company then to
8    my recollection.
9      Q. When did Reg Bryant quit being your
10   supervisor? Wasn't it right after this?
11     A. Right after this, about January.
12     Q. About January? So, what would you do
13   after he quit being your supervisor with
14   respect to these?
15     A. I would report to Bob Roese.
16     Q. Did you submit written reports to Bob
17   Roese as you were supposed to submit to
18   Reggie?
19     A. My employment didn't last that long
20   there. Me and Bob, me and Bob would sit down
21   and look at them together that they came from
22   Hollywood, and at that point we had another
23   person, that I didn't have to send them to
24   Reg. I sent them to somebody else. I can't

1  recall who it was. It was Trish, I believe,
2  yeah. I know for a fact it was.
3    **Q.** Trish Hardick?
4    A. Yes.
5    **Q.** So, you don't know of any written
6  reports you would have submitted to Bob Roese
7  when he started back becoming your supervisor?
8    A. Me and Bob.
9    **Q.** My question is you don't know of any
10  written reports that you would have submitted?
11    A. No, I never sent nothing to Bob.
12    **Q.** What's a cycle inventory?
13    A. Cycle inventory you take, oh, 20
14  different products, and do a cycle count each
15  week on them.
16    **Q.** When you say a cycle count, what do
17  you mean?
18    A. That means that them 20 products they
19  want you to count them, and take it off, see
20  if it matches up with their inventory. Cycle
21  counts would be like okay, our computer says
22  you got this many bags of corn, how many bags
23  of corn do you got. I would put my number
24  down, fax it to Dusty Matthews. Dusty would

1  come back and say okay, you are off. Please
2  count it again. We would count it again, and
3  90 percent of the time my count would still be
4  the same, but they would have a different
5  count. It wasn't getting deducted out of
6  their computer or what have you.
7    **Q.** How often were cycle inventories to
8  be completed?
9    A. Once a week.
10    **Q.** Did you complete them once a week?
11    A. Yes. We got to the point where it
12  was mandatory, and we did it, yeah.
13    **Q.** When was that point?
14    A. If we was real super busy, he would
15  allow overtime to take care of it. We got to
16  where we would do them every week.
17    **Q.** Who is he would allow?
18    A. Whoever authorized overtime, somebody
19  in Hollywood. At that point it could have
20  been, it was probably Reg. It was real
21  important when Jerry was there that we did
22  cycle counts too.
23    **Q.** At the end of that Exhibit One the

1  will be, a follow-up progress review will be
2  performed in three months --
3    A. Uh-huh.
4    **Q.** -- at which time further
5  recommendations will be made. What did you
6  understand that to mean?
7    A. On cleanliness, cycle counts, general
8  cleanliness, the wrapping of the skids, and
9  making sure the shipments was properly shipped
10  out.
11    **Q.** So, there was going to be an
12  assessment of how well you were doing on those
13  things after three months?
14    A. Yes, yes, basically.
15    **Q.** Did you have any discussion of what
16  would occur at the end of three months?
17    A. A discussion?
18    **Q.** With Mr. Bryant.
19    A. No. At that point I was dealing with
20  Bob, I believe, Bob Roese.
21    **Q.** At the point you were given this by
22  Reg Bryant, you were dealing with Reg Bryant
23  as your supervisor?
24    A. Shortly after this I wasn't dealing

1  with Reg on this.
2    **Q.** Did Mr. Bryant say anything to you
3  about what this three month follow-up review
4  would be?
5    A. No.
6    **Q.** Was there any discussion?
7    A. He made a discussion on a phone
8  conversation that, which I have that paperwork
9  there at home, I believe. Bradley has it too,
10  where we had a phone conversation, but there
11  was nothing written in writing, that I would
12  receive a 3 percent increase in my wages, but
13  that really wasn't the issue. The issue was
14  to get all of this performance of what he
15  wanted done got done. That was what I wanted
16  to do, and that's what I did.
17    **Q.** You said you have some documentation
18  of a phone conversation or some paperwork.
19  When are you talking about?
20    A. When he called me on the phone and we
21  discussed it, I was to shut the office door,
22  and nobody would be in there, and he basically
23  went over stuff with me about customer

1  all this, and that I would receive a 3 percent
2  wage increase, but that wasn't stated in any
3  of this paperwork.
4     **Q.** So, what paperwork --
5     A. That was prior to this letter here.
6     **Q.** Had he already given you this outline
7  for you, these issues prior to this?
8     A. Yes. He told me that I would have
9  another review after this was taken care of.
10  I believe that's the way it went.
11     **Q.** You mentioned some paperwork.
12     A. I had some paperwork -- he wanted me
13  to give him some paperwork to respond on his
14  complaint. You probably got that one.
15     **Q.** I may have.
16     MR. GIVEN: Mark that as Two.
17     (Whereupon said document was duly marked,
18     for purposes of identification, as
19     Exhibit Number Two, as of this date.)
20     **Q.** Mr. Burrus, just so it is clear I am
21  going to hand you Exhibit Number Two. This is
22  not the paperwork. That we will get to in a
23  minute that you were just referring to. This
24  is something that came from Mr. Bryant. So, I

1  didn't want to confuse you before I handed it
2  to you. Can you identify what Exhibit Two is,
3  please.
4     A. About the cycle count.
5     **Q.** Well, this appears to be a memo from
6  Reg Bryant to you dated December 18, 2002?
7     A. Uh-huh.
8     **Q.** It shows that, your signature, looks
9  like your signature to the bottom right --
10     A. Yeah.
11     **Q.** -- of the document where it is dated
12  12-23-02. Is that your signature at the
13  bottom?
14     A. Yes.
15     **Q.** Would you have signed it on or about
16  December 23 of 2002?
17     A. Whenever I dated it, yeah.
18     **Q.** So, this was a document that Mr.
19  Bryant sent to you about cycle inventories?
20     A. Well, let me make sure. It shows
21  here ongoing problem. Well, I do the cycle
22  counts, but just because their number didn't
23  match my number, they thought it was an

1  on my half. I mean my numbers that I give
2  them was the numbers that I had.
3     **Q.** One of the issues that's raised here
4  is the timeliness of doing cycle counts, is it
5  not?
6     A. The time limit?
7     **Q.** Timeliness.
8     A. Uh-huh.
9     **Q.** Was that concern raised with you,
10  they had to be done on schedule?
11     A. We had to have them turned in by
12  Friday, I believe, by the end of the week, or
13  it was the middle of the week. It might have
14  been the middle of the week. We done them the
15  middle of the week, and we had to the end of
16  the week if we had recounts, we would recount
17  them.
18     **Q.** He is telling you that this is an
19  important issue that needs to be tended to.
20  Isn't that the purpose as you understood it of
21  this?
22     A. Of the cycle counts.
23     **Q.** Of this communication to you though.
24     A. Yes, yes, I understood this real

1  well.
2     **Q.** Did you think Mr. Bryant -- what was
3  your understanding, Mr. Burrus? Did you think
4  he was pleased with your performance as of
5  December of 2002 or not?
6     A. No, I don't think so.
7     **Q.** Is that what he told you, that he
8  wasn't pleased with it?
9     A. Well, all you have to do is read the
10  letter here Allen Mitchell, the chief
11  operating officer called me concerning -- he
12  wasn't happy with it, but what do they want me
13  to do, change numbers? I give them the right
14  number, the number that I counted on cycle
15  counts that they wanted.
16     **Q.** What this memo to me it seems to
17  address is not performing cycle counts, not
18  what the numbers you're coming up with, but
19  the failure to perform them as scheduled. Do
20  you see something different in this memo that
21  relates to the numbers that you are coming up
22  with?
23     A. Well, at this point you could have