1  cycle counts in. You might have shipped a few
2  loads out after that. So, then therefore, you
3  go back and count, and your cycle counts are
4  going to be different. There had to be a
5  point to where, you know what I am saying.
6  There had to be a point to where you had to
7  basically, probably would have been better if
8  after the end of the shipments during the day
9  and then count them from there, but yet you
10  are faxing this paperwork down to Hollywood
11  that these shipments have been shipped, and
12  somehow between him and us they got screwed up
13  on what went out, what came in, vice versa.
14  There had to be a breaking point is what I was
15  trying to say.
16      Q. Let me quote from the letter so that
17  we are on the same page here, and this is, I
18  am quoting the third paragraph where he says,
19  quote, the cycle count process is a required
20  activity, and failure to perform cycle counts
21  as requested will be grounds for termination.
22      A. Uh-huh.
23      Q. It goes on in the next paragraph, the
24  fourth full paragraph to say, I have been

1  informed that failure to perform cycle counts
2  in Assumption has been an ongoing problem. We
3  must make sure that it is never a problem in
4  the future.
5      A. Uh-huh.
6      Q. Did you understand that he was
7  pointing out the problem was the failure to do
8  cycle counts?
9      A. Yes, but there was no failure to do
10  them. They was done, but they didn't like the
11  numbers they was getting.
12      Q. You disagree with Mr. Bryant that
13  there had been any failure to perform the
14  cycle counts?
15      A. There wasn't.
16      Q. He is just wrong in that?
17      A. Right. We would double up on them.
18  If there was a busy week, and shipping was
19  going out, they would tell you don't worry
20  about them this week, or take a little extra
21  time to do it.
22      MR. GIVEN: Mark that as Exhibit
23  Three.

1      (Whereupon said document was duly marked
2  for purposes of identification, as
3  Exhibit Number Three, as of this date.)
4      Q. Mr. Burrus, I am going to hand you
5  what has been marked as Exhibit Three, which
6  appears to be a memo from Reg Bryant to you
7  dated January 2 of 2003. Have you seen this
8  document before, sir?
9      A. Uh-huh.
10      Q. Is that a yes?
11      A. Yes, sorry.
12      Q. Would you have seen it on or about
13  the 2nd of January of 2003?
14      A. Yes.
15      Q. Do you recall discussing with Mr.
16  Bryant the issues raised in this memo, which
17  is Exhibit Three?
18      A. Would you say that again.
19      Q. Sure. Did you have a discussion with
20  Mr. Bryant about this memo when he showed it
21  to you?
22      A. Over the phone.
23      Q. Tell me what you recall about that
24  discussion.

1      A. I told him I would comply with it,
2  and proceed with this.
3      Q. What were you complying with?
4      A. Everything he states in the letter
5  here.
6      Q. Well, he is talking about
7  establishing standards, identifying
8  opportunities for improvement, measure
9  performance. What did you do with regard to
10  any of those items?
11      A. That's probably when we come out with
12  our shipping evaluation sheet and our
13  receiving evaluation sheet at this point.
14  That was one of the things that me and Bob
15  Roese come up with there at the plant. Me and
16  him sat down. At this point here shortly
17  after this this is when he told me that I
18  needed to report to Bob Roese, and me and Bob
19  sat down, and we come up with this good little
20  thing that, the sheet of shipping. Like I was
21  telling you the condition of the trailer,
22  number of pallets, trailer number, time that
23  the truck came in, time that it was loaded and

117

1   me and Bob Roese, that we would improve the
2   shipment.
3       **Q.** How did you learn that Reg Bryant was
4   going to no longer be your supervisor?
5       A. He called me on the phone and told me
6   that I didn't, that he is so far down there,
7   that he was busy handling, trying to get their
8   trucking company out of a big bind, it was all
9   messed up, and that I think he realized at
10  that point that there was no communication
11  with me and him, that there would be with me
12  and Bob because Bob was in Assumption right
13  next to me.
14      **Q.** That's when Bob took over as your
15  supervisor?
16      A. That's when Bob took over.
17      **Q.** Did you think that was good news or
18  bad news?
19      A. I thought that was bad news.
20      **Q.** Why is that?
21      A. I thought well, right here they are
22  wanting to weed me out of my job.
23      **Q.** What gave you that perception?
24      A. They was taking away job tasks that

118

1   was mine, like having Bob Miller do my cycle
2   counts.
3       **Q.** Who was taking away any job tasks
4   that were yours?
5       A. Bob Roese.
6       **Q.** What did Bob Roese take away from you
7   when he became your supervisor?
8       A. My employees.
9       **Q.** How did he take away employees?
10      A. Would call in one of my employees,
11  ask him questions instead of me.
12      **Q.** What employee did Bob Roese call in
13  to ask questions?
14      A. All of them, Bob Miller, Pierre, Paul
15  Latch, Beverly, start having Misti, start
16  communicating with the trucks coming in and
17  out, setting up the loads, stuff like that,
18  job tasks that used to be mine.
19      **Q.** Bob was involved in those?
20      A. Yeah.
21      **Q.** Did you voice any disagreement about
22  that?
23      A. There wasn't nothing I could do. I
24  had to go with the flow.

119

1       **Q.** You didn't voice any disagreement?
2       A. It didn't do any good if I did.
3       **Q.** That wasn't my question. You didn't
4   voice any disagreement?
5       A. I probably did, but at this point I
6   don't remember what I said.
7       **Q.** You don't know what you said to whom.
8   You don't know who you you might have talked
9   to?
10      A. My employees, I talked to them.
11      **Q.** So, was Mr. Roese then taking on some
12  of your job responsibilities?
13      A. Oh, yeah.
14      **Q.** Did you have discussions with Mr.
15  Roese about that, or the transition of those
16  responsibilities?
17      A. We all tried to work together. Let's
18  put it that way.
19      **Q.** Well, that wasn't my question, Mr.
20  Burrus. My question is did you have
21  discussions with Mr. Roese about the
22  transition of those job duties that you say he
23  was taking away from you and putting onto
24  himself?

120

1       A. Yeah, like evaluations and stuff like
2   that. I do evaluation on my employees for a
3   pay increase. He evaluated Bob Miller, which
4   I have no knowledge of whatsoever. Bob comes
5   up, he gets a dollar raise on his check. Paul
6   is sitting right next to him, didn't like it a
7   bit. Paul comes back on me. Therefore, they
8   lose leadership in me.
9       **Q.** Did you discuss this with Mr. Roese?
10      A. Yeah. I walked in and talked to him.
11  I said did you evaluate Bob. He said yeah. I
12  said well, he got a dollar an hour increase.
13  Well, good for him. That's what was said.
14      **Q.** That was all of the discussion on it?
15      A. That was all of the discussion. At
16  the same time when you got another guy that
17  had not got a raise yet, was due for a raise
18  when the agreement him being hired that he
19  would be evaluated for a raise, and never got
20  one, that's when your employees start going
21  against you then.
22      **Q.** So, did you bring that to Mr. Roese's
23  attention to try to remedy that situation?
24      A. Yeah.

121

1    **Q.** You did?
2    A. Yeah, I believe so.
3    **Q.** What did you say?
4    A. That's whenever I said did you
5    evaluate Bob, and he said yes, I did. I put
6    him in, and I said thanks a lot for letting me
7    know.
8    **Q.** How does that -- you didn't raise
9    with Mr. Roese though the issue of Mr. Latch?
10   A. Yeah, we would try to get his
11   insurance that he should have got after being
12   a full-time employee after so many months and
13   so many hours, and never got it.
14   **Q.** What did you discuss with Mr. Roese
15   about Mr. Latch or his evaluation or lack of
16   evaluation?
17   A. Why hasn't he got a wage increase,
18   and he would fall back and say it was due to
19   Allen Mitchell.
20   **Q.** That's what Mr. Roese would say?
21   A. Yes.
22   **Q.** When did this conversation occur?
23   A. I am going to say about January of
24   2003.

122

1    **Q.** Anything else you recall about it?
2    A. No, at that point I was probably
3    gone, which would have been in February. I
4    resigned in February.
5    **Q.** Any other job duties that Mr. Roese
6    took on of yours after he became your
7    supervisor?
8    A. Telling me how to take care of my
9    product, how to store it, where to put it,
10   where he didn't want it.
11   **Q.** As your supervisor did you think that
12   was appropriate or inappropriate?
13   A. I thought that was appropriate. I
14   dealt with that.
15   **Q.** How was he taking on your job duties
16   then in that respect?
17   A. They was my duties before. My duties
18   was to call like overnight if I had a pallet
19   to go out, have them come in. He would put
20   that job on the secretary, which didn't know
21   nothing about it, Misti Klay. She started
22   doing the trafficking, and scheduling the
23   trucks where I used to do it. I would have

123

1    After that they didn't know what they was
2    doing. Things weren't going too smooth.
3    Things started really getting stressful on me
4    then.
5    **Q.** What started getting stressful on
6    you, Mr. Burrus?
7    A. The trucking, like say the go ahead
8    and pull a load for California. Well, the
9    Oregon truck pulls up first when the
10   California truck should have pulled up.
11   That's an example. We are going to use that
12   for an example. That gets frustrating when
13   you have to tell the employees okay, she
14   screwed up, let's pull it back off, we are
15   going to ship this load here. That's when
16   your mistakes start getting, you are going to
17   have mistakes then. Then everything is
18   haywire. Everything is messed up. You have
19   to start all over again.
20   **Q.** I take it you didn't like it that Mr.
21   Roese changed some of the duties that you had,
22   and changed some of the procedures within your
23   Department, is that accurate?
24   A. Yeah, yes.

124

1    **Q.** That frustrated you?
2    A. It would frustrate anybody. It
3    didn't only frustrate me. It frustrated my
4    employees too.
5    **Q.** Did it create stress on you?
6    A. Well, yeah, it did, stress on them
7    too.
8    **Q.** Are you contending at all that Mr.
9    Roese didn't have the right as your supervisor
10   to implement those changes?
11   A. I don't think he did, no. He didn't
12   have that right without discussing it with me.
13   **Q.** Why would he have to discuss that
14   with you?
15   A. Because I was shipping manager.
16   **Q.** But he is superior to you in the
17   organization. He is your boss?
18   A. Right, he is my boss. He is not the
19   one to take over my job. He was my boss.
20   **Q.** So, you didn't like the way that he
21   was managing you?
22   A. No, no.
23   **Q.** You did or you didn't like it?
24   A. I didn't like the way he was managing

125

1  me, no. There is no paperwork like this from
2  Bob to me, like there was from Reg or Jerry.
3  It was his way or no way, hit the highway.
4  Basically that was the way I seen it.
5  **Q.** You didn't like that?
6  A. Yes.
7  **Q.** You ultimately decided to hit the
8  highway?
9  A. To a certain, at a point to where, I
10  was at the point to where I was literally
11  going nuts. By my family I think would be
12  worth more than my job, but yet I had to have
13  a job. The pressure was on. I was just a
14  hateful person to my family. I made that
15  decision. Yes, you could say that. I was
16  pressured into that. I mean I was blackballed
17  out of there. That was my decision. I mean
18  when I signed the paper, which the deal was to
19  get my last check and turn my uniforms in, I
20  had to sign that resignation paper, which you
21  got a copy of that. That's the only one they
22  got. They claim I quit three times. I
23  didn't.
24  **Q.** Well, there came a time in January of

126

1  2003 when you told Bob that you were quitting,
2  isn't that true?
3  A. Bob said I don't want you to quit,
4  take the rest of the day off, come back.
5  **Q.** That was his response when you said I
6  want to quit, that I am feeling too much
7  stress?
8  A. I --
9  **Q.** Let me finish my question so we can
10  get it down, because we can't both be talking,
11  and then I will give you a chance.
12  A. Okay.
13  **Q.** In January of 2003 you went to Bob
14  and told him you were feeling a lot of stress
15  in your life, and that you were quitting your
16  job. That's what you told him. Is that not
17  accurate?
18  A. That I was quitting my job, I think I
19  wanted some time off maybe. I can't recollect
20  if I said I was quitting my job. At the time
21  that I quit my job was when I signed that
22  resignation paper.
23  **Q.** In January you told him that you

127

1  you were quitting, and his response was he
2  wanted to talk you out of it, and said no, why
3  don't you give it some time and think about
4  it, and think about staying, told you you
5  needed a job, didn't he?
6  A. Yes, he told me he didn't want me to
7  quit. I said I don't want to quit either. He
8  told me to go ahead and take some time off.
9  **Q.** That was his response?
10  A. To take some time off.
11  **Q.** To take some time off because?
12  A. Because I was stressed out.
13  **Q.** Because he didn't want you to quit?
14  A. I was stressed out. There wasn't no
15  mention about quitting. I needed some time
16  off.
17  **Q.** Your testimony under oath, Mr.
18  Burrus, in January of 2003 you never told Mr.
19  Roese that you were quitting your job, or that
20  you wanted to quit your job?
21  A. Maybe. I don't recall that day now.
22  I am not saying I didn't say I was quitting my
23  job, but I ain't going to say that I said it
24  that date that you are saying.

128

1  **Q.** Well, I am talking about before you
2  ultimately resigned in February and signed the
3  paperwork. A month before that you had gone
4  to Mr. Roese and told him you were quitting
5  your job?
6  A. I don't recall that, that I told him
7  I was quitting.
8  **Q.** You do recall him saying take some
9  time off, don't quit?
10  A. I recall him telling me to take, that
11  he would prefer me to take, to go home and
12  think about it. That's what it was.
13  **Q.** What were you to be thinking about?
14  A. How to improve my job ability.
15  **Q.** I am not talking about February now
16  when you ultimately called in and you quit.
17  A. Yeah.
18  **Q.** I am talking about a discussion that
19  you would have had with Mr. Roese --
20  A. Uh-huh.
21  **Q.** -- when you were telling him about
22  some personal problems that you were having,
23  and that you wanted to quit.

129

1  quit. I don't recall saying that I was going
2  to quit, no.
3      **Q.** If Mr. Roese recalls that, would you
4  have any reason to dispute that?
5      A. No, I couldn't say that I could.
6  Like I say, my mind was not, my answer to you
7  is I can't recall saying that. I might have
8  said -- I can't recall saying it, sir. That's
9  what I am trying to tell you.
10     **Q.** Okay.
11     A. That's my answer.
12     **Q.** Okay. That's fair enough. Were you
13 having some financial problems around that
14 time in January of 2003?
15     A. Yeah, I had a lot of, I worked,
16 missed a little bit of work due to personal
17 problems, bankruptcy. I filed bankruptcy, and
18 I was talking with lawyers, and probably
19 banks, and other stuff like that. That would
20 be the only time that I took any time off from
21 work.
22     **Q.** When did you file for bankruptcy,
23 sir?
24     A. Way before this all came on me.

130

1      **Q.** Are we talking in 2002, 2001, 2003?
2      A. 2002, I think.
3      **Q.** Mr. Burrus, do you recall after your
4  discussion you had with Mr. Roese that a day
5  or two later you called him up and said I am
6  not going to quit, I am going to come back to
7  work?
8      A. I said I would like to come back to
9  work, yes. His response was the company said
10 you quit three times, and three strikes and
11 you are out.
12     **Q.** You don't recall a conversation about
13 a month before that after he told you to take
14 some time to think about it where you called
15 him up, I don't want to quit, I want to come
16 back to work?
17     A. That was when I resigned. After I
18 resigned I said I think I blew the gun. I
19 really don't want to -- I would like to have
20 my job back. That was at that point.
21     **Q.** That was at the --
22     A. That was after I signed my
23 resignation.

131

1  Mr. Roese about that before you had, the month
2  before in January of 2003?
3      A. No, not that I quit. I left early.
4  He told me why don't you go on home early that
5  day, which was around 2:30 I left, and I
6  returned to work, but I don't recall quitting.
7  We discussed, I just told him the stress is
8  building up and all that, and he told me to go
9  home and think about it, but I actually did
10 not quit, no.
11     **Q.** That's the time you did come back to
12 work?
13     MR. WILSON: I am going to object.
14 He never did quit. He never did come back to
15 work.
16     A. I was told that three strikes and I
17 was out.
18     **Q.** So, now you are talking about the
19 time in February --
20     A. Right.
21     **Q.** -- after you signed your termination
22 papers?
23     A. Yes. I said maybe I jumped the gun,
24 and that's when Bob said well, he talked to

132

1  Hollywood. The funny thing is he is the boss
2  now, but he talked to Hollywood, and three
3  strikes and you are out. But yet he is the
4  boss.
5      MR. GIVEN: Mark that as Four.
6  (Whereupon said document was duly marked,
7  for purposes of identification, as
8  Exhibit Number Four, as of this date.)
9      **Q.** Mr. Burrus, I have handed you what
10 has been marked as Exhibit Four, which appears
11 to be a letter from you to Reg Bryant dated
12 January 6 of 2003.
13     A. Yeah, which that would have been the
14 letter, that was a follow-up letter on here, I
15 believe, yeah.
16     **Q.** Was this in response to the
17 performance review that he had given you?
18     A. Yes. He wanted me to write a letter
19 to respond to that, and this is my response.
20     **Q.** Did you talk with Reg about this
21 response?
22     A. Yeah. I had to fax it to him. I
23 faxed it to him, which I believe this was on a

137

1  evaluation forms?
2      A. He come up with the evaluation forms,
3  shipping evaluation and receiving evaluation.
4      Q. Okay. To help get a better handle on
5  what the shipments were?
6      A. We were ready to try anything. We
7  was doing our job in Assumption.
8      Q. Did you have any problem with Mr.
9  Roese sitting down with you and trying to
10 hammer out those things?
11     A. No, he was my supervisor. Why should
12 I?
13     Q. Now, as I understand it on February
14 11th of 2003 Mr. Roese had a conversation with
15 you about the Shipping Department. Do you
16 recall that?
17     A. No.
18     Q. Where he had told you about some
19 general observations he had made about the
20 employees that you were overseeing?
21     A. Oh, yeah.
22     Q. As I understand it you had missed
23 three days within the last two weeks of work.
24 You had missed a Friday, I think it was

138

1  January 31st?
2      A. It was probably pertaining to my
3  bankruptcy at that time.
4      Q. You had missed the Friday of February
5  7th, and then you missed the Monday of
6  February 10th. So, three days in about a ten
7  day period of time?
8      A. That could have been when I was going
9  through my bankruptcy. I could be wrong on
10 the date of the bankruptcy. That's something
11 you want to forget.
12     Q. You recall missing some days in
13 there?
14     A. Those days that I missed was all due
15 with being with an attorney, or being with the
16 bank, what you call the, when you redo
17 something on a loan. I can't think of the
18 name right now.
19     Q. For whatever you were out those two
20 days, Friday and a Monday, and the Tuesday you
21 came back to work on the 11th. Mr. Roese met
22 with you, discussed some issues with you, and
23 discussed some complaints that he had heard
24 from your employees. Do you recall that?

139

1      A. They needed me, to look at me as more
2  leadership or something. I think I recall
3  that discussion.
4      Q. What do you recall about that
5  discussion with Mr. Roese?
6      A. If I can't be there for them, for me
7  to lead them on, then what are we going to do
8  about it. I think it was pertaining to my
9  business that I had on, during my bankruptcy
10 ordeal.
11     Q. So, one of the issues that he voiced
12 to you was that you got to be there to lead
13 them, and if you are not there, they are not
14 getting leadership. Is that the gist of it?
15     A. Basically that's what he was trying
16 to tell me, yeah.
17     Q. Did he also express to you concerns
18 about the quality of the Shipping Department
19 at that time?
20     A. Yes, that's when we come up with this
21 shipping evaluation and receiving evaluation
22 sheets.
23         MR. GIVEN: Mark that as Exhibit
24 Five.

140

1      (Whereupon said document was duly marked,
2      for purposes of identification, as
3      Exhibit Number Five, as of this date.)
4      Q. Take a look at Exhibit Five, Mr.
5  Burrus. Have you had a chance to read Exhibit
6  Five, sir?
7      A. Uh-huh.
8      Q. Have you read it before?
9      A. No, I never read this letter, but I
10 remember the conversation that we had.
11     Q. As best you recall it does Mr. Roese
12 here in the first paragraph of his memo, does
13 he state accurately the substance of the
14 discussion with you and the issues that were
15 raised?
16     A. About a poor attitude and all that?
17     Q. Yes, sir.
18     A. Yes. He discussed that with me.
19     Q. Is there anything in that that's
20 inaccurate?
21     A. Lack of new ideas of storage and
22 stock rotation. Like I said, you can't rotate
23 when you got a small building.
24     Q. But he raised those issues with you

141

1 in your discussion?
2 A. Yes, we tried to get more warehouse
3 space and stuff. He knows that.
4 Q. He also records that your response is
5 that you ask him what he thought about what
6 you might do about some of these things, is
7 that accurate?
8 A. Yes.
9 Q. And his response back to you was
10 well, gee, Greg, I want to know what you are
11 going to do about them.
12 A. Yeah.
13 Q. Is that what was said in the
14 conversation?
15 A. Yeah. He said something about
16 bringing more out of my employees in this
17 conversation, I believe, yeah, yes.
18 Q. So, he was looking for you to lead
19 your employees and to come up with some ideas?
20 Is that your understanding?
21 A. Yeah, yes. I never got a copy of
22 this letter. Like he is using me as absence
23 on this. Like I said that's pertaining to
24 reaffirming on some stuff. Reaffirm is what I

142

1 was trying to think of awhile ago.
2 Q. Did he tell you that the employees
3 had complained about that to him?
4 A. It says the employees had complained,
5 poor attitude, loss of respect towards their
6 supervisor, well, yeah, they are going to lose
7 respect. At this point everything here was
8 going pretty smooth with our loads and stuff.
9 Q. Did you have any reason to dispute
10 that the employees that you supervised had
11 complained or expressed concern to Mr. Roese?
12 A. I didn't realize they had complained
13 to him, no, not to my knowledge.
14 Q. He didn't discuss that with you at
15 this meeting on February 11th?
16 A. Yes, he did. I didn't -- when he
17 told me, I didn't realize that they weren't
18 happy with me, my employees.
19 Q. You understood that based on what he
20 told you on February 11th?
21 A. Yes. I understood the letter. I
22 mean I understand what he says, what he went
23 over. He did go over this with me. John
24 I-----, he was going to become a preacher.

143

1 Now it's come back to me. What was we going
2 to do about him. Basically all he did was
3 brought the corn to us. That wasn't no big
4 deal. I could have done it myself. He didn't
5 like my opinions no matter what I stated. I
6 handled it all by myself before.
7 Q. Well --
8 A. We cut back. We had to layoff. As a
9 matter of fact, John was one of the last ones
10 that I hired, but I had to lay off two prior
11 to John because John's decision was he was
12 going to leave the company anyway, which at
13 that point I wasn't doing no more hiring.
14 Q. How was this meeting left with Mr.
15 Roese, between you and Mr. Roese on February
16 11th? You were supposed to go home and think
17 about how to solve some of these problems?
18 A. Solve some of these problems, and how
19 to make my people happy. Bring the morale,
20 that's the exact words, you need to bring the
21 morale of your employees up.
22 Q. Did you agree or disagree with that?
23 A. At that point I was having problems
24 of my own. They are not happy. I couldn't

144

1 bring the morale up. I done the best I could.
2 Q. You thought you were incapable --
3 A. That's when he said --
4 Q. You have to let me finish. You
5 thought you were incapable of bringing the
6 morale of his employees up as he had requested
7 you to do?
8 A. I ain't no psychiatrist.
9 Q. You thought you were incapable of
10 doing that?
11 A. Bring the morale up?
12 Q. Yes, sir.
13 A. I couldn't bring the morale up with
14 the work environment, what they had to deal
15 with.
16 Q. Is that what you told him?
17 A. No, I didn't tell him that.
18 Q. But that's the conclusion that you
19 came to?
20 A. That's the conclusion that I came to
21 myself, yes.
22 Q. So, you decided then after February
23 11th that you were going to quit?
24 A. I think resign was dated for the 14th.

145

1    or the 13th.
2    **Q.** But didn't you call in on the 12th of
3    February and tell Misti that --
4    **A.** I was stressed out, and I wouldn't be
5    coming into work.
6    **Q.** -- that you were turning in your
7    uniforms, and that you were quitting?
8    **A.** Yeah, that's when I resigned.
9    **Q.** You told her you were resigning,
10    right?
11    **A.** Thinking about it.
12    **Q.** You told her you would bring your
13    uniforms in on the 13th, and you would sign
14    the paperwork?
15    **A.** No. The uniform deal was they told
16    me that I wouldn't get my last check until I
17    brought in, all my uniforms in, and signed
18    this resignation sheet.
19    **Q.** Mr. Burrus, did you call Misti on the
20    12th and tell her that you were resigning?
21    **A.** I would have to go back and recall
22    that date. I don't recall it was that date,
23    but I did call Misti.
24    **Q.** Okay.

146

1    **A.** And told her I was thinking about
2    resigning from my job position.
3    **Q.** You told her that you were stressed
4    out, and that you were going to resign for
5    that reason?
6    **A.** I told her I was stressed out. I was
7    thinking about resigning. I thought maybe me
8    and Bob could talk about maybe getting me a
9    different job classification for a little
10    while maybe is what I was getting at. That's
11    when he come back three strikes you are out.
12    From that point there was no more Great
13    Western.
14    **Q.** Did you come in then and sign your
15    termination paperwork?
16    **A.** Well, I had to to get my paycheck and
17    turn my uniforms in.
18    **Q.** To finally effect your resignation is
19    that what you understood?
20    **A.** Well, I wasn't really thinking right
21    at the time when I did that. It was a matter
22    of, I think the next day I called and said I
23    screwed up, and I would like to have my job

147

1    when he said Hollywood said no, three strikes,
2    you are out. They claimed that I quit three
3    times.
4    **Q.** But that was after you had already
5    signed your termination paper?
6    **A.** Yes. There is only one termination
7    paper that you have signed on me. That's when
8    I quit. Then the one that verbally I had from
9    Jerry that I had left the premises, the wrong
10    procedure leaving.
11    MR. GIVEN: Brad, can we take a short
12    break.
13    MR. WILSON: Sure.
14    (Whereupon the deposition was in
15    recess.)
16    MR. GIVEN: Back on the record. Mark
17    that as Six.
18    (Whereupon said document was duly marked,
19    for purposes of identification, as
20    Exhibit Number Six, as of this date.)
21    **Q.** Mr. Burrus, I have handed you what
22    has been marked as Exhibit Six, which is a
23    notation by Misti Klay dated February 12th,
24    2003 documenting a phone call she had with you

148

1    on that date, and I think we have already
2    discussed this some. You recall calling Misti
3    on February 12, 2003, the day after you had
4    your meeting with Mr. Roese? Do you recall
5    that? Do you recall calling her?
6    **A.** This is when I called in that
7    morning, yeah.
8    **Q.** You talked to Misti?
9    **A.** Yes, I talked to Misti.
10    **Q.** She says here in the first paragraph
11    of her note that Greg Burrus called and
12    informed me that he would be bringing in his
13    uniforms on the following day, and then in
14    parenthesis, 2-13-03. I asked him why, and he
15    then told me that he wanted to resign, and
16    that he had been up all night and had made up
17    his mind. Do you recall saying that to Miss
18    Klay?
19    **A.** Yes.
20    **Q.** It goes on to say I did ask him if he
21    was sure, and he said yes. Do you recall
22    responding like that to Miss Klay?
23    **A.** Yes, I did.
24    **Q.** He said he was too stressed out, and

149

1   that he was not doing his job properly. Is
2   that what you told Miss Klay?
3       A. I didn't tell her I wasn't doing my
4   job properly. I told her I was stressed out.
5       Q. She goes on to say I did ask him if
6   he wanted to speak to Bob Roese, and he said
7   no, that he had made up his mind, and that he
8   would, that we would see him tomorrow. Do you
9   recall that?
10      A. I didn't want to talk to Bob. I
11  didn't really say I made up my mind. I said I
12  was stressed out. That I would see him
13  tomorrow. I was upset with Bob. I didn't
14  want to talk to Bob.
15      Q. So, other than the part where she
16  says that you said that you were not doing
17  your job properly, you disagree with that
18  because you don't recall that, but otherwise
19  this looks like an accurate --
20      MR. WILSON: That's not his
21  testimony. I am going to object.
22      Q. Is there anything else in here that
23  you disagree with other than that?
24      A. Well, I didn't tell her I wasn't

150

1   doing my job properly. I didn't say that. I
2   did say I didn't want to speak with Bob
3   because I was mad at Bob, and that I would see
4   him tomorrow. That part is right. I probably
5   did say I was bringing my uniforms in. I did
6   say that.
7       Q. Did you go into the facility the next
8   day on the 13th?
9       A. The day I went into the facility was
10  the day -- the last time I was there was when
11  I signed my resignation paper. What was that?
12      Q. We will see that in just a second.
13  Hold on one second. Mark this as --
14      A. That would have been the 13th then or
15  the 14th.
16      Q. Wait a second so she can mark that.
17      A. Okay.
18      (Whereupon said document was duly marked,
19      for purposes of identification, as
20      Exhibit Number Seven, as of this date.)
21      Q. Mr. Burrus, I have handed you what
22  has been marked as Exhibit Seven. Can you
23  identify that for me, sir?

151

1       Q. This is the separation notice or the
2   resignation paperwork that you signed on the
3   13th of February of 2003, is that correct?
4       A. That's correct.
5       Q. That's your signature at the bottom
6   left of the document?
7       A. Yes.
8       Q. And you dated it 2-13-03?
9       A. Yes.
10      Q. And under the heading of type of
11  separation it indicates resignation?
12      A. Personal.
13      Q. Is that correct?
14      A. That's correct.
15      Q. And you signed this at the Great
16  Western facility?
17      A. Yes.
18      Q. Did you meet with Misti? Is that how
19  you got this?
20      A. Yes. Well, I seen -- I was in Bob's
21  office. I believe I signed it with Bob.
22      Q. Did you have any discussions with Bob
23  at the time that you signed this?
24      A. No, I don't believe I did.

152

1       Q. Were you just at the facility for a
2   short time just to sign this document, then
3   you left?
4       A. Yes.
5       Q. Why did you resign, Mr. Burrus?
6       A. I felt that I was being pushed out of
7   the plant. This is what they wanted me to do,
8   that they pushed me to my limits.
9       Q. When you say being pushed out of the
10  plant, what do you mean?
11      A. Well, where, we go back to the letter
12  here, where the people ain't happy with me.
13  They have lost respect towards their
14  supervisor.
15      Q. So, you resigned because people
16  weren't happy with your performance?
17      A. I figured I was going to be out the
18  door anyway. So, I figured on the record it
19  would be better to resign than get fired for
20  future job applications.
21      Q. Why did you think you were going to
22  be fired?
23      A. The way everything was coming down on
24  me.

153

1    **Q.** When you say everything that was
2    coming down on you because people --
3    A. Started with Reggie. Then it started
4    with Bob.
5    **Q.** Because they were being too demanding
6    on you?
7    A. Not demanding, just a hunch I had.
8    He had stated that well, if you don't know
9    what to do, I got an answer for it; and I
10   assumed that's what he was going to do was
11   fire me.
12   **Q.** That's what Mr. Roese had told you?
13   A. Yes.
14   **Q.** He said if you don't know what to do,
15   I have an answer for it?
16   A. Yes, that was right here.
17   **Q.** During your meeting on the 11th?
18   A. The afternoon, yeah. If I couldn't
19   resolve it, he could resolve it, and that's
20   the way I took it that I was going to be
21   fired.
22   **Q.** So, you thought because of this
23   morale issue that that was going to be your
24   undoing?

154

1    A. I believe so, yes. That's why I
2    signed this paper.
3    **Q.** Is that because you concluded you
4    didn't have any solution to, how to boost the
5    morale of the people that you were overseeing?
6    A. Well, they wasn't going to listen to
7    me after they was listening to Bob, and Bob
8    was getting them raises and I wasn't
9    basically. They was going to act on what he
10   said no matter what I would say to them, you
11   know. That's the way they was, and that's the
12   way it was at the end. Just like Bob, I felt
13   that Bob wanted this Bob Miller to have
14   shipping manager's job. What's Bob Miller's
15   position there now, he is the shipping
16   manager. Why was Beverly was my assistant, why
17   didn't they give it to Beverly?
18   **Q.** Why do you think Mr. Roese would have
19   preferred to have Bob Miller as the shipping
20   manager? Where did you get that impression?
21   A. Maybe because he was older.
22   **Q.** Miller was older?
23   A. Yes, Bob Miller was older.

155

1    A. No.
2    **Q.** So, you think --
3    A. I feel Bob had a grudge against me
4    from the time that he started.
5    **Q.** Why do you think Bob Roese had a
6    grudge against you?
7    A. Just the way that I wasn't in on the
8    meetings and stuff like that, what was going
9    to be run that day, and everything as far as
10   product, that way I would know where to put
11   the product.
12   **Q.** Well, did he ever say anything to you
13   to indicate that he had some sort of grudge
14   against you?
15   A. Get my shit together.
16   **Q.** That's what he told you?
17   A. Meaning on shipments and stuff. I
18   didn't know what their future shipments was.
19   They seen all of the future shipments. I was
20   never informed like I say. They all knew,
21   Neil knew, Tim knew. They knew what they was
22   going to run that day. At this point the
23   warehouse was so packed full you didn't have
24   room for hardly anything, and you had to find

156

1    room for it.
2    **Q.** Did you have the impression that Mr.
3    Roese wasn't pleased with the way the Shipping
4    Department was being run by you?
5    A. Definitely, yeah, I sure did.
6    **Q.** What else leads you to that
7    conclusion?
8    A. Like I say, taking my employees in
9    his office, and talking to them. And having
10   Bob Miller do cycle counts when it states that
11   it is my job to do cycle counts. Then for
12   them to come back and say that when Bob was
13   doing the cycle counts, if they wasn't
14   sufficient enough, that it would come back on
15   me. The 169 complaints here, that they
16   couldn't show me 169 complaints when I called
17   Trish, which I had the right to, and say
18   Trish, what's going on here. She tells me
19   Greg, I hardly have any complaints out of you.
20   You run a pretty tight ship. It is the people
21   down here in Hollywood screwing up. But in
22   this letter here it states that Assumption had
23   a tremendously large amount of complaints, 169

161

1  and I said I think I probably blew the gun, is
2  there another position that I can do there.
3    Q. So, you were asking if --
4    A. That's less stressful, and he said
5  no, Hollywood said three strikes you are out.
6  But yet Hollywood doesn't have anything to do
7  with me when Reggie tells me that Bob --
8    Q. I just want to get what was said.
9    A. That's what was said.
10   Q. What was your response to that?
11   A. To?
12   Q. When he said no, Hollywood says three
13 strikes, you are out. That's what you said he
14 said to you in this phone conversation.
15   A. That's what he told me.
16   Q. What was your response?
17   A. What could I say, well, okay.
18   Q. That was the end of the conversation?
19   A. He said no, how am I going to change
20 his mind? He told me there was no openings,
21 no.
22   Q. So, you didn't say anything to him in
23 response to that. He told you there is no
24 openings. You asked about another position

162

1  you could go into. He said there is no
2  openings?
3    A. He said three strikes, you are out.
4  Final answer. I told you.
5    Q. So, that was just the end of the
6  conversation?
7    A. That was the end of the conversation.
8    Q. Did you ever have any more
9  discussions with him after that?
10   A. No.
11   Q. Mr. Roese had never threatened to
12 fire you, had he?
13   A. No.
14   Q. Mr. Burrus, you have alleged in your
15 lawsuit that Great Western forced you to
16 resign. Is that what you are alleging in your
17 lawsuit?
18   A. Uh-huh.
19   Q. That's for the reasons that you have
20 described to me of why you felt like you
21 needed to resign?
22   A. Yeah.
23   Q. You allege in your lawsuit that this
24 was somehow retaliatory. Do you understand

163

1  that?
2    A. No. What do you mean retaliatory?
3    Q. That's what you allege in your
4  lawsuit that it was, you claim that Great
5  Western was, had retaliated against you --
6    A. Uh-huh.
7    Q. -- or was retaliating against you.
8    A. Uh-huh.
9    Q. Who at Great Western are you claiming
10 was retaliating against you?
11   A. At the point Bob was at the end, and
12 basically Bob Miller and Paul.
13   Q. Bob Miller?
14   A. Uh-huh.
15   Q. And Paul who?
16   A. Paul Latch.
17   Q. These were people that you were
18 overseeing?
19   A. They was employees, yes. I was
20 supposed to be overseeing them.
21   Q. In what way, for what reason was Bob
22 Roese retaliating against you? What had you
23 done that you claim he was retaliating
24 against?

164

1    A. Well, he would want me to stop. We
2  were getting all these chips, and
3  overcrowding, and all this, and like back to
4  Rocky again. Purchasing would purchase the
5  stuff. I wouldn't even know it would be
6  coming in. It would be coming in.
7    Q. So, he didn't like the way the
8  warehouse was organized because there was too
9  many items in it?
10   A. We was putting it in production area
11 where they done their product.
12   Q. He didn't like it that the warehouse
13 was too crowded, and he blamed you?
14   A. Not necessarily blamed me. He tried
15 to make me, to figure out a way to make it
16 better, and there was no way. I used all my
17 storage trailers. I used up all of our space.
18   Q. So, your claim that he was
19 retaliating against you because you couldn't
20 figure out a way to better store the items?
21   A. Yes.
22   Q. So, is your claim --
23   A. I would call them and almost, called
24 them and told them that we can't even run

1   production today because there is no room.
2      **Q.** For what other reason do you claim,
3   if any, that Mr. Roese was retaliating against
4   you?
5      A. Kind of working against me, not with
6   me.
7      **Q.** Why do you think that he was doing
8   that?
9      A. Because he would help the other
10   supervisors out, you know, Tim, he had
11   somebody to help him out, which they hired a
12   guy named Neil, which helped. I had Bev, but
13   Bev, she just couldn't correspond to it. So,
14   I don't know how to answer that question.
15      **Q.** What had you done at least in your
16   mind, your understanding, what had you done
17   that would make your understanding of why Mr.
18   Roese would want to retaliate against you?
19      A. Because I was shorting customers and
20   product, which would make him look bad because
21   he produced them.
22      **Q.** So, because the shipments weren't
23   right?
24      A. Due to the fact that we didn't have

1   the product to ship out, because I didn't hold
2   it for this certain customer.
3      **Q.** And he blamed you for that. He
4   didn't like that, and so he wanted you out of
5   the company. That's --
6      A. That's what you are saying.
7      **Q.** Is that what you believe?
8      A. To a certain extent, but maybe not
9   necessarily like that.
10      **Q.** Tell me why you believe Mr. Roese
11   wanted you out of the company.
12      A. His attitude towards me.
13      **Q.** But why, why do you believe Mr. Roese
14   had some reason he wanted to retaliate against
15   you?
16      A. I don't know.
17      **Q.** Is it just --
18      A. Why don't you ask him.
19      **Q.** You don't know, you don't have any
20   idea why he didn't like you, do you?
21      A. No, I don't know why. I don't. Bob
22   never had no reason why not to like me. I
23   couldn't figure it out.

1   you?
2      A. That's right.
3      **Q.** You believe he was trying to force
4   you out of the company?
5      A. Yes, that's right.
6      **Q.** But you have no idea of why he might
7   want to do that?
8      A. No. It could have been the people up
9   higher than him.
10      **Q.** You just don't know one way or the
11   other?
12      A. It could have been, I am thinking it
13   was the people up higher than him.
14      **Q.** Who would that be?
15      A. Oh, Allen Mitchell, Reg Bryant.
16      **Q.** Do you have any evidence or
17   information that would suggest in any way that
18   Allen Mitchell or Reg Bryant in any way ever
19   communicated with Mr. Roese that they wanted
20   you out of the company?
21      A. They could have talked on the phone
22   for all I know.
23      **Q.** But you don't have any information
24   one way or the other. You just don't know?

1      A. No, not offhand.
2      **Q.** So, you are sort of theorizing or
3   speculating about that, but you just don't
4   know?
5      A. Not wanting to work with me. I
6   figure that's --
7      **Q.** But as you sit here today you don't
8   have, you don't know of a reason why Mr. Roese
9   would want you out of the company?
10      A. Well, I wish I knew the reason.
11      **Q.** But you don't?
12      A. If I knew the reason, then I could
13   have cured the problem at the time, and I
14   wouldn't have resigned. I mean I don't know
15   what else to say. That's all I could say.
16      **Q.** So --
17      A. You are wanting a yes or no question,
18   and I can't tell you yes or no at this point.
19      **Q.** Do you have any information to
20   suggest what Mr. Roese's motive might have
21   been if as you allege, he wanted you out of
22   the company?
23      A. Do I have any evidence?

169

1  would suggest to you what his motive might be?
2  A. No, I don't.
3  Q. Not at all, right?
4  A. No.
5  Q. Other than Mr. Roese did you talk
6  with anybody else at Great Western after you
7  had resigned and signed your termination
8  papers?
9  A. Human Resources.
10  Q. Who was that?
11  A. I can't think of his name. It used
12  to be Vickie Broderick. She left. I can't
13  think of the man's name.
14  Q. What was the reason you talked to
15  that person?
16  A. Probably insurance reasons, 401K
17  retirement.
18  Q. You don't recall the conversation?
19  A. Unemployment.
20  Q. Do you recall a conversation, or you
21  just are assuming that you may have had one?
22  A. Oh, I have had them with him. I am
23  trying to think of his name. I can't think of
24  his name. He was just in there shortly after,

170

1  he got in there shortly after I quit or
2  resigned.
3  Q. These would have been issues relating
4  to benefit sort of issues?
5  A. Yes, yes.
6  Q. Nothing to do with your resignation,
7  or your trying to get your job back, or
8  anything like that?
9  A. No. He had a conversation with the
10  State of Illinois, unemployment, stuff like
11  that.
12  Q. Mr. Burrus, what have you done for
13  employment since you resigned from Great
14  Western?
15  A. I worked self-employed trimming
16  trees. I worked at IHC Turbo Plant in
17  Shelbyville, Illinois, made turbo chargers.
18  Q. The self-employment trimming trees,
19  were you working with a firm, or by yourself?
20  A. With a buddy of mine.
21  Q. Was that part-time or full-time?
22  A. It was just part-time.
23  Q. For how long did you do that?

171

1  20 years now with him.
2  Q. Is that seasonal?
3  A. That's seasonal basically, yes, and I
4  worked at Shelbyville until they shut the
5  plant down.
6  Q. What was the time frame you worked at
7  Shelbyville?
8  A. I worked there three days. Ain't
9  that funny. They called me and guaranteed me
10  work until like November. I worked three
11  days, and they called me and said my
12  employment was fulfilled there, and I went
13  from there and drawed some unemployment, and
14  then I worked for the elevator, which was
15  seasonal work.
16  Q. What elevator was that?
17  A. Pana Elevator. I worked from
18  November, no, the end of November I worked
19  with them. Then I went to work for Hutchens
20  Bulldozing.
21  Q. When did you start that?
22  A. I started there in the end of April
23  of this year.
24  Q. April of '04?

172

1  A. That's who I am working for now.
2  Q. Does he have a construction company
3  or something?
4  A. Yes.
5  Q. What's the name of it?
6  A. Hutchens Bulldozing.
7  Q. Where is that out of?
8  A. Assumption and Decatur. Actually
9  Elwin, Illinois is where our shop is.
10  Q. Elwin?
11  A. Elwin.
12  Q. You're a bulldozer driver?
13  A. I am a grunt. I operate some
14  machinery. They are going to break me in.
15  Q. Is that a full-time position?
16  A. Yes. We do field tile, and do city
17  jobs, poor concrete, hundreds of things.
18  Q. What's your wage rate there, sir?
19  A. $450.00 a week salary.
20  Q. It is a salary position?
21  A. Uh-huh.
22  Q. Is there overtime with it too?
23  A. No overtime, prevailing wages when we

1  Q. How about benefits, any benefits?
2  A. No benefits.
3     MR. GIVEN:  Mark this as Eight.
4  (Whereupon said document was duly marked,
5  for purposes of identification, as
6  Exhibit Number Eight, as of this date.)
7  Q. Mr. Burrus, you have been handed what
8  has been marked as Exhibit Eight.  Can you
9  tell me what this document is, sir?
10  A. It is a medical record.
11  Q. Whose medical record?
12  A. Mine.
13  Q. From what medical provider?
14  A. Dr. Bilyeu.
15  Q. Is this a document you submitted to
16  the Unemployment Compensation Board?
17  A. No, it was medical records that my
18  attorney wanted.
19  Q. Does this show all of your visits
20  with Dr. Bilyeu?
21  A. Clear back to wherever it is dated
22  here.  Yes, this is all my medical records, if
23  that's what you are asking.
24  Q. The first entry it appears to be from

1  September 18 of 1998.  Is that correct, on the
2  first page of Exhibit Eight?
3  A. Uh-huh.
4  Q. You need to say yes or no.
5  A. Yes.
6  Q. It appears to me from review of this
7  that you had complained about stress and
8  anxiety to Dr. Bilyeu and some other symptoms
9  related to that, is that right?
10  A. Yeah.
11  Q. You were experiencing stress and
12  anxiety back in 1998?
13  A. Yeah.
14  Q. Inability to sleep, well, that was
15  another symptom you were experiencing?
16  A. Uh-huh.
17  Q. You also mentioned that you were
18  agitated easily, and you would blow up at your
19  children?
20  A. Uh-huh.
21  Q. You need to say yes, sir.
22  A. Yes.
23  Q. And that's when Dr. Bilyeu started

1  A. Yes.
2  Q. Have you been taking that ever since
3  1998?
4  A. Yes.
5  Q. Are you still on that medication?
6  A. Yes.
7  Q. You also contend that you have
8  suffered from, well, let me ask it this way.
9  What medical symptoms, if any, have you
10  suffered that you contend are related to the
11  end of your employment with Great Western?
12  A. Not happy with life.
13  Q. Is that depression?
14  A. The depression, it hurt my pride.  I
15  worked there a long time.  I worked there 15
16  years.
17  Q. What symptoms have you experienced
18  that relate to that that are different than
19  the stress and anxiety that you were feeling
20  as far back as 1998?
21  A. A lot worse.
22  Q. How so?
23  A. Get real depressed, maybe start
24  crying going down the road, sex drive with my

1  wife.
2  Q. Are these symptoms that you have
3  reported to your doctor?
4  A. I mean me and my doctor talked about
5  it on family counseling, yes.
6  Q. That would have been Dr. Bilyeu?
7  A. Dr. Bilyeu.
8  Q. Have you seen any other health care
9  provider other than Dr. Bilyeu?
10  A. Maybe for common cold.  I got a flu
11  shot here a couple months ago.
12  Q. But anything relating to these
13  symptoms of any sort of mental distress?
14  A. Dr. Bilyeu.
15  Q. It would all be with Dr. Bilyeu?
16  A. Yes, he is -- family counseling with
17  Dr. Bilyeu.
18  Q. Is this a complete, this being
19  Exhibit Eight, is this a complete report of
20  your visits with Dr. Bilyeu from September of
21  1998 to the present?
22  A. It wouldn't be to the present because
23  they don't have 2004 in here, do they?

201

REDIRECT EXAMINATION
BY MR. GIVEN:
Q. Mr. Burrus, I want to ask you about this relabeled cheese issue.
A. Uh-huh.
Q. You don't know one way or another, do you, whether cheese can be relabeled if it was tagged with a wrong --
A. It can't be because on the bag it has a date on it.
Q. My question is this. Do you have any basis to know one way or the other whether what Rocky Franklin told you about the ability to relabel cheese that may have been mismarked because of the wrong lot number was accurate or inaccurate as it relates to any sort of health regulations?
A. It is accurate because on the bag it has an expiration date, the bag itself inside the box.
Q. But do you have any basis of knowledge as to whether what Mr. Franklin told you was in any way accurate or inaccurate?
A. I would say it would be accurate.

202

Q. That you can relabel it?
A. That I can relabel it?
Q. Well, let me back up just so it is clear. As I understand your testimony you said that Rocky told you that you got some cheese back from a customer, and that it needed to be relabeled because the distributor had said it had been mismarked.
A. Right.
Q. Is that correct?
A. That's correct.
Q. You didn't think that was, that you should do that?
A. No.
Q. But legally you don't have any knowledge, one way or the other, whether you can relabel cheese or not, do you, in that circumstance?
A. Let me ask you a question. If you bought a --
MR. WILSON: No, you can't.
A. I don't think it was right.
Q. Legally you don't know one way or another. You have never been trained in that

203

You don't have any experience in that. You don't have anything that would indicate to you one way or the other whether that's proper or not, is that correct?
A. Just by tasting it, okay. No legally, I am not no cheese expert or nothing like that.
MR. WILSON: The counselor of cheese.
Q. You haven't had any specialized training in food and drug laws, or anything else?
A. No, no.
Q. So, you just don't know whether what the distributor may have suggested should be done was appropriate or inappropriate?
A. I think it was inappropriate. No, I don't think it should have been done.
Q. But you don't know legally whether that's correct or not?
A. As far as lot number?
Q. Yes.
A. When that cheese comes in, it has a lot number on it per pallet, tells you on each one.

204

Q. Let's back up.
A. No, I am not no expert on food.
MR. WILSON: We will stipulate to that.
A. As far as weevil in the popcorn, yes, I am an expert on that. I have about 15 years. I know that's wrong.
Q. On that Mr. Bryant agreed with you?
A. Well, yeah.
Q. And Mr. Roese agreed with you?
A. Uh-huh.
Q. On the popcorn issue?
A. Right.
Q. With respect to the pepper lids, your complaint about the pepper lids is it created more work for your staff because the company instructed you to ensure that the pepper lids were properly fastened onto the jars, is that correct?
A. That's correct, but if the lids came off at the other end, it would come back on me.
Q. It would come back on you because the

205

1  customer wouldn't accept the goods, correct?
2      A. No, by the time it got there the lids
3  could have came off, and it would have come
4  back on the shipper.
5      Q. That wouldn't be a good situation for
6  the company, would it?
7      A. No, or me.
8      Q. And because the customer wouldn't pay
9  for those goods, would they?
10     A. I have no idea. That wasn't my
11  department.
12     Q. They could reject the shipment if it
13  has a bunch of open jars?
14     A. I imagine they would. They would
15  have to put it on the bill of lading.
16     Q. That wouldn't be to the company's
17  advantage if that occurred, would it?
18     A. No, they lose business.
19     Q. Nobody was in favor of that
20  happening, were they? Anybody at Great
21  Western want the jars to come open?
22     A. No.
23     Q. Now, you mentioned that you had
24  gotten some quotes to fix some of the racks,

206

1  is that right?
2      A. Yes.
3      Q. When did you do that?
4      A. I got them, Jeff Pennell is who I got
5  the quotes from, Pennell Fork Truck Service.
6  I don't recall dates.
7      Q. How do you know if it was before or
8  after the OSHA letter?
9      A. I would say it was before. How do I
10  know?
11     Q. Yes, sir.
12     A. Because I probably seen the problem.
13     Q. But you can't say for certain that
14  that occurred, can you, that you would have
15  gotten those quotes before the OSHA letter?
16  You can't say that certain under oath, can
17  you?
18     A. I think I can. I think I noticed the
19  racks. I think I was checking into it.
20     Q. You think you were, but what gives
21  you an indication that that occurred before
22  the OSHA letter?
23     A. I think I checked on getting the

207

1      Q. What leads you to believe that today
2  that you did that before?
3      A. Because I could see the falling, the
4  racks falling, splitting. The welds was
5  splitting on the centers of them. They put up
6  used racks.
7      Q. When did that first occur? When did
8  you first notice that?
9      A. When they built this room on in the
10  back, they called it the chip room. It was
11  going to be the candy room.
12     Q. When was that?
13     A. Whenever we started getting
14  overcrowded, and having to put pallets of
15  cheese and stuff that was overweight that was
16  splitting them when it was supposed to
17  strictly be for chips.
18     Q. Give me a time frame, Mr. Burrus.
19  When did that occur?
20     A. November.
21     Q. Of 2002?
22     A. Let's make it '3 or '2. Well, let me
23  look at this date here. I can do that, can't
24  I?

208

1      Q. What date are you trying to look for?
2      A. On the OSHA complaint I was going to
3  say it was a month before the OSHA complaint.
4      Q. What leads you to believe it was a
5  month before?
6          MR. WILSON: He just explained that.
7      A. Memory. I seen it.
8      Q. That's when this room was built on?
9  I mean that's how you started out that answer
10  that there was a room built on.
11     A. The room was built strictly for chips
12  only. We got overcrowded with everything, and
13  we had to put heavier stuff on them racks.
14     Q. You said that you sent these quotes
15  to Reg Bryant?
16     A. Yes.
17     Q. When did you do that?
18     A. Right after Jeff Pennell faxed them
19  to me.
20     Q. Did you have any discussions with Reg
21  about them?
22     A. He wouldn't communicate with me on
23  that.

209

1 about that at all?
2   A. No.
3   Q. None?
4   A. That's when Bob Roese took care of
5 it, and had them fixed.
6   Q. Bob Roese had them fixed after the
7 OSHA letter?
8   A. Yeah.
9   Q. You had never --
10   A. They wouldn't have got a letter if
11 they was fixed before.
12   Q. You never had communicated with Mr.
13 Roese about these racks or any quotes for the
14 racks?
15   A. Not at the time because I was dealing
16 with Reggie.
17   Q. Not at any time, did you, until after
18 the OSHA letter?
19   A. I had to deal with Reggie until one
20 day he called and said to go with Bob.
21   Q. You didn't discuss that with Mr.
22 Roese, did you?
23   A. No. I discussed it with Mr. Bryant.
24   Q. Mr. Burrus, you don't know one way or

210

1 the other, do you, whether prior to February
2 11 any of the employees that you supervised
3 complained directly to Mr. Roese about your
4 job performance?
5   A. I had no idea whatsoever that they
6 was unhappy with me.
7   Q. You don't know who went to him, or
8 who complained, or who might not have
9 complained?
10   A. No, I don't. First time I read that
11 letter was right here.
12   Q. Part of your complaints that you have
13 against Mr. Roese is that he was taking parts
14 of your job duties and doing them himself,
15 correct?
16   A. He was taking my employees and
17 overseeing them.
18   Q. That was taking away some of your
19 workload?
20   A. You could call it that, but they
21 wouldn't want to take my command then.
22   Q. So, he was giving you less
23 responsibility, and he was taking some of your

211

1   A. No. He would give me a little bit
2 more responsibilities at the time.
3   Q. He was increasing your
4 responsibilities?
5   A. He wasn't, the whole place was. The
6 workload, the capacities of what we had to
7 handle, production.
8   Q. There was just more to do at work?
9   A. Yes.
10   Q. That fell on Mr. Roese as well as the
11 plant manager?
12   A. Well, yeah, he was the plant manager.
13   Q. His workload would be increasing
14 right along with yours, is that correct?
15   A. I don't know, ask him. I don't know
16 what his workload was.
17   Q. Mr. Burrus, do you have any
18 information that would suggest to you that Mr.
19 Roese wanted to retaliate against you and
20 force you out of the company because you
21 raised any issue with respect to infested
22 corn?
23   A. I don't think that had anything to do
24 with Bob. Maybe Phil, Phil was corn manager.

212

1   Q. It didn't have anything to do with
2 Mr. Roese as far as you knew, did it?
3   A. All he cared about is if the job got
4 done right. That was Phil's job. We are
5 talking about stuff we already talked about.
6   Q. You don't have any information to
7 suggest that your complaint about the, what
8 Mr. Uphoff made you do with the corn in any
9 way made Mr. Roese want to force you out of
10 the company?
11   A. They probably thought that they are
12 going to pass the buck off on the little guy
13 is my opinion.
14   Q. You don't have any information to
15 suggest, that would lead you to believe that
16 Mr. Roese wanted you out of the company
17 because of that, do you?
18   A. I might have.
19   Q. Well, he agreed with you, didn't he,
20 on how the corn should be treated?
21   A. Yes.
22   Q. Do you have any information that
23 would suggest that he wanted you out of the

1    A. No.

2    **Q.** What about with respect to the

3  jalapeno peppers, do you have any information

4  to suggest that Mr. Roese would want you out

5  of the company because of this issue with the

6  jalapeno lids?

7    A. No.

8    **Q.** What about with respect to this

9  cheese issue, do you have any information that

10  would suggest that Mr. Roese wanted you out of

11  the company --

12    A. No.

13    **Q.** -- because of the cheese? Doesn't

14  have to do anything with Mr. Roese?

15    A. No, that's Rocky's ordeal. I told

16  you personal.

17    **Q.** With respect to Mr. Roese you think

18  it was just personal, is that what you mean?

19    A. Personal and hearsay.

20    **Q.** Personal because he didn't like you?

21    A. Well, I wouldn't say he didn't like

22  me. He wanted to make a change. He got the

23  higher up to do that, and he wanted to make a

24  change.

1    **Q.** Why do you believe he wanted to make

2  a change, Mr. Roese? Why do you believe he

3  wanted to make a change?

4    A. I just believe he thought maybe if he

5  got somebody else in there, that things would

6  be better.

7    **Q.** That's why you think he wanted you

8  out of there?

9    A. Yeah.

10    MR. GIVEN: That's all that I have.

11    MR. WILSON: We will waive.

12        (Witness Excused)

13

14

15

16

17

18

19

20

21

22

23

24

1  STATE OF ILLINOIS  )
                      )  SS
2  COUNTY OF CHRISTIAN)

3

4    I, Sandra K. Haines, a Notary Public and

5  Certified Shorthand Reporter, associated with

6  Stewart-Haines Court Reporting, do hereby

7  certify that prior to the taking of the

8  deposition herein, and on the 7th day of July,

9  2004, the Deponent, GREG BURRUS was, by me,

10  duly sworn to testify to the truth in relation

11  to the matter in controversy herein. That on

12  said date the foregoing deposition was taken

13  down stenographically by me and afterwards

14  reduced to typewritten form by me, and that

15  the foregoing transcript contains a true and

16  accurate translation of all such shorthand

17  notes.

18    Given under my hand and seal this 12th

19  day of July, 2004 at Taylorville, Illinois.

20

21

22            Notary Public and CSR

23

24

OFFICIAL SEAL
SANDRA K HAINES
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES:02/02/06

Reg Bryant
Operations Manager
Great Western Products


Subject: Greg Burrus Review


Date: 15 December 2002


Greg,

This letter contains issues from 2002 and goals for 2003. It will become a permanent part of your personnel file and is your performance review for 2002.

Issues:

Since August 2002 Great Western Products has received 169 customer complaints concerning shipments received from Assumption. Customer complaints include short ships, receiving incorrect merchandise, damage due to poor skid packing or wrapping and late receipts. Customer service must be our top priority, shipping the wrong product or not properly packaging or wrapping skids is unacceptable.

Customer returns being credited properly have also been an issue due to incorrect or poor handling of return paperwork (RGA's) by the Assumption warehouse.

The corporate purchasing department continues to have issues and problems caused by receipts processed by the Assumption warehouse. Many times paperwork is never forwarded as required. Receipt paperwork that is sent to purchasing is often improperly marked or incorrectly received. Paperwork is generally not signed or dated and the code dates on expiring product is not annotated.

It is imperative that a lead or supervisor understands the chain of command and how to work through it properly. During the week of October 25th Greg made calls to the President of Great Western Products asking him about policies that I as his manager clearly and precisely had explained. Only after notification and or permission by his direct supervisor should an associate ever pursue action through the chain of command.


The general cleanliness and organization of the Assumption warehouse is constantly in flux. It is important that the warehouse be kept clean and organized at all times.

EXHIBIT NO. 1
S. HAINES 7/7/04

Great Western Products
0001

The cycle inventory process must be monitored closely. Many times after a cycle inventory the product cannot be located for shipments to customers. The cycle inventory process gives the warehouse an opportunity to gather and store stocked items together.

International shipments have been forwarded from Assumption without proper documentation, even after Michelle West has ask multiple times to be notified prior to shipping container loads internationally. This adds additional charges and delays customer deliveries.

Code dated items or products that expire must be put in stock allowing for first in first out rotation (FIFO). Many items in the Assumption warehouse are not being rotated by expiration date.

Shipment refusal of issued purchase orders is unacceptable. Mission Foods contacted Assumption concerning delivery appointments. They were told that Assumption had no room for chips and would not give appointments.

Goals for 2003

Communications: A weekly activity report will be faxed to 1-256-259-8698, Attn Reg Bryant. The report should have the following information, (see attached) associate time record, weekly orders shipped, RA's returned and receipts.

There will be an unannounced review conducted by Great Western management of the Assumption warehouse. During this review the warehouse must be clean and orderly. It is imperative that the warehouse stay clean and organized at all times.

Customer service complaints will be faxed to Greg's attention. After his review Greg will be required to submit in writing to Reg Bryant corrective action taken to prevent repeat complaints in the future. Our goal is to provide superior customer service, with proper training and follow-up substantiated warehouse issues should average 1 per every 100 shipments on a rolling monthly average.

Cycle inventories will be tracked by Assumption and reviewed weekly, any out of stock or short ship on an item that was cycled inventoried during the previous work week must be explained with reason and written corrective action must be forwarded to Reg Bryant. Great western will not tolerate a lackadaisical approach to cycle inventories.

A stock rotation sheet must be maintained on each item requiring rotation. When items are received the item will be track by location and rotation date required. As Assumption receives orders this tracking sheet will be used to execute FIFO stock rotation.

Recommendation:

A responsible supervisor cannot lead his people through radio communication sitting behind a desk in the office. Greg you must spend at least 70 percent of your day working in the warehouse assisting and leading warehouse associates. I suggest you do away with your office desk and move a workstation near the shipping receiving doors of the warehouse. I see no reason for you to use an office unless reviewing or training/consulting with an associate.

A follow-up progress review will be performed in 3 months at which time further recommendations will be made.


Reg Bryant
Operations Manager
Great Western Products

*Personal & Confidential*

*please deliver to Greg —*

To: Greg Burrus

Subject: Cycle Inventory

Date: 12-18-02

Greg ,

Allen Mitchell, who as you know is now our Chief Operating Officer called me into his office concerning the Assumption cycle count issue. He informed me that Golden Rule, the owners of Great Western Products have some very strict rules and guideline to follow concerning scheduling and completing cycle counts.

It is imperative that we do the cycle counts as scheduled. Whatever re-warehousing activity it takes, moving, stacking or relocating product is approved to get these cycle counts done on time as per requested.

The cycle count process is a require activity and failure to perform cycle counts as requested will be grounds for termination.

I have been informed that failure to perform cycle counts in Assumption has been an ongoing problem; we must make sure that it's never a problem in the future.

Please sign this as an acknowledgment of receipt and return fax to my attention.

Sincerely,

Reg Bryant
Operations Manager

*Greg Burrus  12-23-02*

cc: Allen Mitchell



EXHIBIT NO. 2
S. HAINES  7/7/04

Greg Burrus

01-02-03

Greg,

Great Western Products operates in a Global economy where the demands of our customers are more and more difficult to meet. Our customers demand quality products, quality service and increasing value. The challenge confronting our team is the desire by the company to enhance customer service and satisfaction by improving distribution.

The variety of task to be handled by distribution will continue to increase. Special packaging, unitizing, labeling, and kitting traditionally thought of, as a manufacturing process will be handled by distribution at a minimum cost. The warehouse in Assumption must be prepared to become more flexible and adaptable to these request.

Accountability for performance in distribution must be increased. Distribution management must establish standards, identify opportunities for improvement, measure performance, and take action to assure continuous distribution improvement. The entire distribution function must realize that productivity must be increased. The option of maintaining the status quo is totally unacceptable. Leadership is the ability to define what happens in distribution not just responding to what has happened. Productivity and proactivity pursues continuous improvement then true distribution excellence may be achieved.

Based on information received from our customers the Assumption warehouse has a tremendous amount of improvement to achieve in 2003. Customers drive the business of distribution, but performance depends on distribution people.

Greg we must see a decrease in customer complaints, a reduction in operating cost, improved productivity, and increase quality from our Assumption warehouse.

This review covers process we will put in place in 2003 to meet these goals.

Reg Bryant
Operations Manager
Great Western Products


EXHIBIT NO. 3
S. HAINES  7/7/04

# SEPARATIO
## NOTICE / EX
## INTERVIEW

| | | |
|---|---|---|
| **NAME** GREG BURRUS | | **EFFECTIVE DATE** 2/13/03 |
| **EMPLOYEE/CLOCK NO.** | **POSITION** Shipping Mgr. | **HIRE DATE** |
| **DEPARTMENT** Shipping | **SHIFT** | **SUPERVISOR** R. Roese |
| **DATE NOTICE GIVEN** 2/12/03 To MISTY KLAY | ☒ ORAL ☐ WRITTEN | **LAST DAY WORKED** 2/11/03 |

| TYPE OF SEPARATION | | REASON FOR RESIGNATION | |
|---|---|---|---|
| ☒ Resignation | ☐ Temporary Layoff | ☒ Personal | ☐ Working Con |
| ☐ Discharge | ☐ Permanent Layoff | ☐ Better Position | ☐ Work Hours/ |
| ☐ Other_____ | | ☐ Other_____ | ☐ Relocation |

### EMPLOYEE COMMENTS

### EMPLOYER/SUPERVISOR COMMENTS

| | |
|---|---|
| ☐ SEVERANCE PAY | AMOUNT DUE _____ |
| ☐ VACATION PAY | AMOUNT DUE _____ |
| ☐ SICK / PERSONAL PAY | AMOUNT DUE _____ |
| ☐ PROFIT SHARING/PENSION | AMOUNT DUE _____ |
| ☐ OTHER _____ | AMOUNT DUE _____ |

EXHIBIT NO. 7
S. HAINES 2/7/04

**SIGNED** Greg Burrus    **DATE** 2-13-03    **APPROVED**

**GREG BURRUS**

S: Having problems with what he thinks is stress, anxiety. He gets very agitated easily. Blows up at his children. Can't sleep well at night. Does not really feed depressed, he does get jittery and sweaty, feels like his heart pounds at times. Smokes a pack of cigarettes a day, but does not drink much caffeine. Has lost a little bit of wt. He has poor appetite. No diarrhea, no urinary sx. No HA.

O: B/P initially was elevated to 160/100. Ears looked OK. Throat OK. Thyroid was not palpable. Chest revealed an occasional wheeze, otherwise clear. Heart was reg. VR 80 BPM. Abd. was soft. He had a fine, rapid tremor at rest and with intention also.

A: Anxiety. Tachycardia and tremor. Must r/o overactive thyroid.

P: Draw a T4 and TSH. Start Xanax .5 mg. t.i.d. prn. Off work 9/18/98. Recheck in 3-4 wks. or sooner if the blood tests shows abnormalities.
        9/18/98        Thomas M. Bilyeu, M.D./kja

10/12/98    186½ #        120/92

**GREGG BURRUS**

S: Doing much better on the Xanax. He takes between 1-3 a day. He is able to sleep. He is much less agitated. Said his wife and children notice the difference. He is able to eat, but it is not bothering him to work. Overall he feels much better with it. No side effects to speak of.

O: Ears and throat look OK. No adenopathy. Chest is clear. Heart is reg.

A: Anxiety much improved.

P: Cont. Xanax prn. Monitor B/P as an out pt. It is just borderline. Recheck if any further sx.
        10/12/98        Thomas M. Bilyeu, M.D./kja

| BURRUS, GREGORY | | XB 8/31/58 | | | | | |
|---|---|---|---|---|---|---|---|
| | Date | 9/18 9/13 10/12 | | | | | |
| FRAME | Wt. | 185 182 180¾ | | | | | |
| S  M  L | BP | 160/ 120/ 184/96 | | | | | |
| | Pulse | 72" | | | | | |
| Ht. | Temp | | | | | | |
| | Date | | | | | | |
| | BP | | | | | | |
| | Date | | | | | | |
| | BP | | | | | | |
| | Date | | | | | | |
| | BP | | | | | | |
| | Date | | | | | | |
| | BP | | | | | | |
| | Date | | | | | | |
| | BP | | | | | | |

| Date | Test | Result | Date | SpG | Ph | Chem. | Micro. |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

EXHIBIT NO. 8
S. HAINES  7/7/04

EXHIBIT
G

<u>GREGORY BURRUS</u>  14398A
Needs refill on Xanax.  He will have Pana Walmart call for 1 month, then he will see the doctor.
        9/3/99        Vicki Jones, LPN/cda √

<u>GREG BURRUS</u>
S:  Here for refill on Xanax.  He said sometimes he takes 5-6 of the .5 mg. tab. a day, so they
don't last.  He said as long as he takes this he functions much better.  He doesn't lose his temper.
He is able to work and sleep.  He is on no other meds.  He feels well otherwise.
O:  B/P initially 132/90, I got 120/75.  Ears and throat look good, no adenopathy.  Chest clear.
Heart reg., no murmurs.
A:  Chronic anxiety.
P:  Change Xanax to 1 mg. t.i.d. prn, he can break these in ½.  Recheck if any further problems.
        10/5/99        Thomas M. Bilyeu, M.D./kja

<u>GREG BURRUS</u>  14398A
Needing a refill on his Xanax.    Okayed #90 with 1 refill.  Endris, Pana.
        4/1/00  Saturday            Vicki Jones, LPN/cda √

<u>GREG BURRUS</u>  14398A
Pt. called stating he needs a refill on Xanax 1 mg. t.i.d., #90.  OK'd 1 x only, then he will make
an appt. to see the dr.  Endris Pharmacy, Pana.
        10/2/00  (B) Barbara Burton, RMA/kja

<u>GREG BURRUS</u>
Refill Xanax 1 mg. t.i.d.-q.i.d.  He gets very anxious w/o it.  He functions well.  Works well.
He has no side effects from this.  I gave him a script for Xanax 1 mg. t.i.d. prn, #100.  6 mo.
refills.  If he is doing well in 6 mo., we can phone a refill in.  I will see him back in 1 yr.
        11/6/00        Thomas M. Bilyeu, M.D./kja

<u>GREGORY BURRUS</u>  14398A
Needing a refill on Xanax 1 mg.  Okayed thru Nov.
        5/2/01        Vicki Jones, LPN/ cda

<u>GREG BURRUS</u>  14398A        1010
Called and wanted a refill of Xanax 1 mg t.i.d. p.r.n., #100.  He is due for a checkup.  I okayed 1 month only to Endris
Pharmacy.
        10/27/2001  Saturday        Sheila Kerby, RN/ cda

<u>GREGORY BURRUS</u>
S:  Meds refills.  He takes Xanax, but he is finding as most people do that it works less well now that he has taken it for
awhile.  Does not relieve some of the sx.  He is not having any real problems, but he just does not sleep well, he has been
without it now for 3 days.
O:  Afebrile.  43 yrs. old.  Wt 183.  BP 150/80.  TM's clear.  Nose and throat are clear.  Thyroid is not palpable.  Carotids
are 1+ bilaterally without evidence of any bruit.  Lungs are clear to auscultation and percussion, no wheezes, rhonchi, or
rales.  Unfortunately he continues to smoke cigarettes.
A:  Anxiety with some degree of obsessive compulsive type of behavior.
P:  Continue Xanax 1 mg tid.  Also start Celexa 20 mg once daily, try this for a month.  RTC p.r.n.
        11-30-01        Alan D. Bilyeu, M.D./sl

<u>GREG BURRUS</u> 14398A
Pt. called stating he needs a refill on Xanax 1 mg t.i.d. p.r.n., #100.  OK'd refills till 11/2002.
        5/28/2002  (B) Barbara Burton, RMA/kja

<u>GREG BURRUS</u>  14398A
Needs a refill of his Xanax.  He said he would make an appt in Dec.  This was made for 12/18.  He takes 1 mg q.i.d.  Giving
#120 only.        .(B)
        11/21/2002        Barbara Burton, RMA/ cda

P.02

**GREG BURRUS**
Gets along well with Xanax. Celexa didn't help. He takes 3-4 mg. q.d. This seems to work well for him. Script written for Xanax 1 mg 1-2 t.i.d., #180. Recheck in 6 mo. or sooner if any change in sx.
    12/18/2002      Thomas M. Bilyeu, M.D./kja

**GREG BURRUS**
S: He's been taking Xanax 2 mg t.i.d. This is working well for him. He functions well with it, so I refilled his script. Recheck in 6 mos.
    6/10/2003      Thomas M. Bilyeu, M.D./ cda

**GREGORY BURRUS**   14398A
We received a letter from CareMark Pharmacy stating he gets his scripts from Endris Pharmacy. On 3/13/03, he got #180 Xanax; also on 4/9/03 and 5/10/03. I let Dr. Tom know this was a total of #540 tabs within 60 days. Dr. Tom said that is too many, although at that time, pt was taking 2 tabs q.i.d. We are going to keep an eye on this. Dr. Tom wrote a new script for 2 mg, take 1 t.i.d. Hopefully, this will cut down on the problem.
    6/16/2003      Vicki Jones, LPN/ cda

**GREG BURRUS** 14398A
    Pt. needs a refill on Xanax. Said he will come in next mo. to see the dr.  OK'd Xanax 2 mg t.i.d. p.r.n., #90, no refills.
    12/01/2003      Barbara Burton, RMA / kja

**GREG BURRUS**
    S: He still takes Xanax 1 to 2 mg t.i.d.  Refilled Xanax 2 mg tablets, #90, refills x 6 mos. Recheck in 6 mos.
    12/20/2003      Thomas M. Bilyeu, M.D./ cda