**E-FILED**
Wednesday, 08 December, 2004  01:03:58 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD, DIVISION

| | | |
|---|---|---|
| **GREG BURRUS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 03 - 3225** |
| | ) | |
| **GREAT WESTERN PRODUCTS CO.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

NOW COMES the Plaintiff, GREG BURRUS, by and through his attorneys, GATES, WISE & SCHLOSSER, P.C., and for his Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, states as follows:

### INTRODUCTION

The Plaintiff, Greg Burrus, has presented sufficient facts to create a reasonable inference that he was discharged for opposing certain acts undertaken by Defendant, Great Western Products Co., which placed the health and safety of Plaintiff's co-workers and the general public at risk.

Specifically, Plaintiff has presented facts showing that starting in the summer and fall of 2002, Plaintiff opposed the repackaging of popcorn which was infested with weevils. It

1

was the intent of Defendant's superiors to send the infested popcorn back to its distribution center where it would be shipped to Defendant's customers for consumption by the general public.

Plaintiff has also presented facts showing that he opposed the re-labeling of cheese products which, according to their label, had expired.  Plaintiff opposed the placing new labels on the cheese showing that the cheese had yet to expire because he feared for the health of the general public.

Plaintiff presented additional facts showing that he opposed Defendant's practice of shipping out jalapeno peppers with lids which were not securely fastened.  Plaintiff feared that the lids might open during shipping, causing the peppers to spoil during shipment to the public.

Finally, Plaintiff has presented facts showing that he had complained about safety issues in the warehouse located at Defendant's Assumption, Illinois facility.  Shortly after Plaintiff complained about the unsafe conditions, the Defendant received a notice of safety violations from the United State Department of Labor detailing certain OSHA violations. The temporal sequence of these events raises a reasonable inference that Defendant suspected Plaintiff of reporting his concerns to the Department of Labor.

Shortly after the events set forth above, Defendant undertook a course of action to suggest to Plaintiff that his discharge was imminent.  These acts included, but were not limited to: 1) denying Plaintiff a raise which had previously been promised to Plaintiff; 2)

suggesting to Plaintiff that Defendant had received 169 complaints about Plaintiff's job performance when such was not true; 3) taking away certain job duties of Plaintiff's which he had traditionally performed; and, 4) suggesting to Plaintiff that he would be fired if he did not raise his staff's morale when there was no evidence that any loss of morale by Plaintiff's staff was the result of any actions taken by Plaintiff. The short passage of time between Plaintiff's opposition to Defendant's unlawful acts and Defendant's actions suggest a causal connection between Plaintiff's opposition to Defendants unlawful acts and the adverse employment actions taken by Defendant against Plaintiff.

As a result of Defendant's retaliatory actions, Plaintiff felt that he had no choice but to resign. These facts demonstrate that Plaintiff was constructively discharged in retaliation for his opposing those acts of Defendant which were contrary to public policy. Therefore, the Defendant is not entitled to summary judgment in its favor.

### RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACT

**1. <u>Undisputed Material Fact.</u>**

Plaintiff does not dispute the following facts:

1 through 37, 40 through 43, 45 through 48, 51, 54 through 58, 60 through 62, 64 through 82, 83*, 84 through 86, 87**, 88 through 90, 91***, 92 through 99, 102 through 105, 111 through 148, 150 through 154, 156 through 159, 161 through 166.

\*       In regards to statement of undisputed fact 83, Plaintiff qualifies his response by noting the hearsay nature of the document supplied as Deposition Exhibit #3.  Plaintiff admits, as alleged in statement of undisputed fact 83, that he was given that document.  Plaintiff denies that a significant number of customers actually complained about Plaintiff's job performance. *Burrus Dep. p. 156, 193-195.*

\*\*       In regards to statement of undisputed fact 87, Plaintiff qualifies his response by noting that Plaintiff did not tell Roese that he was going to quit.  *Burrus Dep. p. 87.*

\*\*\*       In regards to statement of undisputed fact 91, Plaintiff qualifies his response by noting the hearsay nature of the document supplied as Deposition Exhibit #3.  Plaintiff admits, as alleged in statement of undisputed fact 91, that he was given that document.  Plaintiff denies that any of his employees actually complained about Plaintiff's job performance.  *Burrus Dep. p. 195.*

## 2.   **Material Facts Claimed To Be Disputed.**

27.   Plaintiff supervised a staff of seven employees which was later reduced to three employees.  *Burrus Dep. p. 189.*

38.   Defendant's Assumption, Illinois facility became overstocked and it became impossible to rotate stock as a result of changes made by Reg Bryant.  *Burrus Dep. p. 25*

39.    Defendant's Assumption, Illinois facility became overstocked and it became impossible to rotate stock as a result of changes made by Reg Bryant.  *Burrus Dep. p. 25.*

44.   Burrus Deposition page 36, does not support the allegations in Defendant's

4

statement of Undisputed Fact Number 44.

49.    Plaintiff did not quit his employment with Great Western in July, 2002. *Burrus Dep. p. 41*

50.    Plaintiff did not quit his employment with Great Western in July, 2002. *Burrus Dep. p. 41.*

52.    Plaintiff did not quit his employment with Great Western in July, 2002. *Burrus Dep. p. 41.*

53.    Plaintiff felt that Roese's action meant that Plaintiff was no longer needed. *Burrus Dep. p. 41.*

59.    Hullebeck told Plaintiff to come back to work on Monday. *Burrus Dep. p. 19.*

63.    Plaintiff was disciplined for leaving Defendant's premises, not for quitting his job. *Burrus Dep. p. 20.*

100.    Plaintiff resigned because he felt he was going to be fired. *Burrus Dep. p. 152.*

101.    Plaintiff resigned because he felt he was going to be fired. *Burrus Dep. p. 152.*

106.    Plaintiff felt that Defendant wanted to take away his job because Plaintiff had refused to re-label cheese and repackage infested corn. *Burrus Dep. p. 199-200.*

107.    Plaintiff felt that Defendant wanted to take away his job because Plaintiff had refused to re-label cheese and repackage infested corn. *Burrus Dep. p. 199-200.*

109.    Plaintiff felt that Defendant wanted to take away his job because Plaintiff had refused to re-label cheese and repackage infested corn. *Burrus Dep. p. 199-200.*

110.    Plaintiff felt that Defendant wanted to take away his job because Plaintiff had refused to re-label cheese and repackage infested corn.  *Burrus Dep. p. 199-200.*

149.    Burrus' Deposition page 81, does not support the allegations in Defendant's statement of Undisputed Fact Number 149.

155.    It was Plaintiff, not Great Western, which refused to re-label the cheese.  Great Western, through Rocky Franklin instructed Plaintiff to re-label the cheese.  *Burrus Dep. p. 80, 190.*

160.    The December 26, 2003 letter from the Department of Labor indicates the notice was posted as a result of notice received by OSHA on December 22, 2002.

**3.  <u>Facts Claimed To Be Immaterial</u>**

None

**4.  <u>Additional Material Facts</u>**

1.    Plaintiff graduated from Pana High School in 1977 and has had no other formal education beyond high school.

2.    Plaintiff is familiar with the Defendant's shipping operations and the process by which Defendant's products are shipped from Defendant's production facilities and warehouses to Defendant's customers.  *Burrus Dep p. 187.*

3.    In September of 2002, Plaintiff was informed by Tony Wheeler in the Defendant's Hollywood, Alabama facility that a pallet of 35 pound popcorn bags was being shipped to the Defendant's Assumption, Illinois facility.  *Burrus Dep p. 42-43.*

4.     Tony Wheeler informed Plaintiff that the popcorn was being shipped back to the Assumption, Illinois plant because it was old and had weevils in it and, therefore, needed to be fumigated.  *Burrus Dep. p. 43-44.*

5.     When the popcorn arrived, little, white worms were visible on both the outer shrink wrap cover and inside the shrink wrap cover on the individual bags of popcorn. *Burrus Dep. p. 44 - 45.*

6.     After the infested popcorn arrived, Plaintiff and Beverly Beck to the corn to Phil Uphoff, the "Corn Manager" at Defendant's facility in Assumption, Illinois.  *Burrus Dep. p. 44 - 45.*

7.     Phil Uphoff ignored the transfer order's instruction to fumigate the corn and told Plaintiff to simply remove the infested corn's outer shrink wrap off, re-wrap it and ship it back to the Defendant's Hollywood, Alabama facility.  *Burrus Dep. p. 44 - 45, 50.*

8.     A couple of weeks after the infested popcorn was shipped to Defendant's Hollywood, Alabama facility it was returned to Defendant's Assumption, Illinois facility because it was still infested with weevils.  *Burrus Dep. p. 46.*

9.     When the infested corn was returned to the Assumption, Illinois facility, Plaintiff took the corn to the Assumption, Illinois storage room and put a red tag on it to indicate that the corn needed to be fumigated.  *Burrus Dep. p. 47.*

10.     Phil Uphoff did not like that Plaintiff had taken the corn to the storage room and "red tagged" it to indicate the corn needed to be fumigated.  *Burrus Dep. p. 47.*

7

11.     Plaintiff does not know if Defendant ever fumigated or dumped the infested corn. *Burrus Dep. p. 48*

12.     If Defendants' employees in the Hollywood, Alabama facility had not returned the infested corn to the Assumption, Illinois facility, the infested corn would have been sent out to Defendant's customers. *Burrus Dep. p. 187.*

13.     After the incident in which the infested 35 pound bags of popcorn were returned to the Assumption, Illinois facility, Plaintiff was informed by Robert Lee, a dispatcher at Defendant's Hollywood, Alabama facility that a shipment of 50 pound bags of popcorn had been returned by one of Defendant's customers. *Burrus Dep. p. 50-52.*

14.     Mr. Lee informed Plaintiff that the shipment of 50 pound bags of popcorn was being returned by the customer because the 50 pound bags were infested. *Burrus Dep. p. 50-53.*

15.     After seeing many occurrences of corn being infested with weevil, Plaintiff called Scott Martin, who at that time was Defendant's president. *Burrus Dep. p. 56-57.*

16.     Plaintiff called Scott Martin to inform him that Plaintiff was seeing weevil infestation in the corn and that the infestation problem might be the result of the manner in which Defendant was processing the corn. *Burrus Dep. p. 60-61.*

17.     Scott Martin told Plaintiff that he needed to report his concerns to Reggie Bryant. *Burrus Dep. p. 62.*

18.     Prior to his phone call to Scott Martin, Plaintiff had tried to report his concerns

8

to Reg Bryant, who informed Plaintiff that Plaintiff had to talk to Bob Roese about the infested corn, later Mr. Bryant refused to return Plaintiff's calls about the issue. *Burrus Dep. p. 62, 69.*

19.    Plaintiff spoke with Bob Roese about the issue of the infestation of Defendant's popcorn. *Burrus Dep. p. 69.*

20.    Bob Roese had no training on how to deal with infested corn and Mr. Roese did not the authority to make a decision as to what should be done with infested corn. *Burrus Dep. p. 70-71.*

21.    Reg Bryant told Plaintiff that he should be immediately fired for calling Scott Martin about the problems with the infested corn. *Burrus Dep. p. 135-136.*

22.    The jalapeno peppers that Defendant purchased from Louisiana Foods were shipped to Dachau, Germany. *Burrus Dep p. 71, 74, 188.*

23.    It would take months for the peppers to travel from Defendant's facility in Assumption, Illinois to Dachau, Germany. *Burrus Dep p. 188.*

24.    Defendant had three truck loads of peppers go bad because the vendor was not fastening the lids on to the jars tight enough. *Burrus Dep p. 72.*

25.    Plaintiff was concerned that if the loose lids on the jar of peppers came off during shipment that the peppers could become contaminated by the time the peppers arrived in Germany. *Burrus Dep p. 74, 188.*

26.    Plaintiff was also concerned that open or broken jars of pepper would have

leakage or seepage that would result in slippery and dangerous conditions for the employees responsible for loading and unloading the peppers. *Burrus Dep p. 72, 76, 78.*

27.     Plaintiff made Bob Roese and Rocky Franklin, Defendant's purchasing agent, aware of his concerns regarding the peppers. *Burrus Dep p. 76-78.*

28.     Rocky Franklin told Plaintiff he would have the vendor, Louisiana Foods, fix the problem with the loose lids. *Burrus Dep p. 76.*

29.     Rocky Franklin never had the vendor correct the problem with the loose pepper lids and Defendant continued to receive pepper shipments with loose lids. *Burrus Dep p. 75.*

30.     When shipment of peppers contained peppers that had gone bad, Bob Roese told Plaintiff to have Plaintiff's staff open a jar of peppers from each pallet, taste the peppers and if they tasted all right to put the lid back on and ship them to Germany. *Burrus Dep p. 72, 188.*

31.     In November of 2002, Defendant received a shipment of cheese that had been returned by Defendant's customers because labels indicated that the cheese was about to expire in December, 2002. *Burrus Dep p. 79-80.*

32.     The customers that returned the cheese included Regal Distributing and Marjack Company. *Burrus Dep p. 79-80.*

33.     Other customers had returned cheese that, according to the labels, had already expired. *Burrus Dep p. 79-80.*

34.    Plaintiff spoke with Rocky Franklin about the cheese and was told that the cheese was still good despite the fact that the expiration date on the box indicated that the cheese had expired. *Burrus Dep p. 80.*

35.    Rocky Franklin told Plaintiff to re-label the cheese with labels showing the cheese was still good. *Burrus Dep p. 80.*

36.    Plaintiff refused to re-label the cheese because the expiration dates indicated that the cheese had expired and he was concerned about the health of Defendant's customers. *Burrus Dep p. 80, 190.*

37.    Plaintiff and his staff had never re-labeled cheese in order to change the expiration dates on the labels. *Burrus Dep p. 82-83.*

38.    Plaintiff talked to Trish Hardick, Mary Smith and individuals in Great Western's purchasing and customer service department, about the cheese and was told that Defendant had overstocked on the cheese and a lot of it was being sent back to Great Western. *Burrus Dep p. 86-87.*

39.    On December 26, 2002, the Occupational Health and Safety Administration (OSHA) sent notice to Bob Roese stating that on December 23, 2002, OSHA received notice of safety and health hazards at the Defendant's Assumption, Illinois facility. *December 26, 2002 Letter from U.S. Department of Labor.*

40.    The notice indicated that one of the safety and hazards listed was described as "In the Warehouse, employees are exposed to falling materials because the racks are

broken." *December 26, 2002 Letter from U.S. Department of Labor.*

41.     Prior to December 22, 2002 made Bob Roese aware of the problems with the racks in the warehouse. *Burrus Dep. p. 192-193.*

42.     Plaintiff had as many as seven staff members working under him. *Burrus Dep. p. 189.*

43.     Defendant reduced Plaintiff's staff to three workers. *Burrus Dep. p. 189.*

44.     Despite being reduced in number, during the six months prior to February 11, 2003, Defendant assigned Plaintiff's staff new duties such as checking the lids on peppers. *Burrus Dep. p. 189-190, 196-197.*

45.     Plaintiff's staff was overworked. *Burrus Dep. p. 189-190.*

46.     Plaintiff's staff's morale was adversely affected by the extra work they were assigned by Defendant. *Burrus Dep. p. 192-193*

47.     Plaintiff's staff complained about the additional duties Defendant had assigned them. *Burrus Dep. p. 196-197.*

48.     None of Plaintiff's employees ever approached Plaintiff with complaints about Plaintiff's job performance. *Burrus Dep. p. 195.*

49.     Plaintiff never heard any of his employees inform Bob Roese or any other individual that they were unhappy with Plaintiff's job performance. *Burrus Dep. p. 195.*

50.     On February 11, 2003, Plaintiff was told by Bob Roese that if Plaintiff did not figure out a way to raise the moral of his staff, then Bob Roese knew a way to do it. *Burrus*

12

*Dep. p. 198-199.*

51.    When Plaintiff was told by Bob Roese on February 11, 2003 that if Plaintiff did not figure out a way to raise the moral of his staff, then Bob Roese knew a way to do it, Plaintiff perceived that statement as a threat that Plaintiff was going to be fired. *Burrus Dep. p. 198-199.*

52.    Plaintiff was told by Bob Roese that Defendant had received 169 customer complaints about Plaintiff. *Burrus Dep. p. 156, 193.*

53.    After Plaintiff was told by Bob Roese that Defendant had received 169 complaints about Plaintiff, Plaintiff called Trish Hardick to inquire about the alleged 169 complaints. *Burrus Dep. p. 193.*

54.    Trish Hardick informed Plaintiff that Defendant had only received 6 or 7 complaints about Plaintiff and they concerned expired cheese; she further informed Plaintiff that she thought Plaintiff ran a "pretty tight ship." *Burrus Dep. p. 156, 193-195.*

55.    Plaintiff asked Bob Roese if he could see the 169 complaints Defendant had allegedly received. *Burrus Dep. p. 194.*

56.    Bob Roese could not find the 169 complaints Defendant allegedly received and never made those complaints available to Plaintiff for Plaintiff's review. *Burrus Dep. p. 194-195.*

57.    Bob Roese would take Plaintiff's staff into Bob Roese's office and speak to them outside of Plaintiff's presence. *Burrus Dep. p. 118, 156.*

13

58.    Bob Roese took away from Plaintiff several of Plaintiff's assigned job duties, such evaluating Plaintiff's staff and awarding raises to Plaintiff's staff. *Burrus Dep. p. 120, 156.*

59.    Bob Roese assigned responsibility for performing cycle counts, which had been Plaintiff job to Bob Miller, one of Plaintiff's subordinates. *Burrus Dep. p. 120, 156.*

60.    Plaintiff felt that Bob Roese was trying to make Plaintiff look bad in front of Plaintiff's staff and trying to make it more difficult for Plaintiff to do his job. *Burrus Dep. p. 198-199.*

61.    On February 11, 2004, Bob Roese inform Plaintiff that Plaintiff would not be receiving an anticipated pay raise. *Plaintiff's Answer to Defendant's Interrogatory No. 19.*

62.    In December 2002, Plaintiff's subordinates believed that Plaintiff's job was being given to Bob Miller. *Burrus Dep. p. 158-159.*

63.    Plaintiff resigned because he felt he was going to be discharged and it was better to resign than to be fired. *Burrus Dep. p. 152.*

64.    Plaintiff felt that Defendant wanted to take away Plaintiff's job because Plaintiff refused to re-label cheese and to repackage infested corn. *Burrus Dep. p. 199-200.*

65.    Plaintiff felt that management at Defendant's Assumption, Illinois facility suspected Plaintiff of filing an OSHA report.  Burrus Dep. p. 200.

**APPLICABLE LAW**

**1.  Procedural Law (Standard for Summary Judgment)**

1.      Summary judgment is appropriate when the moving papers and affidavits show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  Fed.R.Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d. 265 (1986).

2.      Once a moving party meets its burden, the non-moving party must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. Fed.R.Civ. P. 56(e); *Silk v. City of Chicago,* 194 F.3d 788, 798 (7th. Cir 1999)

3.      The court considers the record as a whole and draws all reasonable inferences in the light most favorable to the party opposing the motion.  *Bay v. Cassens Transport Co.,* 212 F.3d 969, 972(7th. Cir. 2000).

4.      A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**2. Substantive Law**

1.      Constructive discharge occurs when an employee's working conditions are made so intolerable the employee, acting a reasonable person, is compelled to resign.  *Stone v. Department of Human Rights,* 299 Ill.App.3d 306, 700 N.E.2d 1105, 233 Ill.Dec. 397 (4th Dist. 1998); also see *Lindale v. Tokheim Corp.,* 145 F.3d 953,955 (7th Cir. 1998).

2.      When an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated, and the plaintiff employee resigns, the employer's conduct may amount to constructive discharge. *Equal Employment Opportunity Commission v. University of Chicago Hospitals,* 276 F.3d 326 (7th Cir. 2002).

3.      The Illinois Supreme Court has not squarely addressed the issue of whether a constructive discharge will support a retaliatory discharge claim. *Handel v. Belvedere USA Corporation,* 2001 WL 1286842 (N.D. Ill. 2001)(citing *Fisher v. Lexington Health Care, Inc.,* 188 Ill.2d 455, 722 N.E.2d 115, 243 Ill. Dec. 46 (Ill. 1999).

4.      To establish a cause of action for retaliatory discharge, a claimant must show: (1) he was discharged in retaliation for his activities; and (2) the discharge violated a clearly mandated public policy. *King v. Senior Services Associates, Inc.,* 341 Ill. App. 264, 267, 792 N.E.2d 412 (2nd Dist. 2003).

5.      Involuntary resignation of employee, resulting from threats of discharge by employer, would satisfy discharge element of tort of retaliatory discharge. *Hinthorn v. Roland's of Bloomington, Inc.,* 151 Ill.App.3d 1006, 503 N.E.2d 1128 (4th Dist. 1987).

6.      Illinois Courts have recognized public policy sufficient to support a retaliatory discharge claim where the statute supporting the tort impacts the health and safety of its citizens in general.   *Handel v. Belvedere USA Corporation,* 2001 WL 1286842 (N.D. Ill. 2001)(citing *Wheeler v Caterpillar Tractor Co.,* 108 Ill.2d 502, 485 NE2d 372 (Ill. 1985).

7.    A plaintiff may establish a link between protected activity and adverse employment action through evidence that the discharge took place on the heels of protected activity. *See King v. Preferred Technical Group,* 166 F.3d 887 (7th Cir. 1999); *Dey v. Colt Construction & Development Company,* 28 F.3d 1446, 1448 (7th Cir. 1994).

8.    Illinois public policy supports the safe and sanitary processing and storage of food items. *See, e.g.,* Butter and Cheese Factories Act, 410 ILCS 610 et seq; Illinois Food, Drug and Cosmetic Act, 410 ILCS 620/1 et seq; Food Handling Regulation and Enforcement Act, 410 ILCS 625/0.01 et seq.; Grade A Pasteurized Milk and Milk Products Act, 410 ILCS 635/1 et seq.

9.    Public policy favor safe working conditions. *See* Occupational Safety and Health Act, 29 U.S.C. Sec 650 et seq.

## ARGUMENT

### 1.  Under The Facts Of This Case, Illinois Courts Would Recognize Plaintiff's Claim For Retaliatory Constructive Discharge.

Defendant has asserted that Plaintiff's claim must fail because Plaintiff alleges that he was constructively discharged and Illinois courts have repeatedly held that Illinois courts have long held that no such cause of action exists under Illinois law. *Defendant's Memorandum of Law, page 22.* This is assertion is not accurate. While the Illinois Supreme Court has criticized the expansion of the tort to include constructive discharge, it has not squarely addressed the issue. *Handel v. Belvedere USA Corporation,* 2001 WL 1286842

17

(N.D. Ill. 2001)(citing *Fisher v. Lexington Health Care, Inc.,* 188 Ill.2d 455, 722 N.E.2d 115, 243 Ill. Dec. 46 (Ill. 1999). Furthermore, because there are no cases on point with the factual situation presented here, i.e., a plaintiff who was constructively discharged for reporting unsafe and unsanitary practices on the part of a food handler and processor, this Court must anticipate how the Illinois Supreme Court would handle the issue.

Here, it is undeniable that public policy strongly favors the preservation of the health and safety of the public. To further that public policy goal, the State of Illinois has enacted numerous statutes designed to protect the public health and safety during the processing and storage of food stuffs.

It is also undeniable that public policy favors safe working conditions. Both state and federal statutes have been enacted to further this public policy goal.

Plaintiff has presented evidence raising, at the very least, a reasonable inference that he was constructively discharged as a result of opposing the unsafe and unsanitary practices of Defendant. If the Court were to determine that the principles of constructive discharge do not apply to the area of retaliatory discharge, Plaintiff would be left without a remedy. This would be contrary to public policy considerations which are intended to safeguard the public health.

In the *Kelsay v Motorola, Inc.,* the Illinois Supreme Court first recognized the tort of retaliatory discharge. *Kelsay v. Motorla, Inc.,* 74 Ill.2d 172, 884 N.E.2d 353, 23 Ill.Dec. 559 (Ill. 1978). In *Kelsay,* the plaintiff claimed that her employer had wrongfully discharged her

for filing a claim under the Workman's Compensation Act.  *Id.*  In deciding to create a retaliatory discharge exception to the employment-at-will doctrine, the Illinois Supreme Court noted that the workman's compensation statute did not have an anti-retaliation provision at the time of employee's discharge.  *Id.*  The Illinois Supreme Court reasoned that if it did not recognize a cause of action, the plaintiff would be without a remedy.  *Id.*

As stated above, like the plaintiff in *Kelsay*, if the Court does recognize a cause of action for retaliatory constructive discharge, Greg Burrus will be left without a remedy for the retaliatory actions taken by Defendant in response to Burrus's attempts to protect the public health and welfare.  Given the overriding interest the State of Illinois in protecting the public health, it would be contrary to public policy to allow Defendant to force Plaintiff of the job because Plaintiff opposed unsafe and unsanitary practices in the preparation and storage of food products.  If an employer can obtain resignations from weaker willed and less sophisticated employees in order to retaliate against them for the exercise of rights involving to public policy by threatening discharge, *even by implication*, the remedy promulgated by the retaliatory discharge doctrine can be significantly impaired.  *Hinthorn v. Roland's of Bloomington, Inc.,* 151 Ill.App.3d 1006, 503 N.E.2d 1128 (4th Dist. 1987).

As a result of the above, Plaintiff respectfully asserts that the courts of Illinois would recognize a cause of action for retaliatory constructive discharge if presented with the facts of this case.

**2.  Plaintiff Has Established That He was Constructively Discharged.**

Constructive discharge occurs when an employee's working conditions are made so intolerable the employee, acting a reasonable person, is compelled to resign.  *Stone v. Department of Human Rights,* 299 Ill.App.3d 306, 700 N.E.2d 1105, 233 Ill.Dec. 397 (4th Dist. 1998); also see *Lindale v. Tokheim Corp.,* 145 F.3d 953,955 (7th Cir. 1998).  When an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated, and the plaintiff employee resigns, the employer's conduct may amount to constructive discharge.  *Equal Employment Opportunity Commission v. University of Chicago Hospitals,* 276 F.3d 326 (7th Cir. 2002).   A person who is told repeatedly that he is not wanted, has no future, and can't count on ever getting another raise would not be acting unreasonably if he decided that to remain with this employer would necessarily be inconsistent with even a minimal sense of self respect, and therefore intolerable.  *Henn v. National Geographic Society,* 819 F.2d 824, 829-30 (7th Cir. 1987).

In the present case, Plaintiff has presented evidence showing that Defendant undertook a course of action which would cause a reasonable person to believe that they were no longer wanted or needed and that his discharge was imminent.  Defendant's actions included, but were not limited to, the following:

    C    Telling Plaintiff that he should be immediately fired for calling Scott Martin about the problems with the infested corn. *Burrus Dep. p. 135-136.*

    C    Implying that Plaintiff would be fired if Plaintiff did not figure out a way to

raise the moral of his staff, when any morale problems experienced by Plaintiff's staff were the result of Defendant overworking Plaintiff's staff by cutting Plaintiff's staff from seven to three individuals and then assigning additional duties to the staff. *Burrus Dep. p. 198-199.*

C    Telling Plaintiff that Defendant had received 169 customer complaints about Plaintiff when Defendant had only received 6 or 7 complaints about Plaintiff and they concerned the expired cheese which Plaintiff had opposed shipping to customers. *Burrus Dep. p. 156, 193-195.*

C    Failing to provide Plaintiff with any documentation regarding the 169 complaints Defendant allegedly receive.

C    Taking Plaintiff's staff into Bob Roese's office and speaking to them outside of Plaintiff's presence. *Burrus Dep. p. 118, 156.*

C    Taking away from Plaintiff several of Plaintiff's assigned job duties, such evaluating Plaintiff's staff and awarding raises to Plaintiff's staff. *Burrus Dep. p. 120, 156.*

C    Assigning responsibility for performing cycle counts, which had been Plaintiff's job, to Bob Miller, one of Plaintiff's subordinates. *Burrus Dep. p. 120, 156.*

C    Trying to make Plaintiff look bad in front of Plaintiff's staff and trying to make it more difficult for Plaintiff to do his job. *Burrus Dep. p. 198-199.*

21

&#x25CB;    Denying Plaintiff an anticipated pay raise. *Plaintiff's Answer to Defendant's Interrogatory No. 19.*

&#x25CB;    Leading Plaintiff's subordinates to believe that Plaintiff's job was being given to Bob Miller. *Burrus Dep. p. 158-159.*

&#x25CB;    Plaintiff resigned because he felt he was going to be discharged and it was better to resign than to be fired. *Burrus Dep. p. 152.*

The above facts demonstrate that Plaintiff was told repeatedly that he was not wanted, had no future with the Defendant, couldn't count on ever getting another raise and would most likely be fired. Under these circumstances, Plaintiff was not acting unreasonably when he decided that to remain with this employer would necessarily be inconsistent with even a minimal sense of self respect, and therefore intolerable.

In light of the above facts, Plaintiff respectfully asserts that he has established that he was constructively discharged.

**3.  Plaintiff Has Presented Evidence Of Retaliatory Animus**

Generally, a plaintiff may establish a link between protected activity and adverse employment action through evidence that the discharge took place on the heels of protected activity. *See King v. Preferred Technical Group,* 166 F.3d 887 (7th Cir. 1999); *Dey v. Colt Construction & Development Company,* 28 F.3d 1446, 1448 (7th Cir. 1994).

Plaintiff has presented evidence showing that starting in the summer of 2002, Plaintiff opposed what he believed to be acts on the part of Defendant which endangered the

health and safety of the general public.  Plaintiff has also presented evidence showing that he raised concerns that the racks in the Plaintiff's warehouse in Assumption, Illinois posed safety risks to Defendant's employers.  Shortly after Plaintiff raised these concerns, Defendant received a notice of safety violations from the United States Department of Labor's Occupational Safety and Health Administration.  The U.S. Department's "OSHA" notice noted that the racks in the Assumption warehouse were unsafe.

Shortly after Plaintiff opposed the Defendant's unsafe and unsanitary food handling practices, Defendant started to strip Plaintiff of his job duties.  Shortly after Plaintiff opposed the Defendant's unsafe and unsanitary food handling practices, Defendant gave Plaintiff negative performance evaluations and denied Plaintiff a raise which he had earlier been promised.  Within six weeks of Defendant's receipt of the "OSHA" notice, Defendant suggested that Plaintiff would be discharged if he did not raise his staff's moral.

Based on the temporal proximity between Plaintiff's opposition to those acts of Defendant which placed the general public and Plaintiff's co-workers at risk of injury and the adverse employment actions experienced by Plaintiff, there is a reasonable inference of a causal connection between Plaintiff's conduct and the actions taken by Defendant. Plaintiff has also offered additional evidence in support of this inference.

The evidence shows that Reg Bryant told Plaintiff he should be immediately fired for informing Scott Martin, the Defendant's president, about the concerns Plaintiff had regarding the Defendant's handling of weevil infested shipments of popcorn.  Additionally,

Plaintiff has indicated that his superiors at Great Western Products acted in such a way as to indicate to him that they wanted him out of the company because he opposed Defendants handling of infested popcorn, expired cheese and other foodstuffs.

Finally, the Defendant's proffered explanation for its treatment of Plaintiff are clearly pre-textual. Defendant has asserted that Plaintiff was unable to handle his job. In support of this claim, Defendant asserts that Plaintiff was unable to rotate stock in the warehouse, unable to keep his staff's morale up, and that Defendant had received 169 customer complaints about Plaintiff's job performance.

In regards to Defendant's assertion that Plaintiff was not able to properly rotate stock in the warehouse, the evidence shows that Defendant's Assumption, Illinois facility became overstocked and it became impossible to rotate stock as a result of changes made by Reg Bryant. *Burrus Dep. p. 25*. There is no evidence that Reg Bryant was ever disciplined for implementing these changes in the Assumption, Illinois warehouse.

The evidence does not support Defendant's claim that Plaintiff was responsible for not keep the morale of his staff up. The evidence shows that Plaintiff's staff was understaffed and overworked by Defendant. The moral of any employees faced with these working conditions would understandably be low. Yet, Defendant has tried to make Plaintiff a scapegoat for low employee morale that that was the result of Defendant's actions, not Plaintiffs.

Finally, the claim that Defendant received numerous customer complaints regarding

24

Plaintiff is clearly contradicted by the evidence. Plaintiff was informed that Defendant had received 169 complaints about Plaintiff. Despite Plaintiff's requests that he be allowed to review the alleged 169 complaints, Defendant failed to produce any documentation regarding the complaints. In support of its motion for summary judgment, the best Defendant can do is offer a letter from Reg Bryant to Plaintiff in which Mr. Bryant alludes to having received customer complaints. Other than this attempt to introduce hearsay into the record, Defendant has offered no tangible proof that such complaints were ever received.

Additionally, the facts show that, after Defendant refused to produce evidence of any customer complaints, Plaintiff called Trish Hardick, one of Defendant's customer service representatives. Ms. Hardick informed Plaintiff that she had only received six or seven complaints regarding the Assumption, Illinois warehouse and those complaints were from customers who had received expired cheese. It should be remembered that it was Plaintiff who opposed the practice of re-labeling cheese with new expiration dates.

In sum, Plaintiff has presented sufficient evidence of a causal connection between his opposition to Defendant's practices and the adverse employment actions taken by Defendant to raise a reasonable inference of retaliatory animus. These acts include the short time lapse between Plaintiff's opposition to Defendant policies and the adverse employment actions, Reg Bryant's stated desire to have Plaintiff discharged for reporting his concerns regarding Defendant's practices to Scott Martin and the implausible explanations Defendant has offered in support of the adverse employment actions taken against Plaintiff.

## CONCLUSION

**WHEREFORE**, in light of the above, Plaintiff, GREG BURRUS, respectfully

requests that Defendant's Motion for Summary Judgment be denied.


Respectfully submitted,
GREG BURRUS, Plaintiff,

By:/s/ Bradley B. Wilson
        One of His Attorneys



Bradley B. Wilson
GATES, WISE & SCHLOSSER, P.C.
1231 S. Eighth Street
Springfield, IL 62703
Phone: (217) 522-9010
Fascimile: (217) 522-9020
e-mail: brad@gwspc.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**
**SPRINGFIELD, DIVISION**

| | | |
|---|---|---|
| **GREG BURRUS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 03 - 3225** |
| | ) | |
| **GREAT WESTERN PRODUCTS CO.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## STATEMENT OF COMPLIANCE

Now comes the Plaintiff, Greg Burrus, by and through his attorneys, Gates, Wise &
Schlosser, P.C., and pursuant to Local Rule 7.1 (B)(2) presents their certificate of compliance
stating as follows:

    1.    The attached Plaintiff's Memorandum of Law In Opposition to Defendant's
Motion for Summary Judgment contains 30,705 characters.

    2.    The attached, Plaintiff's Memorandum of Law In Opposition to Defendant's
Motion for Summary Judgment has a word count of 5,819.

                                    Respectfully submitted,
                                    Greg Burrus, Plaintiff


                    By:    /s/ Bradley B. Wilson
                              One of His Attorneys

Bradley B. Wilson (#6238373)
***GATES, WISE & SCHLOSSER, P.C.***
1231 South Eighth Street
Springfield, IL 62703
(217) 522-9010

27

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of December, 2004, a copy of the foregoing was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

      Thomas H. Wilson
      SORLING, NORTHRUP, HANNA, CULLEN & COCHRAN, LTD.
      Suite 800, Illinois Building
      607 East Adams Street
      P.O. Box 51331
      Springfield, IL 62705

It is hereby certified that a true and correct copy of the foregoing document has been sent on December 8, 2004 in an envelope with proper postage affixed thereto, securely sealed and deposited in a United States Post Office Mailbox at Springfield, Illinois and addressed to the following:

      Stuart R. Buttrick
      Baker & Daniels
      300 North Meridian Street
      Suite 2700
      Indianapolis, Indiana 46204-1782

                         /s/ Bradley B. Wilson