**E-FILED**
Monday, 10 January, 2005  09:34:03 AM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| GREG BURRUS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  03-3225 |
| | ) | |
| GREAT WESTERN PRODUCTS, CO., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

JEANNE E. SCOTT, U.S. District Judge:

This matter comes before the Court on Defendant Great Western Products Company, Inc.'s (Great Western) Motion for Summary Judgment on Burrus' state law claim for retaliatory constructive discharge (d/e 15). This Court has subject matter jurisdiction based on the complete diversity between the parties.[1]  28 U.S.C. § 1332(a).  Great Western contends that Plaintiff Greg Burrus' (Burrus) claim for retaliatory constructive discharge

---

[1]Great Western is an active Alabama corporation, as attested to by Great Western, and verified independently through the online database of the Alabama Secretary of State.  Notice of Removal (d/e 1), pg. 2, ¶ 6; see also http://www.sos.state.al.us/sosinfo/inquiry.cfm.  Burrus is a resident of Illinois.  Id. at ¶ 5; see also Complaint, ¶ 1.

has no root in Illinois law.  In the alternative, Great Western argues that even if Illinois recognizes such a claim, the agreed facts show that Burrus was neither constructively discharged nor the subject of retaliation because he resigned for personal reasons.[2]  For the reasons set forth below, Great Western's Motion for Summary Judgment is ALLOWED.

## STATEMENT OF FACTS

Great Western is a manufacturer of snack food equipment, supplies, and accessories.  It is registered as a corporation and has its principal place of business in Alabama.  In approximately 1999, Great Western purchased a facility in Assumption, Illinois (Assumption facility).

Burrus began working at the Assumption facility in 1985 when it was owned and operated by Max Hutchins.  In approximately 1995, the facility was purchased by Blevins Concession Supplies, which then sold it to Great Western in 1999.  Burrus continued to work at the Assumption facility

---

[2]In its Notice of Removal, Great Western also claimed that this Court has original jurisdiction over this action "because it involves claims that arise under the Occupational Safety and Health Act [OSHA], 29 U.S.C. § 651 et seq."  Notice of Removal, pg. 2, ¶ 3.  This contention is abandoned by both parties on Great Western's Motion for Summary Judgment, with good reason.  OSHA contains no private right of action for retaliatory discharge.  See George v. Aztec Rental Center Inc., 763 F.2d 184 (5th Cir. 1985); Taylor v. Brighton Corp., 616 F.2d 256, 264 (6th Cir. 1980); Pitchford v. Aladdin Steel, Inc., 828 F.Supp. 610, 614 (S.D. Ill. 1993).  Therefore, Burrus' sole cause before this Court is his claim for retaliatory constructive discharge under Illinois common law.

through these ownership changes, in the capacity of Shipping Manager.

As the Shipping Manager for Great Western, Burrus completed shipping documents, managed the in-flow and out-flow of products in the warehouse, filled customer orders, responded to customer complaints, coordinated with company purchasing agents, and supervised other shipping employees. <u>Motion for Summary Judgment</u>, <u>Defendant's Designation of Evidence in Support of Motion for Summary Judgment</u>, <u>Deposition of Greg Burrus</u> (Burrus Dep.), pgs. 14-16, 28-29, 37. In Great Western's chain of command, Burrus was under the Assumption facility Plant Manager, Phil Uphoff, but he reported to Scott Martin, Great Western's President, and Reese Harris, the Production Manager, both of whom worked at Great Western's Hollywood, Alabama, headquarters. In approximately 2000, Burrus began reporting to Jerry Hulleback (Hulleback), Great Western's Operations Manager, who also worked at the Hollywood, Alabama, headquarters.

Before Great Western purchased the Assumption facility, however, Burrus had sought medical treatment to cope with work-related stress. In September 1998, his doctor prescribed Xanax, which alleviated many of Burrus' symptoms. <u>Burrus Dep.</u>, Exh. 8, pg. 1. Burrus continued to take

Xanax throughout the period relevant to the present action.  Id. at 175; Exh. 8., pgs. 1-3.

In approximately January 2002, Bob Roese (Roese) replaced Phil Uphoff as the Assumption facility Plant Manager, and Uphoff reverted to supervising the popcorn processing.  Id. at 18.  In July 2002, Burrus arrived at work to find Roese directing Burrus' employees to rearrange the warehouse.  Burrus Dep., pgs. 18-21.  Burrus felt embarrassed, as if he "wasn't doing [his] job properly", and left the Assumption facility without notifying anyone.  Id. at 18-19.  In response, Hulleback called Burrus, told him to take the rest of the week off, and encouraged him to return to work the following Monday, which Burrus did.  Id. at 19.  Upon his return, Hulleback orally disciplined Burrus for improperly leaving the facility, and had Burrus sign a written acknowledgment of the discipline.  Id. at 20.

In approximately August or September 2002, Reg Bryant (Bryant) replaced Hulleback as Great Western's Operations Manager, and as Burrus' direct supervisor.  Under Bryant, Burrus experienced an increase in job-related stress due to new policies and procedures implemented by Bryant, and Bryant's more demanding attitude.  Id. at 26.  Bryant placed more emphasis on rotating stock on a first-in, first-out basis, and directed Burrus

4

to more accurately track stock.  <u>Id.</u> at 24-25, 34, 38.  Several factors impeded Burrus' attempts to accomplish these directives.  First, product overstocking in the warehouse made it progressively more difficult to rotate stock.  <u>Id.</u> at 25.  Second, Burrus had trouble getting in touch with Bryant, because Bryant did not return Burrus' calls when Burrus had a problem.  <u>Id.</u> at 20, 39.  Third, Burrus also felt stress due to his conflicting responsibilities to coordinate with Great Western purchasing and customer service employees by phone, and supervise the in- and out-flow of product from the warehouse at the Assumption facility.  The phone was physically separated from the receiving and loading areas, making it impossible for Burrus to "be at two places at once."  <u>Id.</u> at 28.  Finally, when there were shortages in stock and a customer's order could not be filled, Burrus was blamed although he had little control over what he was shipped.  <u>Id.</u> at 33-35, 37.

In approximately September 2002, Tony Wheeler, Shipping Manager for the Hollywood, Alabama, headquarters told Burrus about a shipment of bagged popcorn infested with weevils being shipped to the Assumption facility for fumigation.[3]  <u>Id.</u> at 42-43.  Burrus received the infested popcorn,

---

[3]The Assumption facility is the designated fumigation facility in the Great Western shipping network.  <u>Id.</u> at 43.

witnessed the weevil problem, and informed Phil Uphoff.  Uphoff ordered Burrus to strip away the old shrink wrap covering the shipment, repackage it with new shrink wrap, and resend it to the Hollywood facility.  Id. at 45. Burrus complied, but the Hollywood facility sent the shipment back because it remained contaminated.  Id. at 46.

Upon return receipt of the infested popcorn, Burrus segregated the popcorn until it could be fumigated.  Uphoff "didn't like it" that Burrus had segregated the infested popcorn.  Id. at 47.  Burrus also spoke with both Bryant and Roese, both of whom agreed that the popcorn needed to be fumigated.  Id. at 49, 70.  Bryant told Burrus that Burrus "didn't need to worry about that, and that Phil [Uphoff] better go with the procedure on that part, and get the corn fumigated, and make it right."  Id. at 48-49. Burrus testified that, with the exception of the shipment to the Hollywood facility, he could not recall knowingly shipping contaminated popcorn to any customer, although occasionally it would happen inadvertently.  Id. at 54-55, 67.

At one point Burrus complained to Scott Martin, Great Western's President, about the way Plant Manager Phil Uphoff managed infested popcorn.  Id. at 62-64.  Martin told Burrus that he should talk with Bryant

about his concerns, but Burrus responded that he could not get in touch with Bryant.  Id. at 62.  Bryant later told Burrus that he was angry with Burrus for going outside the chain of command.  Burrus recalled Bryant telling him, ". . . when you called Scott Martin, I should have come down and fired you then."  Id. at 136.  Burrus also talked with Roese about the infested popcorn, but testified, however, that he had no reason to think Roese wanted to retaliate against him for raising an issue regarding the contaminated popcorn.  Id. at 211.

Burrus also complained about loose lids on jalapeño pepper jars that passed through the Assumption facility.[4]  The manufacturer did not tighten the lids enough to prevent them from popping open in transit, or in storage. Burrus was instructed not to ship any "bad pallet[s] of peppers."  Id. at 74. Burrus noted that "[a]t one point they had some go bad where we had to lay out like three truck loads of them."  Id. at 72.  To salvage the shipment, Burrus said that Great Western "brought like five people in.  We would pull a jar out of every case, and they had a taste sample.  They would all taste them. [If] [t]hey tasted good, put the lid on, and ship them out."  Id.

---

[4]It is unclear from Burrus' deposition testimony when he complained about the loose jalapeño pepper jar lids.

Roese directed Burrus to have his employees check the jalapeño pepper jar lids before shipping them, and tighten them if necessary.  Id. at 77.  Burrus agreed with Roese's precautionary measure, but did not feel that he and his employees had the time to do that extra work.  Id. at 74-75, 77. Further, the problem continued to occur, despite Burrus' request that Great Western purchasing agent Rocky Franklin coordinate with the manufacturers to solve the problem.  Id. at 75-76.  Burrus had no further discussions with Roese about the jalapeño pepper jars, and never spoke with Bryant about the issue.  Id. at 77-78.  Burrus testified that he had no reason to think Roese wanted to retaliate against him for raising an issue regarding the jalapeño pepper jars.  Id. at 213.

In approximately November 2002, several customers returned cheese to the Assumption facility because it was close to expiring.  Id. at 79-80. Great Western's purchasing agent Rocky Franklin informed Burrus that the manufacturer had mislabeled the cheese, and that the cheese was not expired.  Franklin told Burrus that he would secure new expiration labels so that Burrus could re-label the cheese.  Id. at 81-82.  Burrus never received any cheese labels, however, and did not re-label any expiration dates on the expiring cheese.  Id. at 82-83.  Although Burrus told his employees that he

would refuse to re-label the cheese should the promised expiration labels ever arrive, he never told Franklin, Roese, or Bryant of his intentions. Id. at 83-86. Burrus testified that he had no reason to think Roese wanted to retaliate against him for anything related to the expiring cheese. Id. at 213.

On December 15, 2002, Bryant discussed Burrus' 2002 performance evaluation by phone with Burrus. Id. at 98-99. The evaluation identified numerous issues with Burrus' performance and the Assumption facility, including: (1) 169 customer complaints concerning shipments from the Assumption facility; (2) improper customer return crediting due to faulty paperwork; (3) purchasing problems due to improperly prepared paperwork at the Assumption facility; (4) Burrus' Fall 2002 conversation about Uphoff's popcorn management practices with Scott Martin, Great Western President, outside the chain of command; (5) fluxuating cleanliness and organization of the warehouse; (6) improper cycle inventory process monitoring; (7) lack of proper documentation for international shipments; (8) failure to rotate stock on a first-in, first-out basis; and (9) unacceptable refusal of product shipments.[5] Id., Exh. 1, December 15, 2002 Greg Burrus

---

[5]Burrus explained that the cycle inventory process consisted of doing a manual count of stock on hand in the warehouse of a set number of products, and then comparing that number with the master computerized inventory count for the same

Review by Reg Bryant (December Review), pgs. 1-2.

The December Review also included a list of goals for Burrus to meet in the upcoming year, including: (1) submission of weekly activity reports to Bryant; (2) preparation for unannounced warehouse inspections by Great Western management; (3) written descriptions of how Burrus took action to prevent repeat customer complaints; (4) observance of the cycle stock inventory procedure; and (5) adherence to the first-in, first-out stock rotation policy.  Further, Bryant advised Burrus to "spend at least 70 percent of your day working in the warehouse assisting and leading warehouse associates.  I suggest you do away with your office desk and move a workstation near the shipping receiving doors of the warehouse."  Id. at 3.  Bryant also informed Burrus that he would conduct a follow-up review within three months.  Id.

In response to the December Review, Burrus contacted Trish Hardick to find out why he had received 169 complaints.  Hardick told Burrus, however, that she had only received "maybe six or seven on [Burrus], and what they are, they are cheese complaints of expired cheese."  Burrus Dep.

_____

products.  Burrus indicated that cycle counts were required weekly, even if it resulted in overtime work.  Id. at 105-06.

at 193.  Burrus then asked Roese to get the 169 complaints so Burrus could examine them.  Id. at 194-95.  Although Roese tried to, he was unable to secure them for Burrus.  Id. at 195.

On December 18, 2002, Bryant sent Burrus a memo about the Assumption facility "cycle count issue."  Id., Exh. 2, December 18, 2002 Memorandum to Greg Burrus from Reg Bryant (December Memo), pg. 1. Bryant's December Memo reinforced the importance of weekly inventory cycle counts, and informed Burrus that "failure to perform cycle counts as requested will be grounds for termination".  Bryant asked Burrus to sign and return the December Memo.  Id.  Burrus signed the Memo on December 23, 2002.  Id.

At some point in December, Beverly Beck, another employee at the Assumption facility, told Burrus that she thought Bob Miller, one of Burrus' employees, was "trying to take [Burrus'] job."  Burrus Dep., pg. 158.

On December 26, 2002, Roese received telephone notice from OSHA, followed by a letter, regarding alleged safety and health hazards at the Assumption facility.  Plaintiff's Memorandum, December 26, 2002 Letter to Bob Roese from United States Department of Labor, pg. 1.  Burrus testified that he never filed an OSHA complaint against Great Western, did

not know any employee who had filed an OSHA complaint, and had never been accused of filing an OSHA complaint by Great Western management. <u>Burrus Dep.</u>, pgs. 88, 97-98. Burrus did state, however, that he thought employees at the Assumption facility might have thought that he had been the OSHA complainant. <u>Id.</u> at 200. Among other concerns, the OSHA letter directed Great Western to address several safety issues with its storage racks. <u>Plaintiff's Memorandum</u>, <u>December 26, 2002 Letter to Bob Roese from United States Department of Labor</u>, pg. 1. Burrus testified that in November 2002, he had obtained quotes to repair the welds on the storage racks and had forwarded those quotes to Bryant, but that the racks were not repaired until after the OSHA letter was received. <u>Burrus Dep.</u>, pgs. 192-93, 206-08. Burrus also testified that ultimately it was Roese who had a local welder come in to repair the racks. <u>Id.</u> at 92. To the best of Burrus' recollection, however, the only safety issue about which he complained to a supervisor was a directive to conserve power in the summer by turning off the warehouse lighting. Burrus told Bryant that he objected to his employees being told to work by flashlight and fork truck light because it increased the risk of an accident. <u>Id.</u> at 94-96.

On January 2, 2003, Bryant sent Burrus another memo, detailing the

12

importance of decreasing customer complaints, reducing operating cost, improving productivity, and increasing quality at the Assumption facility. Id., Exh. 3, January 2, 2003 Memorandum to Greg Burrus from Reg Bryant (January Memo), pg. 1. Bryant and Burrus discussed the January Memo by phone, and Burrus told Bryant that he would comply. An outgrowth of that compliance was the creation of the shipping and receiving evaluation sheets. Burrus testified that he and Roese collaborated to create the shipping and receiving evaluation sheets to measure and track various factors, including: "the condition of the trailer, number of pallets, trailer number, time that the truck came in, [and] time that it was loaded . . ." Id. at 116.

On January 6, 2003, Burrus faxed a letter to Bryant responding to the December Review. Id. at 132. In his letter, Burrus apologized to Bryant for going outside the chain of command by calling Scott Martin to talk with him about Uphoff's popcorn handling practices at the Assumption facility. Id. at 135. Burrus also testified that he had apologized to Bryant over the phone about the same incident, and Bryant had responded by saying, "I should have come down and fired you then." Id. at 135-36.

In early January 2003, Bryant ceased being Burrus' direct supervisor, and Assumption facility Plant Manager Bob Roese assumed that duty. Id.

13

at 104. Bryant explained that he was too busy to supervise Burrus due to his other job responsibilities, and that it made more sense for Roese to be Burrus' supervisor because Roese worked at the Assumption facility. <u>Id.</u> at 117.

Burrus took this change as "bad news", and thought that it signaled that the Great Western management wanted "to weed [him] out of [his] job." <u>Id.</u> Burrus got this impression because Roese reassigned some of Burrus' job tasks to Burrus' subordinates, and assumed some of Burrus' job responsibilities himself. <u>Id.</u> at 118. Roese re-assigned Burrus' responsibilities for doing cycle inventory counts, communicating with incoming trucks, and scheduling loads to Burrus' subordinates. <u>Id.</u> at 118, 123. Roese himself assumed some responsibility for communicating with Burrus' employees. <u>Id.</u> at 118, 156. Roese also assumed responsibility for evaluating Bob Miller, one of Burrus' employees, and gave Miller a raise without telling Burrus. <u>Id.</u> at 119-20. Burrus felt like this action made his employees lose confidence in his leadership, especially because one employee who had previously been promised a raise and benefits did not receive either benefit. <u>Id.</u> at 120-21. Burrus also felt like Roese's actions indicated an attempt to make Burrus look bad in front of his employees,

and make it more difficult for Burrus to do his job.  Id. at 198.

Further, Roese began telling Burrus "how to take care of my product, how to store it, where to put it, [and] where he didn't want it."  Id. at 122. Burrus felt this was an appropriate role for a supervisor to take, but he also felt like Roese's direction took away some of his responsibilities as the Shipping Manager.  Id.  Burrus did not agree with Roese's management style.  Id. at 124.  Roese did not take away Burrus' job title or reduce Burrus' pay.

In January 2003, Burrus told Roese that he wanted to resign due to the stress of his job.  Burrus testified that he was ". . . at a point to where I was literally going nuts.  [But] my family I think would be worth more than my job, but yet I had to have a job.  The pressure was on.  I was just a hateful person to my family."  Id. at 125.  Roese told Burrus that he did not want Burrus to quit, and gave Burrus time off to think about it.  Id. at 126- 28.  At the time, Burrus was also going through a personal bankruptcy.  Id. at 129.  Burrus did return to work after taking some time off.

On February 11, 2003, Roese met with Burrus to discuss Burrus' management of the shipping department.  Roese noted several of Burrus' recent absences, and cited Burrus' leadership of the shipping department.

Roese told Burrus that Burrus' employees had complained about Burrus' management. This was a surprise to Burrus. He testified that he was not aware of any complaints about his performance from his employees. <u>Id.</u> at 195. Roese also asked Burrus for ideas on how to better rotate stock at the Assumption facility, and how to raise the morale of the department. <u>Id.</u> at 142. Roese told Burrus that if Burrus could not raise his employees' morale, then Roese "knew a way to do it." <u>Id.</u> at 199. Burrus interpreted this comment as Roese's intent "[t]o take and put me in a different position maybe, or eliminate me, or give somebody else my position. That's the way I believed it. He had a way of resolving it." <u>Id.</u> Further, Roese told Burrus that Burrus would not receive an anticipated pay raise by being promoted to a salaried position. <u>Plaintiff's Memorandum</u>, <u>Answer to Defendant's Interrogatory</u>, ¶ 19.

Burrus felt like he could not improve his employees' morale due to the "work environment, what they had to deal with." <u>Burrus Dep.</u>, pg. 144. Burrus felt his employees were unhappy because they were overworked. <u>Id.</u> at 189-90, 197. Further, Burrus testified that, "At that point I was having problems of my own. They [Burrus' employees] are not happy. I couldn't bring the morale up. I done the best I could." <u>Id.</u> at 143.

On February 12, 2003, Burrus called Mitsi Klay at the Assumption facility and told her that he'd been up all night thinking about his decision; that he intended to resign because of stress; and that he would return his uniforms the next day. Id. at 147-48. On February 13, 2003, Burrus filled out resignation paperwork. Id. at 151; Exh. 7. He testified that he resigned because, "I figured I was going to be out the door anyway. So, I figured on the record it would be better to resign than get fired for future job applications." Id. at 152. On his resignation paperwork, Burrus checked "Resignation" under "Type of Separation", and "Personal" under "Reason for Resignation." Id., Exh. 7. Roese attested that he accepted Burrus' resignation "because, in light of his two previous resignation attempts, it was apparent that Burrus was struggling with his job and did not desire to remain with the Company." Id., Affidavit of Bob Roese, pg. 2, ¶ 4.

On February 14, 2003, Burrus called Roese and asked if there was another, less stressful position open with Great Western that he could take. Id. at 161. Roese told Burrus that there were no such openings, and that due to Burrus' previous attempts to resign, Great Western was not interested in employing him. Id. Burrus thought Roese's motivation for not re-hiring him after he resigned was not personal, but rather, based on

Roese's belief that someone else might be able to better do the job of Shipping Manager.

> Q.  With respect to Mr. Roese you think it was just personal, is that what you mean?
>
> A.  Personal and hearsay.
>
> Q.  Personal because he didn't like you?
>
> A.  Well, I wouldn't say he didn't like me.  He wanted to make a change.  He got the higher up to do that, and he wanted to make a change.
>
> Q.  . . . Why do you believe he wanted to make a change?
>
> A.  I just believe he thought maybe if he got somebody else in there, that things would be better.
>
> Q.  That's why you think he wanted you out of there?
>
> A.  Yeah.

Id. at 213-14.

When asked who at Great Western had retaliated against him, Burrus identified Roese, as well as two of Burrus' subordinates, shipping employees Bob Miller and Paul Latch.  Id. at 163.  Burrus claimed that Roese retaliated against him because Burrus "couldn't figure out a way to better store . . . items" in the warehouse.  Id. at 164.  When pressed, Burrus admitted that he did not know why Roese did not like him.

18

Q.  Tell me why you believe Mr. Roese wanted you out of the
    company.

A.  His attitude towards me.

Q.  But why, why do you believe Mr. Roese had some reason he
    wanted to retaliate against you?

A.  I don't know.

                              * * *

Q.  You don't know, you don't have any idea why didn't like
    you, do you?

A.  No, I don't know why.  I don't.  Bob never had no reason
    why not to like me.  I couldn't figure it out.

Id. at 166.  Burrus also speculated that Great Western Chief Operating

Officer Allen Mitchell, or Reg Bryant, might have told Roese that they

wanted Burrus out of the company.  Id. at 167.  Burrus testified, however,

that he had no evidence and was simply speculating on that point.  Id. at

167-68.

    In his Complaint, Burrus claims that Great Western's actions leading

up to his resignation constitute the common law tort of retaliatory

constructive discharge, in violation of Illinois law.  He recognizes, however,

that the Illinois Supreme Court, "has criticized the expansion of the tort [of

retaliatory discharge] to include constructive discharge . . ."  Plaintiff's

19

Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment (d/e 16) (Plaintiff's Memorandum), pg. 17.  He argues that the Illinois Supreme Court " . . . has not squarely addressed the issue", and that under the facts of this case, it would find the existence of such a tort.  Id.

Great Western moves the Court to enter summary judgment on the grounds that the tort of retaliatory constructive discharge does not exist under Illinois common law.  In the alternative, Great Western argues that even if such a tort exists, under the agreed facts of this case, Burrus can show neither constructive discharge nor retaliatory discharge.  For the reasons cited, infra, Great Western's Motion for Summary Judgment is allowed.

## ANALYSIS

At summary judgment, the movant must present evidence that demonstrates the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  The Court must consider the evidence presented in the light most favorable to the non-moving party.  Any doubt as to the existence of a genuine issue for trial is resolved against the moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  Once the moving party has produced evidence showing that it is

entitled to summary judgment, the non-moving party must present evidence to show that issues of fact remain.  <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).  When viewed in the light most favorable to Burrus, Great Western is entitled to summary judgment.

I.     <u>RETALIATORY CONSTRUCTIVE DISCHARGE</u>

In his Response to Great Western's Motion for Summary Judgment, Burrus argues that he has presented sufficient facts to state a claim for retaliatory discharge based on his workplace and food safety complaints, with a twist.  Burrus claims that despite the fact that he submitted his own resignation, he did so only because Great Western made his working conditions so intolerable that he had no choice but to resign.

Under Illinois law, an employee is constructively discharged when the employee shows that "'the employer deliberately or intentionally made the employee's working conditions so intolerable that a reasonable person would have felt compelled to resign to escape the intolerable conditions.'"  <u>Propst v. Bitzer</u>, 39 F.3d 148, 154 n.5 (7th Cir. 1994), <u>quoting</u> <u>Dudycz v. City of Chicago</u>, 206 Ill.App.3d 128, 134, 563 N.E.2d 1122, 1126 (Ill. App. 1st Dist., 1990) (citations omitted).  In sum, Burrus argues that Great Western's deliberate or intentional actions, in retaliation for his complaints

about workplace and food safety, made his working conditions so intolerable that any reasonable person would have been compelled to resign.

The problem with Burrus' retaliatory constructive discharge theory, however, is that has not been accepted by the Illinois Supreme Court, and, even if the theory had been accepted, the evidence here (viewed in a light most favorable to Burrus) does not create a genuine issue of fact for trial.[6] In Hartlein v. Illinois Power Co., the Illinois Supreme Court concluded that a temporarily disabled employee could not claim retaliatory constructive discharge because his employer directed him to begin a job search. Hartlein v. Illinois Power Co., 151 Ill.2d 142, 162-63, 601 N.E.2d 720, 730 (Ill. 1992). The Illinois Supreme Court stated, "[w]e further decline to expand the tort of retaliatory discharge, on these facts, to encompass the concept of 'constructive discharge.'" Id.

This decision is in accord with the Illinois Supreme Court's retaliatory discharge jurisprudence. Since first recognizing the tort in Kelsay v. Motorola, Inc., the Illinois Supreme Court "has consistently sought to

_____

[6]In fact, it is doubtful that Illinois courts recognize a common law tort of constructive discharge. Zimmerman v. Buchheit of Sparta, Inc., 164 Ill.2d 29, 39, 645 N.E.2d 877, 882 (Ill. 1994) (noting that "that Illinois courts have refused to accept a 'constructive discharge' concept").

restrict the common law tort of retaliatory discharge."[7]  <u>Fisher v. Lexington</u>

<u>Health Care, Inc.</u>, 188 Ill.2d 455, 467, 722 N.E.2d 1115, 1121 (Ill. 1999);

<u>see also</u> <u>Zimmerman</u>, 164 Ill.2d at 37, 645 N.E.2d at 881 (recounting cases

evidencing the Illinois Supreme Court's "disinclination to expand the tort

of retaliatory discharge").

Further, in the Seventh Circuit's recent evaluation of an employee's

suit for retaliatory discharge based on his indefinite suspension, it concluded

that the Illinois Supreme Court "'has thus far declined to recognize a cause

of action for retaliatory constructive discharge.'"  <u>Thomas v. Guardsmark,</u>

<u>Inc.</u>, 381 F.3d 701, 708 (7th Cir. 2004), <u>quoting</u> <u>Fisher</u>, 188 Ill.2d at 468,

722 N.E.2d at 1121.[8]  The Seventh Circuit held that ". . . only an <u>actual</u>

termination can support an employee's retaliatory discharge claim under

Illinois law."  <u>Thomas</u>, 381 F.3d at 707 (emphasis in the original).

_____

[7]<u>Kelsay v. Motorola, Inc.</u>, 74 Ill.2d 172, 185, 384 N.E.2d 353, 358-59 (Ill. 1978).
In <u>Kelsay</u>, the Illinois Supreme Court recognized the common law tort of retaliatory
discharge for an employee who was discharged after trying to access worker's
compensation benefits through the Illinois Workmen's Compensation Act.  In <u>Palmateer
v. Int'l Harvester Co.</u>, the Illinois Supreme Court extended the tort to an employee who
was discharged for cooperating with a criminal investigation against a fellow employee.
<u>Palmateer v. Int'l Harvester Co.</u>, 85 Ill.2d 124, 421 N.E.2d 876 (Ill. 1981).  In <u>Barr v.
Kelso-Burnett Co.</u>, however, the Illinois Supreme Court reaffirmed that the tort would
be limited to plaintiffs whose discharge violated ". . . a clearly mandated public policy."
<u>Barr v. Kelso-Burnett Co.</u>, 106 Ill.2d 520, 525, 478 N.E.2d 1354, 1356 (Ill. 1985).

[8]The Seventh Circuit's opinion in <u>Thomas</u> was issued August 27, 2004.  <u>Id.</u>

Accordingly, this Court finds that there is no cause of action for retaliatory constructive discharge under Illinois law. Therefore, Great Western's Motion for Summary Judgment must be allowed, unless Burrus has presented sufficient evidence to create a factual issue on a claim of retaliatory discharge under Illinois common law.

II.    RETALIATORY DISCHARGE

In Illinois, an employer may discharge an employee-at-will "'for any reason or for no reason . . . except for when the discharge violates a clearly mandated public policy.'" Buckner v. Atl. Plant Maint., Inc., 182 Ill.2d 12, 19, 694 N.E.2d 565, 569 (Ill. 1998), quoting Barr, 106 Ill.2d at 525, 478 N.E.2d at 1356. In order to state a claim under this exception to the general rule, a plaintiff must allege: " . . . 'that she was (1) discharged; (2) in retaliation for her activities; and (3) that the discharge violates a clear mandate of public policy.'" Thomas, 381 F.3d at 707, quoting Zimmerman, 164 Ill.2d at 35, 645 N.E.2d at 880 (internal quotation marks omitted). Great Western's Motion for Summary Judgment must be allowed because Burrus can satisfy neither of the first two elements of the tort.

A.    DISCHARGE

"Discharge" has been defined by Illinois courts as meaning ". . . the

24

release, dismissal, or termination of an employee." <u>Welsh v.</u> <u>Commonwealth Edison Co.</u>, 306 Ill.App.3d 148, 152, 713 N.E.2d 679, 683 (Ill. App. 1st Dist., 1999), <u>citing</u> <u>Webster's Third New International</u> <u>Dictionary</u> 644 (1993); <u>Black's Law Dictionary</u> 463 (6th ed. 1990). Burrus cannot show actual discharge. Further, even if the Court assumes, <u>arguendo</u>, that a cause of action for retaliatory constructive discharge does exist in Illinois, Burrus has not presented sufficient evidence to create an issue of fact as to whether he was constructively discharged.

      1.   <u>Actual Discharge</u>

In <u>Thomas</u>, the Seventh Circuit concluded that ". . . only an <u>actual</u> termination can support an employee's retaliatory discharge claim under Illinois law." <u>Thomas</u>, 381 F.3d at 707. Further, discharge has been defined by Illinois courts as "the release, dismissal, or termination of an employee." <u>Welsh</u>, 306 Ill.App.3d at 152, 713 N.E.2d at 683, <u>citing</u> <u>Webster's Third New International Dictionary</u> 644 (1993); <u>Black's Law</u> <u>Dictionary</u> 463 (6th ed. 1990).

It is undisputed that Burrus filed his own resignation. On February 12, 2003, Burrus called Mitsi Klay at the Assumption facility and told her that he had been up all night thinking about his decision; that he intended

to resign because of stress; and that he would bring in his uniforms the next day.  Burrus Dep. at 147-48.  On February 13, 2003, Burrus filled out resignation paperwork.  Id. at 151; Exh. 7.  He testified that he resigned because, "I figured I was going to be out the door anyway.  So, I figured on the record it would be better to resign than get fired for future job applications."  Id. at 152.  On his resignation paperwork, Burrus checked "Resignation" under "Type of Separation", and "Personal" under "Reason for Resignation."  Id., Exh. 7.  Roese attested that he accepted Burrus' resignation "because, in light of his two previous resignation attempts, it was apparent that Burrus was struggling with his job and did not desire to remain with the Company."  Id., Affidavit of Bob Roese, pg. 2, ¶ 4. Therefore, Burrus cannot show that he was actually discharged.

### 2.    Constructive Discharge

As stated, supra, constructive discharge may occur if "'the employer deliberately or intentionally made the employee's working conditions so intolerable that a reasonable person would have felt compelled to resign to escape the intolerable conditions.'"  Propst, 39 F.3d at 154 n.5, quoting Dudycz, 206 Ill.App.3d at 134, 563 N.E.2d at 1126 (citations omitted).  An employee cannot claim constructive discharge, however, just because an

employer expressed displeasure with the employee's job performance. <u>Henn v. Nat'l Geographic Soc.</u>, 819 F.2d 824, 830 (7th Cir. 1987) (finding that salespeople who were told that they were not meeting their sales quotas had no claim for constructive discharge).

Burrus argues that he suffered constructive discharge due to the following workplace conditions: (1) at some point between September 2002 and January 2003, Bryant told him that he should have been fired for going outside the chain of command by talking with Great Western President Scott Martin about Uphoff's popcorn management practices; (2) Bryant's December Review statistic, averring that Great Western had received 169 customer complaints regarding shipments from the Assumption facility, of which Trish Hardick later attributed six or seven to Burrus; (3) Roese's re-assignment of some of Burrus' job duties to Burrus' subordinates, and assumption of other duties himself; (4) Roese's actions that Burrus interpreted as attempts to make him look bad in front of his employees, make it more difficult to do his job, and lead his subordinates to believe Bob Miller was going to replace him; (5) Roese's comment on February 11, 2003, which Burrus interpreted as a threat that he would be fired unless he raised his employees' morale; and (6) Roese's failure to give Burrus an

27

anticipated pay raise through promotion to a salaried position.

Burrus was not constructively discharged. As an initial matter, underlying all the events described above was Burrus' long-standing issue with workplace-related stress, for which he sought medical attention and medication, and his own personal financial difficulties–not all of Burrus' workplace-related stress can be attributed to Great Western's actions. Burrus Dep., Exh. 8; Burrus Dep., pg. 125. Burrus also ignores Great Western's July 2002 and January 2003 grants of temporary leave to help him alleviate his stress. Burrus Dep., pgs. 19, 126-28. During both periods, Great Western Managers told Burrus that they did not want him to quit and encouraged him to return to work after taking time off to alleviate his stress. Id. In addition, after receiving the unfavorable December Review from Bryant, Roese collaborated with Burrus to develop the shipping and receiving evaluation forms to help Burrus meet Bryant's higher expectations. Id. at 116. Rather than demonstrating a deliberate attempt to drive him into resigning, Great Western's actions suggest a desire to help Burrus work through his problems.

In addition, the factors Burrus claims were intolerable were actually unfavorable feedback related to his job performance, which employees can

28

expect in any job.  Bryant told Burrus that going outside the chain of command was an offense that could lead to termination–but did not fire Burrus at the time.  Effectively, Bryant's statement was a warning to Burrus not to violate the chain of command again.  Such a statement would not cause a reasonable employee to feel compelled to resign.

Burrus makes much of the fact that Trish Hardick only attributed six or seven customer complaints to Burrus himself, thereby attempting to cast some doubt on the veracity of the 169 customer complaints Bryant claimed in Burrus' December Review.  In the December Review, however, Bryant stated, "Since August 2002 Great Western Products has received 169 customer complaints concerning shipments received from [the] Assumption [facility]."  Burrus Dep., Exh. 1, December Review, pg. 1 (emphasis added).  The December Review does not claim that Burrus himself caused all 169 complaints.  Rather, it puts Burrus on notice, as the Shipping Manager, that his facility as a whole was not performing at an acceptable level of customer service.

Burrus also complains that Roese re-assigned some of his job responsibilities to subordinates, and assumed others for himself.  But Roese did not change Burrus' job title or reduce his pay, and Burrus testified that

29

there was more work at the Assumption facility in general, increasing everyone's responsibilities.  Id. at 211.  Roese made it clear on February 11, 2003, that Burrus needed to improve both the rotation of stock and his employees' morale.  As the Shipping Manager, both those functions were his responsibilities, and it was within Roese's rights as Burrus' supervisor to put him on notice as to those areas.  In fact, Burrus testified, "I just believe [Roese] thought maybe if he got somebody else in there, that things would be better."  Id. at 214.  Finally, as to Burrus' anticipated pay raise and promotion to a salaried position, Great Western's failure to follow through does not suggest constructive discharge.

These work conditions are in contrast to situations where Illinois courts have found constructive discharge, such as E.E.O.C. v. Univ. of Chicago Hospitals.  E.E.O.C. v. Univ. of Chicago Hospitals, 276 F.3d 326 (7th Cir. 2002).  In E.E.O.C. v. Univ. of Chicago Hospitals, the plaintiff returned from vacation to find all of her belongings packed and her office used for storage.  The Seventh Circuit found that fact to be of the most significance in finding that if she had not resigned, she would have been terminated.  Id. at 332.  In the present case, however, nothing so dramatic was done to Burrus.

Burrus also cites <u>Henn v. Nat'l Geographic Soc.</u> for the principle that employees who are told that they are unwanted, will receive no additional raises, and have no future with the company were working in intolerable conditions sufficient to support a claim of constructive discharge.  <u>Henn</u>, 819 F.2d at 829-30.  Burrus misreads <u>Henn</u>.  In fact, <u>Henn</u> states that an employer is free to communicate displeasure at an employee's job performance when it declines.  The Seventh Circuit wrote:

> The district court properly concluded that salesmen must endure adverse reactions and other signs of displeasure when their productivity falls off.  An employer's communication of the risks of the job does not spoil the employee's decision to avoid those risks by quitting.  Were it otherwise, any employee about whom there was dissatisfaction would have a jury case under the ADEA, even if the dissatisfaction were supported by objective indicators (such as low productivity).

<u>Id.</u> at 830.  Supervisors like Burrus bear a similar risk of incurring an employer's dissatisfaction should their unit not perform as desired.  The circumstances Burrus encountered were not sufficient to cause a reasonable employee to feel compelled to resign.  Burrus was not constructively discharged.

B.    <u>RETALIATORY ANIMUS</u>

Burrus has also not presented evidence of the second element of a

retaliatory discharge claim, that he was the subject of retaliatory animus. Burrus claims that he opposed Great Western's food handling practices involving popcorn, jalapeño peppers, and cheese. As to the popcorn, Burrus states that the original order to fumigate the September 2002 weevil-infested shipment of popcorn came from Tony Wheeler, Shipping Manager for the Hollywood, Alabama, headquarters of Great Western. Burrus Dep., pgs. 42-43. While the Assumption facility Plant Manager, Phil Uphoff, ordered Burrus to re-ship the popcorn without fumigating it, Uphoff was the only Great Western Manager that took that position. Bryant and Roese, Burrus' supervisors for the period relevant to this incident, both agreed that the popcorn needed to be fumigated. Id. at 49, 70. Further, Bryant told Burrus that Burrus "didn't need to worry about that, and that Phil [Uphoff] better go with the procedure on that part, and get the corn fumigated, and make it right." Id. at 48-49. Burrus testified that he had no reason to believe that Roese wanted to retaliate against him for raising an issue regarding the contaminated popcorn. Id. at 211. Finally, the popcorn incident occurred in September 2002, five months before Burrus resigned. "A substantial time lapse between the protected activity and the adverse employment action 'is counter-evidence of any causal connection.'"

<u>Filipovic v. K & R Exp. Systems, Inc.</u>, 176 F.3d 390, 399 (7th Cir. 1999) (finding that a four-month lag between plaintiff's filing of EEOC complaint and termination was too attenuated to serve as prima facie evidence of retaliatory animus). Accordingly, the popcorn incident is too attenuated to serve as evidence of retaliatory animus.

As to the jalapeño peppers, it appears that Burrus agreed with all the precautionary steps taken by Great Western management to mitigate the problems caused by the loose jar lids. <u>Burrus Dep.</u>, pgs. 74-75. Burrus was ordered not to ship any "bad pallet[s] of peppers." <u>Id.</u> at 74. It seems that Burrus' primary objection is that he and his employees were upset that they had to do extra work to check the jalapeño pepper lids to make sure they were secure despite having reported the problem to Great Western's purchasing agent Rocky Franklin. <u>Id.</u> at 75-76. Burrus testified that he had no reason to think Roese wanted to retaliate against him regarding the jalapeño peppers. <u>Id.</u> at 213. Further, Burrus did not establish when in time this incident occurred. Accordingly, its mere proximity to his resignation cannot serve as evidence of retaliatory animus.

As to the expiring cheese, Burrus testified that he never told Franklin, Roese, or Bryant of his intentions not to re-label the cheese, if he should

ever receive new expiration labels.  <u>Id.</u> at 83-86.  Burrus testified that he had no reason to think Roese wanted to retaliate against him for anything related to the expiring cheese.  <u>Id.</u> at 213.  Further, the cheese incident occurred in November 2002, approximately four months before Burrus' resignation.  Accordingly, it cannot serve as evidence of retaliatory animus. <u>Filipovic</u>, 176 F.3d at 399.

Burrus also claims that an OSHA complaint was filed shortly after he raised concerns about workplace safety at the Assumption facility.  Yet Burrus has not presented evidence that Great Western management was opposed to making the repairs Burrus suggested, or that Great Western management thought he was the OSHA complainant.  Burrus testified that he talked with Bryant about problems with the storage rack welds, and that Bryant told him to get the racks fixed.  <u>Burrus Dep.</u>, pgs. 91-92.  Burrus explained that he obtained quotes to repair the racks in November 2002. <u>Id.</u> 192-93, 206-08.  Burrus offers no explanation, however, why the racks had not yet been fixed by December 26, 2002, when Roese received notice of reported safety issues, including problems with the storage racks.  Burrus also testified that ultimately it was Roese who had a local welder come in to repair the racks.  <u>Id.</u> at 92.  Further, Burrus testified that he thought that

"folks" at the Assumption facility might have thought that he had been the

OSHA complainant.  Id. at 200.

> Q. Did you ever have a belief that the folks at Great Western
> suspected you were the individual who wrote the letter to
> OSHA?
>
> ***
>
> A. To a certain extent, yeah, I do, I really do.  Like the
> complaints on the chemicals on the grain bins, like me
> putting the corn in the trailer that's being gassed with fox
> toxin when I ain't certified to do that.
>
> Q. Do you believe the folks at Great Western wanted you out
> because they believed that you might have been the person
> who turned them into OSHA?
>
> ***
>
> A. Not the Hollywood branch, but I believe the Assumption.

Id.  Burrus does not establish, as he must, that it was Great Western

management who thought he was the OSHA complainant, not just "folks."

Accordingly, the OSHA complaint cannot serve as evidence of retaliatory

animus, despite its temporal proximity to Burrus' resignation.

## CONCLUSION

THEREFORE, for the reasons stated above, Defendant Great Western

Products Company, Inc.'s Motion for Summary Judgment (d/e 15), is

35

ALLOWED.  This case is closed.

IT IS THEREFORE SO ORDERED.

ENTER:   January 7, 2005.

FOR THE COURT:

_____s/  Jeanne E. Scott_____
JEANNE E. SCOTT
UNITED STATES DISTRICT JUDGE